# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

Case No.: 3:24-cv-01151-X

Dallas Food and Beverage, LLC; 2345 Meacham, LLC; 11000 Reeder, LLC; Gold Club – S.F., LLC; S.A.W. Entertainment Limited; Smithville Bistro, LLC; Deja Vu Showgirls of Las Vegas, LLC; Office Minneapolis, LLC; Cats Meow of Vegas, LLC; Cats 701 Bourbon, LLC; Pole Position at Tacoma, LLC; Jamme Holdings, LLC; 90's Minneapolis, LLC; Las Vegas Bistro, LLC; Stockton Enterprises, LLC,

        Plaintiffs,

v.

United States Small Business Administration; Isabel Casillas Guzman, in her Official Capacity as Administrator of the Small Business Administration; United States Of America; the Small Business Administration Office of Hearings and Appeals; Kimberly McLeod, in her Official Capacities as the Assistant Administrator and Chief Hearing Officer of the Office of Hearings and Appeals; and the United States of America,

        Defendants.

**PLAINTIFFS' VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; ATTORNEY'S FEES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT; AND JUDICIAL REVIEW OF FINAL AGENCY ACTION**

NOW COME Plaintiffs, by and through counsel, and for their verified first amended complaint against the Defendants allege as follows:

## INTRODUCTION AND SUMMARY

1. The Plaintiffs to this action are non-public businesses that are specifically identified and defined below, and the Defendants are governmental actors, also defined below, that are tasked with administering the Paycheck Protection Program ("PPP") enacted to address the national financial fallout of the COVID-19 pandemic (the "Pandemic"). The current disputes among *these* parties arise under the loan programs set up by the PPP.

1

2.      Congress initially created the PPP as part of the Coronavirus, Aid, Relief, and Economic Security Act, Pub. L. 116-136 (2020) (the "CARES Act"). Through the CARES Act and the subsequent Consolidated Appropriations Act, 2021, Pub. L. 116-260, § 311 (2020), which Congress referred to as the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "Appropriations Act" or "EAA"), the PPP ultimately set up two series of loan programs (now referred to as "first draw" and "second draw" loans). These programs authorized certain banks, specifically approved by the United States Small Business Administration ("SBA"), to issue loans under the PPP that would be guaranteed by the SBA. The first and second draw loan programs were then further amended via the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. 117-2, § 5001 (Mar. 11, 2021). The authorized banks that issued PPP loans to these Plaintiffs are referred to hereinafter as the "Lending Banks."

3.      In this action, Plaintiffs seek, among other things, both declaratory and injunctive relief to bring to an end the Defendants' continued, apparently never-ending, and now clearly escalating, harassment and retaliation—through vindictive, retaliatory, unlawful and unconstitutional means delineated in *exhaustive* detail below and documented through voluminous attached exhibits—of the Plaintiffs and others that the SBA *perceives* to be "affiliated" with them; most but not all of which engage in, present, and/or permit, one or more forms of lawful entertainment protected under the First Amendment to the United States Constitution (including such noncontroversial forms of entertainment as karaoke bars).

4.      The actions of the Defendants have caused, continue to cause, and/or will cause, as applicable, these Plaintiffs and certain businesses associated with them to: A) needlessly incur *exorbitant* sums of money in the form of attorneys' fees, accountants' fees, and other professional fees in responding to the actions of the Defendants; B) needlessly devote countless hours of their

staffs' time in attempting to respond to voluminous and ever-changing requests and positions of the Defendants as they exhaustingly seek out a viable course of conduct to financially ruin these Plaintiffs in a manner that could be legally defended (where the SBA often demands documents that a particular Plaintiff simply does not possess and does not have the legal authority to acquire); and C) pay back loans that, according to the law, should be forgiven since they were fully approved, lawfully obtained, and the proceeds thereof were used in strict accordance with statutory requirements. In addition, as detailed shortly below, the Defendants have threatened a number of the Plaintiffs, *as well as their Lending Banks*, with both civil and criminal investigation if the Plaintiffs don't fully bend to every demand--as unreasonable, outrageous, and legally deficient as it may be--of the Defendants.

5.      Pursuant to 15 U.S.C. § 636(a)(36)(F)(i)(I) – (XI) and 15 U.S.C. § 636(a)(37)(J)(iii)(I) – (VIII) of the PPP, loans were to be used for, and forgiveness of such loans was to be granted by the Lending Bank and/or SBA if the loaned funds were specifically expended upon, among other things, payroll costs, certain group health care benefits, rent, mortgage interest, utility bills, interest on other pre-Pandemic debt, personal protective equipment, and covered supplier costs (collectively, the "Permitted Uses"). If the loan is forgiven, the SBA then makes the Lending Bank whole.

6.      All of the Plaintiffs had their PPP loans *approved* by their Lending Banks and/or the SBA (the "Loans"); received the full funds under those Loans (the "Loan Proceeds"); and used the amount requested via their loan forgiveness applications for the purposes specified in the PPP and in their loan documents (although a number of the Plaintiffs have actually returned a portion of their Loan Proceeds because they were unable, as a result of governmentally ordered business shutdowns arising from the Pandemic, to fully utilize such funds for the Permitted Uses).

7.      Now, however, the SBA has, for some of the Plaintiffs, denied forgiveness of the Loans through the issuance of what is known as a Final Loan Review Decision (hereinafter "FLRD," or "Denial Letter"); for other Plaintiffs, the SBA has denied forgiveness of the Loans but has, at least temporarily, suspended such a determination pending "further investigation" *after* those Plaintiffs filed formal administrative appeals in the SBA's Office of Hearings and Appeals ("OHA") of the FLRDs issued to those Plaintiffs and needlessly expended tens of thousands of dollars in professional fees in doing so; for other Plaintiffs the SBA has done the same thing and has now issued "new and improved" Denial Letters triggering the requirement of those Plaintiffs to file yet a second administrative appeal in the OHA; and for yet other Plaintiffs that have not only received PPP Loans but have also obtained *forgiveness* of such Loans, the SBA has recently initiated audits, or what the SBA refers to as "Post-Payment Reviews," of such Plaintiffs purportedly to "re-examine" the question of whether they were eligible for the Loans in the first place.

8.      The OHA proceedings, in which many of these Plaintiffs have been compelled to participate, are nothing short of a mockery of due process. It is no exaggeration to state that, with the exception of motions to extend deadlines, all contested motions filed by the Plaintiffs in the OHA have been denied, and all contested motions filed by the SBA have been granted. But the OHA normally does not even wait until receipt of the SBA's response to a Plaintiff's motion before ruling; rather, such Plaintiff motions are usually denied *within hours* of filing. And, contested motions filed by the SBA in the OHA have been granted *within <u>one minute</u> of the filing of the motion by the SBA*.

9.      In regard to the audits, or Post-Payment Reviews, some Plaintiffs have been informed by their Lending Bank that the SBA is "considering a full denial" of such Loans.

10.    If Loan forgiveness is denied, the Plaintiff is then required to pay the Loan Proceeds back to its Lending Bank. However, and simply put, having used the Loan Proceeds in strict accordance with the PPP (only for the Permitted Uses for the amounts requested to be forgiven), Plaintiffs are no longer in possession of the Loans Proceeds and have no lawful way to recover them in order to be able to pay them back—as demanded by the SBA—to their Lending Banks. The Loan Proceeds are, quite literally, in the hands of the Plaintiffs' employees, utility providers, landlords, and the like.

11.    In addition to denying or threatening to deny Loan Forgiveness, some Plaintiffs have been told through communication from the SBA to the Plaintiffs' Lending Banks that the failure to provide each and every item of the voluminous materials requested by the SBA (unnecessary for the reasons set forth herein) "may include referral to the Office of Credit Management and/or transfer of this matter (borrower and lender) to the Office of Inspector General." [**Exhibit A** (exemplar letter received by Plaintiff Office Minneapolis, LLC; clarification in original)]. As such, the SBA is now not just threatening the Plaintiffs, but it is *also threatening the Plaintiffs' Lending Banks as well* and in doing so, in certain circumstances, is also compromising the ongoing business relationship that a number of the Plaintiffs have with their Lending Banks and associated financial institutions.

12.    In addition, as further evidence of the vindictive, harassing, discriminatory, and retaliatory nature of the SBA's treatment of these Plaintiffs and those that the Defendants believe to be "affiliated" with them, the SBA initiated, shortly before the filing of this suit, an investigation of a number of these Plaintiffs and certain others that the Defendants believe to be "affiliated" with them in regard to funds that such businesses received, *as part of a federal court <u>settlement</u> following the initiation of litigation against some of these same Defendants for similar types of*

*misconduct*, under another Pandemic-related funding program administered by the SBA (the Restaurant Revitalization Fund; "RRF"). These latest actions will likely be the subject of a separate proceeding in *that* federal court.

13.  The SBA's actions in denying Loan forgiveness of the Plaintiffs or, where forgiveness has already been granted, in commencing audits to "re-examine" the question of Loan eligibility, are purportedly based upon, directly or indirectly, *either or both* of what Plaintiffs will refer to herein as the Regulation" found at 13 C.F.R. § 120.110(p), or the "Affiliation Rules" found at 13 C.F.R. § 121.101, 13 C.F.R. § 121.103; 13 C.F.R. § 121.201, 13 C.F.R. § 121.301. Both the Prurience Regulation and the Affiliation Rules are at issue before this Court on claims asserted here by Plaintiffs that are located in the Northern District of Texas.

14.  The dispute concerning the Prurience Regulation involves the question of whether certain of the Plaintiffs present forms of entertainment, or sell products, of a "prurient sexual nature." The SBA contends that such businesses are not eligible for PPP loans under 13 C.F.R. § 121.110(p).

15.  The dispute regarding the Affiliation Rules revolves around the question of whether the Plaintiffs are what the PPP refers to as "NAICS code 72" businesses (including food and alcoholic beverage establishments, such as bars, taverns, restaurants, nightclubs, and discotheques). Such companies or "business concerns" are exempt, under the PPP pursuant to 15 U.S.C. § 636(a)(36)(D)(iii)(I) and 15 U.S.C. § 636(a)(36)(D)(iv)(I) for first draw loans and 15 U.S.C. § 636(a)(37)(D) and (E) for second draw loans (collectively, the "Affiliation Exception Provisions"), from the "normal" Affiliation Rules used by the SBA to determine whether a business, together with entities that the SBA contends are "related" to it, is "too big" to receive funding under certain of its loan and grant programs.

16.     "NAICS" stands for the North American Industry Classification System, which was jointly developed by the Office of Management and Budget, the U.S. Economic Classification Policy Committee, Statistics Canada, and Mexico's Instituto Nacional de Estadistica y Geografia. The NAICS is currently maintained by the United States Census Bureau, with its website providing the latest information, (https://www.census.gov/naics/?99967 (last visited July 13, 2024)).

17.     The NAICS is used for various statistical purposes by certain agencies of the federal government. The Census Bureau is one such agency. The Internal Revenue Service ("IRS") also indirectly, and as is relevant to the circumstances of a number of the Plaintiffs here for the reasons discussed below, references them (albeit, also discussed hereinafter, with some differences).

18.     All Plaintiffs are licensed bars, and/or restaurants, and/or taverns, and/or nightclubs, and are therefore, for PPP purposes, NAICS code 72 businesses.

19.     In addition to the Prurience Regulation and the Affiliation Rules, the SBA has, in a number of their "audits" and as a purely pretextual matter in an effort to run up the Plaintiffs' costs and to have them needlessly expend staff time and effort on unnecessary and extraneous matters, demanded that certain Plaintiffs immediately produce documentation to: A) verify that it indeed suffered a specified 25% reduction in aggregated gross receipts (that being an eligibility prerequisite for second draw PPP loans; *see generally* 5 U.S.C. § 636(a)(37)(A)(iv)(I)); and B) to permit the SBA to be able to calculate the original loan amount or forgiveness amount (the SBA claiming that for the latter Plaintiffs, "sufficient documentation" had not been previously produced *even those such Loans had been approved <u>and forgiven</u>*).

20.     All Plaintiffs applying for and receiving second draw PPP loans suffered the statutory requisite 25% reduction in aggregated gross receipts in order to qualify for such second draw PPP loans.

21.     All Plaintiffs have sufficient and proper documentation to document the original amount of their requested PPP Loans and the amounts thereof sought to be forgiven.

22.     As a result of the above and as further described in detail below, Plaintiffs challenge here as being unconstitutional under the First and Fifth Amendments to the United States Constitution: A) both facially and as applied by the Defendants to these Plaintiffs, the Prurience Regulation (already enjoined by, among other courts, the Southern District of Texas); B) the manner in which the Defendants are applying the Affiliation Exception Provisions to these Plaintiffs; C) both facially and as applied by the Defendants to these Plaintiffs, the Affiliation Rules; and D) both facially and as applied by the Defendants to these Plaintiffs, the rules of the OHA, as discussed and defined, *infra*, *that apply specifically and exclusively to appeals emanating from PPP matters*,[1] which include such stellar cornerstones of due process as, among other things, denying any and all forms of discovery whatsoever (13 C.F.R. § 134.1209(b)), while permitting SBA to "supplement" the administrative record at any time; requiring the appellant to file its appeal brief *before* it has even had an opportunity to *view* the "administrative record" that the SBA purports to have relied on in issuing the FLRD that is the subject of the appeal so that the appellant may respond accordingly (but which it is not even entitled to do as a matter of right) (13 C.F.R. §§ 134.1202, 134.1207); precluding any form of hearing or oral argument whatsoever to occur on the appeal (13 C.F.R. § 134.1209(b)); precluding the award of attorneys' fees and costs under the Equal Access to Justice Act (5 U.S.C. § 504 & 28 U.S.C. § 2412) to appellants if otherwise eligible under that Act (13 C.F.R. § 134.1213); and permitting the SBA to "submit" administrative records to the OHA for *its* consideration of the appeal that have been so heavily *redacted* that the appellant cannot

---

[1] Plaintiffs do *not* challenge the "normal" appellate rules of the OHA that apply to all other appeals except for PPP matters. Those, in contrast to the rules challenged here that pertain *only* to PPP decisions, actually provide some semblance of due process.

in the OHA proceeding fully understand and respond (even if permitted, in the complete and absolute discretion of the OHA) to the supposed reasoning of the SBA in denying loan or forgiveness eligibility—and thereby significantly limiting the Plaintiffs' ability to later adjudicate such claims in a court of law. Plaintiffs also challenge the legality of the SBA having enacted the various challenged regulations and, based upon the extremely egregious conduct by the Defendants as detailed herein, the anti-injunction provisions of 15 U.S.C. § 634(b)(1) as uniquely construed by the Fifth Circuit.

23.    The consequences of Defendants' unlawful and unconstitutional actions have now reached the point where a number of these Plaintiffs are—and more will be if the Defendants are not stopped—on the precipice of financial ruin, which could result in the closure of such Plaintiffs' businesses and, for a number of the Plaintiffs, the cessation of the presentation of, and the ability of the adult public to view and participate in, constitutionally protected entertainment.

24.    The matters set forth in the paragraph immediately above, together with the threats by the SBA to the Plaintiffs and to the Lending Banks to forward these disputes to the Office of Credit Management and/or the Office of Inspector General for "further handling," and particularly in context of the sovereign immunity from claims for damages enjoyed by the Defendants, undeniably constitutes immediate and irreparable harm being suffered by these Plaintiffs. This harassment, targeting, and retaliation, resulting from the admitted disdain (detailed herein) that a certain senior representative of the SBA has for the nature of the entertainment presented by *some* of the Plaintiffs, continues up to the date of the filing of this action and must be stopped. Given the egregious conduct of the Defendants as detailed herein, Defendants and their agents, as public officials, cannot be presumed to be properly discharging or to have been properly discharging their official duties. United States v. Mezzanatto, 513 U.S. 196, 210 (1995).

25.     Plaintiffs have contacted, through the undersigned attorneys, legal counsel from the Department of Justice ("DOJ") who had previously represented the SBA in numerous other lawsuits and disputes between the clients of the undersigned firm and the SBA informing him of the actions summarized above and as described in exhaustive detail below, but the unlawful and unconstitutional actions of the SBA continue unabated.[2]

26.     In fact, following the transmission of correspondence from the undersigned attorneys to (at least previous) legal counsel for the SBA as discussed in the paragraph immediately above, not only did the SBA commence the "review" of the settlement proceeds paid by the SBA under the RRF program discussed in paragraph 12 above, but its actions in initiating "audits" of the clients of the undersigned firm in order to "re-examine" loan eligibility or the use of Loan Proceeds increased *precipitously*. As the undersigned attorneys had been drafting the original complaint in this action, scores of new "audits" of their clients, as well as other businesses that the SBA apparently contends are somehow related to or tainted by them, had been initiated by the SBA.

27.     As a result of the matters set forth in the paragraph immediately above, the current list of Plaintiffs identified in this action is merely representative of those businesses affected by unconstitutional and illegal actions of the Defendants detailed herein, with the Plaintiff list to increase as time permits amendments to these pleadings. Nevertheless, given the cascading actions of the Defendants, the filing of this lawsuit at this time is necessary in order to permit Plaintiffs

---

[2] Plaintiffs do not attribute, in any way, the failure of SBA to conform its actions with the law and/or the U.S. Constitution to the actions or inactions of the aforementioned DOJ attorney; rather, as repeated herein, Plaintiffs attribute it exclusively and directly to the SBA and, in particular, to one of its senior officials with a stated animus towards the form of the constitutionally protected entertainment *some* of the Plaintiffs present.

the opportunity to seek and obtain preliminary injunctive relief and/or accelerated declaratory judgment.

## JURISDICTION AND VENUE

28.    Jurisdiction is conferred on this Court for the resolution of the substantial constitutional questions presented herein by virtue of 28 U.S.C. § 1331; 28 U.S.C. § 1343(a)(1), (3), and (4); 28 U.S.C. § 1346(a)(2); 28 U.S.C. § 1361; and 28 U.S.C. § 2201.

29.    Jurisdiction is conferred on this Court for resolution of all relevant questions of law, the interpretation of constitutional and statutory provisions, the determination of the meaning or applicability of the terms of the SBA's actions as discussed herein, and over Plaintiffs' facial and as applied challenges to the SBA's regulations, by virtue of 5 U.S.C. §§ 702 and 706.

30.    Jurisdiction is conferred on this Court for Plaintiffs' claim(s) for attorneys fees and costs by virtue of 5 U.S.C. § 504 and 28 U.S.C. § 2412.

31.    Jurisdiction is also proper under 15 U.S.C. § 634(b)(1).

32.    No other action, civil or criminal, is pending in any state court involving the Plaintiffs regarding the activities and events discussed herein.

33.    Plaintiff Gold Club – S.F., LLC, and any other Plaintiff that receives a final decision from the OHA regarding their PPP loan forgiveness application, is entitled to judicial review of SBA and the OHA's decision. 13 C.F.R. § 134.1201(d); 13 C.F.R. § 134.1211(g).

34.    This suit is authorized by law to redress deprivations of rights, privileges, and immunities secured by the First and Fifth Amendments to the United States Constitution.

35.    Pursuant to 28 U.S.C. § 1391(e), venue in this Court is appropriate because Plaintiffs Dallas Food & Beverage, LLC, 2345 Meacham, LLC, and 11000 Reeder, LLC are located in the Northern District of Texas; the Small Business Administration operates in the

Northern District of Texas; and the injury complained of and acts causing the injury have occurred and will continue to occur in the Northern District of Texas.

36.     Venue in this Court is appropriate for all Plaintiffs because Plaintiffs Dallas Food & Beverage, LLC, 2345 Meacham, LLC, and 11000 Reeder, LLC, are located in the Northern District of Texas. *E.g.*, Crane v. Napolitano, 920 F. Supp. 2d 724, 746 (N.D. Tex. 2013) ("Because Plaintiff Engle resides in the Northern District of Texas, venue is proper in this district as to all plaintiffs."), aff'd sub nom. Crane v. Johnson, 783 F.3d 244 (5th Cir. 2015); E. Texas Baptist Univ. v. Sebelius, No. CIV.A. H-12-3009, 2013 WL 4678016, at *7 (S.D. Tex. Aug. 30, 2013) (noting that the "only view adopted by the federal courts since 1971" is that "§ 1391(e)(1) [] provide[s] venue to all plaintiffs as long as one plaintiff resides in the district"); Exxon Corp. v. F.T.C., 588 F.2d 895, 899 (3d Cir. 1978) ("There is no requirement that all plaintiffs reside in the forum district.").

37.     In addition, the claims of all Plaintiffs should be heard in this single action because: A) as a result of the financial hardships caused by the Pandemic and the actions of the Defendants detailed herein, a number of the Plaintiffs would not be able to financially afford to fund separate litigation predicated upon its individual circumstances; and B) individual lawsuits, which would be based upon the same facts, circumstances and law, and in particular the SBA's contention that many of these Plaintiffs are part of the same "affiliation group" as discussed herein, could result in inconsistent decisions that would compound the violations of Plaintiffs' constitutional rights.

<u>**THE PARTIES**</u>

*Plaintiffs*

38.     Plaintiff Dallas Food and Beverage, LLC ("Dallas Food and Beverage"), is a Texas Limited Liability Company duly organized and authorized to conduct business in the State of

Texas. Dallas Food and Beverage does business as Bucks Cabaret at 2150 California Crossing Rd. in Dallas, Texas. These addresses will be referred to below as Dallas Food and Beverage's "physical location."

39.    Plaintiff 2345 Meacham, LLC ("Meacham") is a Limited Liability Company duly organized and licensed to do business in the State of Texas. Meacham does business as Buck's Cabaret at 2345 Meacham Blvd, Fort Worth, Texas 76106. This address will be referred to below as Meacham's "physical location."

40.    Plaintiff 1100 Reeder, LLC ("Reeder") is a Texas Limited Liability Company duly organized and authorized to conduct business in the State of Texas. Reeder does business as Bucks Wild at 11327 Reeder Road in Dallas, Texas 75229. This address will be referred to below as Reeder's "physical location."

41.    Plaintiff Gold Club SF, LLC ("Gold Club") is a Limited Liability Company duly organized under the laws of the State of Nevada and authorized to conduct business in the State of California. Gold Club does business as Gold Club at 650 Howard Street, San Francisco, California 94105. This address will be referred to below as Gold Club's "physical location."

42.    Plaintiff S.A.W. Entertainment Limited ("SAW"), is a California Corporation duly organized and authorized to conduct business in the State of California. SAW does business as Larry Flynt's Hustler Club at 1031 Kearny Street and Condor Club at 560 Broadway Street in San Francisco, California. These addresses will be referred to below as SAW's "physical location."

43.    Plaintiff Smithville Bistro, LLC ("Smithville"), is a Tennessee Limited Liability Company duly organized and authorized to conduct business in the State of Tennessee. Smithville does business as Midnight Express - Smithville at 33847 Sparta Way in Smithville, Tennessee. These addresses will be referred to below as Smithville's "physical location."

44. Plaintiff Deja Vu Showgirls of Las Vegas, LLC ("DVSG of LV"), is a Nevada Limited Liability Company duly organized and authorized to conduct business in the State of Nevada. DVSG of LV does business as Deja Vu Showgirls Las Vegas at 3247 Sammy Davis Jr. Drive, in Las Vegas, Nevada. These addresses will be referred to below as DVSG of LV's "physical location."

45. Plaintiff Office Minneapolis, LLC ("Office"), is a Minnesota Limited Liability Company duly organized and authorized to conduct business in the State of Minnesota. Office does business as The Office Pub & Grill at 307 N. Washington Ave., in Minneapolis, MN. These addresses will be referred to below as Office's "physical location."

46. Plaintiff Cats Meow of Vegas, LLC ("Cats"), is a Nevada Limited Liability Company duly organized and authorized to conduct business in the State of Nevada. Cats does business as Cat's Meow at 450 Fremont Street, Suite 201, in Las Vegas, Nevada. This address will be referred to below as Cats' "physical location."

47. Plaintiff Cats 701 Bourbon, LLC ("Cats NOLA"), is a Nevada Limited Liability Company authorized to conduct and does conduct business in the State of Louisiana. Cats NOLA does business as Cat's Meow at 701 Bourbon Street in New Orleans, LA. This address will be referred to below as Cats NOLA's "physical location."

48. Plaintiff Pole Position at Tacoma, LLC ("Pole Position"), is a Washington Limited Liability Company duly organized and authorized to conduct business in the State of Washington. Pole Position does business as Pole Position Sports Bar at 10707 Pacific Ave. S., Ste. F, in Tacoma, WA. This address will be referred to below as Pole Position's "physical location."

49. Plaintiff Jamme Holdings, LLC ("Jamme"), is a Pennsylvania Limited Liability Company duly organized and authorized to conduct business in the State of Pennsylvania. Jamme

does business as Dream Girls Wilkes-Barre at 205 Mundy Street in Wilkes-Barre, Pennsylvania. These addresses will be referred to below as Jamme's "physical location."

50.     Plaintiff 90's Minneapolis, LLC ("90s"), is a Minnesota Limited Liability Company duly organized and authorized to conduct business in the State of Minnesota. 90s does business as Gay 90's Minneapolis at 408 Hennepin Ave. in Minneapolis, MN. These addresses will be referred to below as 90's "physical location."

51.     Plaintiff Las Vegas Bistro, LLC ("LVB"), is a Nevada Limited Liability Company duly organized and authorized to conduct business in the State of Nevada. LVB does business as Larry Flynt's Hustler Club – Las Vegas at 6007 Dean Martin Dr. in Las Vegas, NV. These addresses will be referred to below as LVB's "physical location."

52.     Plaintiff Stockton Enterprises, LLC ("Stockton Enterprises"), is a Nevada Limited Liability Company authorized to conduct and does conduct business in the State of California. Stockton Enterprises does business as Showgirls of Stockton at 64206 N. West Ln., in Stockton, CA. These addresses will be referred to below as Stockton Enterprises' "physical location."

***Defendants***

53.     Defendant Small Business Administration (again, "SBA") is an independent federal agency created and authorized pursuant to 15 U.S.C. § 633, *et seq*. The SBA maintains a branch office at 150 Westpark Way, Ste. 130 in Euless, Texas, which is within the Northern District of Texas.

54.     Defendant Isabel Casillas Guzman ("Guzman," or the "Administrator") is the Administrator of the SBA, a Cabinet-level position, and is sued in her official capacity only as the Administrator of the SBA.

55.     Authority to sue the Administrator is granted by 15 U.S.C. § 634(b), which states, in part:

> In the performance of, and with respect to, the functions, powers, and duties vested in him by this chapter the Administrator may—(1) sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy . . . .

56.     Defendant Office of Hearings and Appeals (again, "OHA") is an independent office of the United States Small Business Administration in 1983 and which has an office in Washington, D.C., but maintains an email address for any internet user to email from anywhere in the world where there is access to the world wide web.

57.     Defendant Kimberly McLeod ("McLeod") is the Assistant Administrator for the OHA and is the Chief Hearing Officer for the OHA.

58.     Defendant United States of America is a sovereign nation dedicated to the protection of life, liberty, and property as set forth in the Bill of Rights and other provisions of and amendments to the Constitution of the United States.

59.     The SBA, the Administrator, the OHA, McLeod, and the United States of America are referred to collectively hereinafter as the "Defendants."

60.     Plaintiffs do not seek, at this time, damages and currently pray only for declaratory and injunctive relief under 5 U.S.C. § 701, *et seq.,* in order to restrain the actions of the SBA, the Administrator, and McLeod in each of their official capacities. Plaintiffs do, however, make a claim for attorneys' fees and costs under the Equal Access to Justice Act and applicable law, 5 U.S.C. § 504 and 28 U.S.C. § 2412, as set forth herein. *See* Count XV.

## **FACTS RELATED TO THE SPECIFIC PLAINTIFFS**

***Dallas Food & Beverage, LLC ("Dallas Food and Beverage")***

61.    Dallas Food and Beverage is a licensed food and alcohol serving, nightclub open to the consenting adult public, which presents on its premises a variety of non-obscene, constitutionally protected, female performance dance entertainment.

62.    Dallas Food and Beverage has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on Dallas Food and Beverage's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at the facility owned and operated by Dallas Food and Beverage.

63.    Dallas Food and Beverage does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

64.    Dallas Food and Beverage operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

   a.    Dance Hall License issued by the City of Dallas;

   b.    A Liquor License issued by the State of Texas;

   c.    An Alcohol Permit issued by Dallas County

   d.    An Alcohol Permit issued by the City of Dallas; and

   e.    An Adult Cabaret License issued by the City of Dallas.

65.    As a consequence of the Pandemic, Dallas Food and Beverage was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, Dallas Food and Beverage suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

17

66.    In order to mitigate the financial impact caused to Dallas Food and Beverage by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Dallas Food and Beverage submitted an application to its Lending Bank for a first draw PPP loan on or about April 7, 2020. At all times relevant hereto, Dallas Food and Beverage's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the first draw PPP loan sought by Dallas Food and Beverage.

67.    Under the PPP, Dallas Food and Beverage was eligible to obtain, and did obtain, a first draw Loan.

68.    On or about July 8, 2021, Dallas Food and Beverage applied for loan forgiveness of its first draw PPP loan. The Loan Proceeds amount that Dallas Food and Beverage applied for forgiveness of for its first draw Loan, Dallas Food and Beverage used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its first draw Loan.

69.    On April 15, 2022, Dallas Food and Beverage received forgiveness of the full amount of forgiveness requested on its first draw PPP Loan.

70.    On or about January 30, 2024, via letter, SBA notified Dallas Food and Beverage that it was initiating a Post-Payment Review of Dallas Food and Beverage's first draw PPP Loan and requested that Dallas Food and Beverage provide a number of documents. The stated purpose for SBA's requests via the Post-Payment Review was to review whether Dallas Food and Beverage was eligible for the PPP Loan under, among other factors, the Prurience Regulation and Affiliation Rules

71.     Because Dallas Food and Beverage operates an alcohol serving nightclub under the licenses/permits identified in paragraph 64, it is, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business.

72.     Dallas Food and Beverage claimed NAICS Code 722410 on its first draw PPP loan forgiveness application, the SBA Form 3511, its second draw PPP loan application, and its second draw PPP loan forgiveness application.

73.     At all times related to the relevant period for its first and second draw PPP Loans, Dallas Food and Beverage had no more than 113 persons employed at its physical location.

74.     Under the PPP, Dallas Food and Beverage was eligible to obtain and did obtain a second draw PPP Loan.

75.     The Loan Proceeds amount that Dallas Food and Beverage applied for forgiveness of for its second draw Loan, Dallas Food and Beverage used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its second draw Loan.

76.     On or about May 24, 2022, Dallas Food and Beverage applied for forgiveness of its second draw PPP Loan. At all times during that forgiveness application process, Dallas Food and Beverage's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of forgiveness of Dallas Food and Beverage's second draw PPP Loan, and issued a forgiveness decision to SBA approving Dallas Food and Beverage's loan forgiveness application in the amount of $889,157.00.

77.     While Dallas Food and Beverage was eligible for forgiveness of its second draw PPP Loan, the SBA conducted a review of Dallas Food and Beverage's Loan and denied forgiveness in an FLRD dated December 14, 2023. The claimed bases for the denial were due to

alleged "size issues" based on SBA's application of the Affiliation Rules despite Dallas Food and Beverage's obvious qualification for the Affiliation Exception Provisions and alleged ineligibility due to SBA's application of the Prurience Regulation. Dallas Food and Beverage timely appealed that FLRD, but SBA filed a motion to dismiss on February 29, 2024, that was granted by the OHA the same day.

78. If forced to repay its second draw PPP Loan, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, Dallas Food and Beverage may be forced to close its business and file for bankruptcy, which would result in the cessation of both the presentation of and the ability to view entertainment that is presumptively protected under the First Amendment to the United States Constitution, as well as the wholesale termination of its employees jobs; which the PPP was in fact designed to preclude from happening.

*2345 Meacham, LLC ("Meacham")*

79. Meacham is a licensed food and alcohol serving, nightclub open to the consenting adult public, which presents on its premises a variety of non-obscene, constitutionally protected, female performance dance entertainment.

80. Meacham has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on Meacham's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at the facility owned and operated by Meacham.

81. Meacham does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

20

82.     Meacham operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

a.      A Specialized Certificate of Occupancy;

b.      A Liquor Permit issued by Tarrant County;

c.      A Liquor Permit issued by the City of Forth Worth;

d.      A health permit issued by the City of Forth Worth; and

e.      Alcoholic Beverage Permit issued by the Texas Alcoholic Beverage Commission.

83.     As a consequence of the Pandemic, Meacham was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, Meacham suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

84.     In order to mitigate the financial impact caused to Meacham by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Meacham applied for, obtained, and obtained forgiveness of, a first draw PPP loan. Meacham also submitted an application its Lending Bank for a second draw PPP loan on or about March 9, 2021. At all times relevant hereto, Meacham's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the second draw PPP loan sought by Meacham.

85.     Because Meacham operates a licensed food and alcohol-serving nightclub under the licenses and permits identified in paragraph 82, it is, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business. Since at least 2013, Meacham has claimed NAICS code 722410

as its "business activity code number" on its federal income tax returns, and claimed NAICS code 722410.

86.     At all times related to the relevant period for its second draw PPP loan, Meacham had no more than 118 persons employed at its physical location.

87.     Under the PPP, Meacham was eligible to obtain its second draw Loan and received its second draw Loan.

88.     The Loan Proceeds amount that Meacham applied for forgiveness of for its second draw Loan, Meacham used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its second draw Loan.

89.     On or about April 15, 2022, Meacham applied for forgiveness of its second draw PPP Loan. At all times during that forgiveness application process, Meacham's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of forgiveness of Meacham's second draw PPP Loan, and issued a forgiveness decision to SBA approving Meacham's loan forgiveness application in the amount of $760,910.00.

*Meacham's Second Appeal to the OHA of SBA's FLRD Denying Forgiveness of its Second Draw PPP Loan*

90.     While Meacham was eligible for forgiveness of its second draw PPP Loan, the SBA conducted a review of Meacham's Loan, on or about June 21, 2023, issued Meacham an FLRD denying Meacham's forgiveness application for its second draw PPP Loan because SBA had concluded that Meacham did not meet the size standards for the PPP or that SBA could not otherwise determine whether Meacham met the size standards despite Meacham's obvious qualification for the Affiliation Exception Provisions.

91.     Meacham timely appealed that FLRD.

92.     Shortly thereafter, Meacham and SBA filed a stipulated request to stay the appeal, which the OHA granted a few days later.

93.     On September 13, 2023, SBA filed a motion to dismiss. Its stated basis for the motion was that it had, apparently that same day, withdrawn the FLRD that was the subject of that appeal because SBA determined that it was necessary to complete a further review of the loan.

94.     That same day, without a response from Meacham, OHA granted SBA's motion and dismissed the appeal.

*Meacham's Second Appeal to the OHA of SBA's FLRD Denying Forgiveness of its Second Draw PPP Loan*

95.     While Meacham was eligible for forgiveness of its second draw PPP Loan, the SBA conducted a review of Meacham's Loan, on or about December 28, 2023, issued Meacham an FLRD this time denying Meacham's forgiveness application for its second draw PPP Loan based on alleged ineligibility due to SBA's application of the Prurience Regulation as its sole basis for the denial.

96.     Meacham timely appealed that FLRD to the OHA.

97.     On or about February 20, 2024, SBA filed a 458-page administrative record in that appeal, relevant excerpts of that administrative record are attached hereto as **Exhibit B**.

98.     Meacham and its staff, as well as its attorneys, began reviewing the 458-page administrative record to determine whether objections were necessary and to prepare the same if necessary, which, pursuant to 13 C.F.R. § 134.1207 and the scheduling order in the appeal, were due within 10 calendar days of SBA filing the administrative record.

23

99.     On page 17 of Meacham's administrative record, the second entry on the "SBA Internal Notes" record was made by Sara Renn on June 24, 2022, states that, based on "internet presence as viewed on www.bucksclubs.com/bucks-cabaret/fort-worth," Meacham "operates as a 'Gentlemen's Club," which is confirmed through open-source searches of the borrower's business," which is then followed by a redaction. [**Id.** at p. 19]. Later, on April 24, 2023, Sharon Drake stated that Meacham was an "ineligible business" based on "[a] visual search of Google (Addendum B) determined these businesses to be adult entertainment clubs, or of a prurient nature." [Id. at p. 18].

100.     On or about February 27, 2024, Meacham filed a 25-page motion for discovery accompanied by 1,669 pages of exhibits seeking necessary discovery in the form of document requests; a Fed. R. Civ. P. 30(b)(6) deposition of the SBA; a deposition of Eric Benderson, SBA's Associate General Counsel for Litigation who had, in previous litigation, provided a declaration regarding how determinations are made under the Prurience Regulation; and the depositions of that person or those persons who made, or participated in any fashion in making, the decision to deny Plaintiff's loan forgiveness application. This motion and other similar motions filed by other Plaintiffs in the OHA are discussed and attached to this First Amended Complaint, *infra*.

101.     On March 7, 2024, Meacham filed various objections to the administrative record, including an objection to the presence of redactions in the administrative record. On March 12, 2024, SBA responded to Meacham's objections. On March 18, 2024, the OHA judge ruled on those objections and ordered SBA to state the privilege asserted for the redactions. A true and accurate copy of the OHA's order referenced earlier is attached hereto as **Exhibit C**.

102.     On March 20, 2024, SBA filed a Motion to Reconsider the OHA's order on the objections to the administrative record. Therein, SBA asserted that the redacted materials were

24

irrelevant and were privileged pursuant to 5 U.S.C. § 552(b)(7). A true and accurate copy of SBA's reconsideration motion is attached hereto as **Exhibit D**. On April 19, 2024, Meacham responded to SBA's reconsideration motion.

103. On April 26, 2024, SBA filed its response to Meacham's appeal, complete with a declaration from Sigmund Pannu which attached additional "evidence" SBA claims it relied upon but which was not included in the administrative record. A true and accurate copy of that response is attached hereto as **Exhibit E**. Therein, SBA argues that the open-source searches referenced above was "SBA's effort to describe by polite means the nature of Appellant's business and more specifically the nature of its performances[.]"

104. Based on SBA's response, on April 27, 2024, the OHA ordered the parties to meet and confer and submit a joint status report no later than May 10, 2024. One of the items the OHA ordered the parties to discuss was whether "the parties agree that the documents in the affiant's exhibits are the same as or consistent with what SBA reviewed prior to December 28, 2023?" A true and accurate copy of this order is attached hereto as **Exhibit F**.

105. On May 6, 2024, OHA counsel for Meacham met and conferred with SBA's OHA counsel. SBA's OHA counsel stated that the exhibits found in Sigmund Pannu's declaration would be added to the administrative record either through stipulation as the OHA judge requested in order to allow the appeal to proceed or the SBA would withdraw the FLRD, include the exhibits from Pannu's declaration into the AR, and reissue the FLRD on the same basis as the one under appeal.

106. On or about May 10, 2024, SBA and Meacham filed a joint status report, which is attached hereto as **Exhibit G**.

107.    On May 14, 2024, OHA issued an order granting Meacham's appeal and remanding the FLRD. OHA concluded that Meacham was correct that the materials attached to Sigmund Pannu's declaration were not found in the administrative record and was without a firm conviction that SBA's FLRD is free from clear error. A true and accurate copy of this OHA order is attached hereto as **Exhibit H**.

108.    If forced to repay its second draw PPP Loans, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, Meacham may be forced to close its business and file for bankruptcy, which would result in the cessation of both the presentation of and the ability to view entertainment that is presumptively protected under the First Amendment to the United States Constitution, as well as the wholesale termination of its employees jobs; which the PPP was in fact designed to preclude from happening.

***11000 Reeder, LLC ("Reeder")***

109.    Reeder is a licensed food serving and BYOB, nightclub open to the consenting adult public, which presents on its premises a variety of non-obscene, constitutionally protected, female performance dance entertainment.

110.    Reeder has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on Reeder's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at the facility owned and operated by Reeder.

111.    Reeder does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

112.    Reeder operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

a.    A Sexually Oriented Business License;

b.    A Health Permit issued by the City of Dallas;

c.    A Dance Hall license; and

d.    A certificate of occupancy.

113.    As a consequence of the Pandemic, Reeder was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, Reeder suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

114.    In order to mitigate the financial impact caused to Reeder by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Reeder submitted an application to its Lending Bank for a first draw PPP loan on or about April 3, 2020. At all times relevant hereto, Reeder's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the first draw PPP loan sought by Reeder.

115.    In order to further mitigate the financial impact caused to Reeder by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Reeder submitted an application to its Lending Bank for a second draw PPP loan on or about January 14, 2021. At all times relevant hereto, Reeder's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the second draw PPP loan sought by Reeder.

116. Because Reeder operates a licensed food serving nightclub under the licenses/permits identified in paragraph 112, it is, and was at all times relevant to the PPP, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business.

117. Reeder claimed NAICS code 722410 on its first draw PPP loan forgiveness application, the SBA Form 3511, its second draw PPP Loan application, and its second draw PPP loan forgiveness application.

118. On or about December 28, 2020, Reeder applied for loan forgiveness of its first draw PPP loan. The Loan Proceeds amount that Reeder applied for forgiveness of for its first draw Loan, Reeder used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its first draw Loan.

119. On or about February 18, 2021, Reeder received forgiveness of the full amount of forgiveness requested on its first draw PPP Loan.

120. On or about November 17, 2021, Reeder applied for loan forgiveness of its second draw PPP Loan. The Loan Proceeds amount that Reeder applied for forgiveness of for its second draw Loan, Reeder used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its second draw Loan.

121. On or about November 24, 2021, Reeder received forgiveness of the full amount of forgiveness requested on its second draw PPP Loan.

122. On or about January 29, 2023, via separate letters, SBA notified Reeder that it was initiating a Post-Payment Review of Reeder's first and second draw PPP Loans and requested that Reeder provide a number of documents. The stated purpose for SBA's requests via the Post-

Payment Review was to review whether Reeder was eligible for the PPP Loan under, among other factors, the Prurience Regulation and Affiliation Rules.

123.    At all times related to the relevant period for its first and second draw PPP Loans, Reeder had no more than 57 persons employed at its physical location.

124.    If forced to repay its first and second draw PPP Loans, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, Reeder may be forced to close its business and file for bankruptcy, which would result in the cessation of both the presentation of and the ability to view entertainment that is presumptively protected under the First Amendment to the United States Constitution, as well as the wholesale termination of its employees jobs; which the PPP was in fact designed to preclude from happening.

### Gold Club – S.F., LLC ("Gold Club")

125.    Gold Club is a licensed food and alcohol serving restaurant/nightclub open to the consenting adult public, which presents on its premises a variety of non-obscene, constitutionally protected, female performance dance entertainment.

126.    Gold Club has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on Gold Club's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at the facility owned and operated by Gold Club.

127.    Gold Club does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

128.    Gold Club operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

a.    Alcoholic Beverage License issued by the State of California's Department of Alcoholic Beverage Control agency; and

b.    A Class/Permit Number H26/32781 License Certificate issued by the City of San Francisco that describes Gold Club as an H26 Restaurant Over 2,000 SQ issued to Alternative Entertainment, Inc., a wholly owned subsidiary of Gold Club.

129.    As a consequence of the Pandemic, Gold Club was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, Gold Club suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

130.    In order to mitigate the financial impact caused to Gold Club by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Gold Club submitted an application to its Lending Bank for a first draw PPP loan on or about April 14, 2020, and for a second draw PPP loan in March of 2021. At all times relevant hereto, Gold Club's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the first and second draw PPP loans sought by Gold Club.

131.    Because Gold Club operates a licensed food and alcohol-serving nightclub under the licenses/permits identified in paragraph 128, it is, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business. Since at least 2016, Gold Club has claimed NAICS code 722410 as its "business code number" on its federal income tax returns, and claimed NAICS code 722410

30

on its second draw PPP loan application, its second draw PPP loan forgiveness application, and its SBA Form 3511.

132. At all times related to the relevant period for its first draw PPP loan, Gold Club had no more than 176 persons employed at its physical location.

133. At all times related to the relevant period for its second draw PPP loan, Gold Club had no more than 155 persons employed at its physical location.

134. Under the PPP, Gold Club was eligible to obtain its first draw Loan and it received its first draw Loan.

135. Under the PPP, Gold Club was eligible to obtain its second draw Loan and it received its second draw Loan.

136. The Loan Proceeds amount that Gold Club applied for forgiveness of for both its first and second draw Loans, were used by Gold Club exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its first and second draw Loan.

*Gold Club's Appeal to the OHA of SBA's FLRD Denying Forgiveness of its First Draw PPP Loan*

137. While Gold Club was eligible for forgiveness of its first draw Loan, the SBA conducted a review of Gold Club's Loan and, on or about October 31, 2023, issued Gold Club an FLRD denying Gold Club's forgiveness application for its first draw Loan because SBA had conclude that Gold Club was ineligible for that Loan for two reasons: 1) Gold Club was allegedly an ineligible business concern providing prurient sexual material (and therefore precluded from eligibility by application of the Prurience Regulation) and 2) Gold Club, together with the businesses SBA claims it is affiliated with, exceeded the maximum allowable number of employees and the SBA's small business size standards.

138.    On or about November 30, 2021, Gold Club timely applied for forgiveness of its first draw PPP Loan. At all times during that forgiveness application process, Gold Club's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of forgiveness of Gold Club's first draw PPP Loan, and issued a forgiveness decision to SBA approving Gold Club's loan forgiveness application in the amount of $262,664.96.

139.    On December 11, 2023, the OHA served a scheduling order for the aforementioned appeal.

140.    The next day, on December 12, 2023, Gold Club filed a motion for discovery seeking necessary discovery in the form of document requests; a Fed. R. Civ. P. 30(b)(6) deposition of the SBA; a deposition of Eric Benderson, SBA's Associate General Counsel for Litigation who had, in previous litigation, provided a declaration regarding how determinations are made under the Prurience Regulation; and the depositions of that person or those persons who made, or participated in any fashion in making, the decision to deny Plaintiff's loan forgiveness application. This motion and other similar motions filed by other Plaintiffs in the OHA are discussed and attached to this First Amended Complaint, *infra*.

141.    At that time, no attorney for the SBA had yet filed an appearance.

142.    The following day, December 13, 2023, without a response from SBA, the OHA, *sua sponte*, denied the aforementioned discovery motion stating that "OHA's authority is limited to reviewing whether a loan forgiveness decision is based on clear error."

143.    On January 2, 2024, SBA filed the 5,967-page administrative record in that appeal.

144.    Gold Club and its staff, as well as its attorneys and accountants, began reviewing the 5,967-page administrative record to determine whether objections were necessary and to

prepare the same if necessary, which, pursuant to 13 C.F.R. § 134.1207 and the scheduling order in the appeal, were due within 10 calendar days of SBA filing the administrative record.

145.    Gold Club requested and was granted three unopposed extensions to file its objections to the administrative record.

146.    On February 27, 2024, the day before Gold Club's objections to the administrative record were due, SBA filed a motion to dismiss the appeal. Its stated basis for the motion was that it had, apparently, on February 20, 2024, withdrawn the FLRD that was the subject of the appeal because SBA determined that it was necessary to complete a further review of the loan.

147.    That same day, without a response from Gold Club, OHA granted SBA's motion and dismissed the appeal.

*Gold Club's First Appeal to the OHA of SBA's First FLRD Denying Forgiveness of its Second Draw PPP Loan*

148.    On or about April 22, 2022, Gold Club applied for forgiveness of its second draw Loan. At all times during that forgiveness application process, Gold Club's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of forgiveness of Gold Club's second draw PPP Loan, and issued a forgiveness decision to SBA approving Gold Club's loan forgiveness application in the amount of $0.00. Gold Club, however, had applied for and qualified for forgiveness in the amount of $1,993,233.75.

149.    While Gold Club was eligible for forgiveness of its second draw Loan, the SBA conducted a review of Gold Club's Loan and, on or about October 31, 2023, issued Gold Club an FLRD denying Gold Club's forgiveness application for its second draw PPP Loan because, despite Gold Club's obvious qualification for the Affiliation Exception Provisions, SBA concluded that Gold Club was ineligible for the Loan for two reasons: 1) Gold Club was allegedly an ineligible business concern providing prurient sexual material (and therefore precluded from eligibility by

33

application of the Prurience Regulation) and 2) Gold Club, together with the businesses SBA claims it is affiliated with, exceeded the maximum allowable number of employees and the SBA's small business size standards.

150.    Gold Club timely appealed this FLRD.

151.    On December 12, 2023, Gold Club filed a motion for discovery seeking necessary discovery in the form of document requests; a Fed. R. Civ. P. 30(b)(6) deposition of the SBA; a deposition of Eric Benderson, SBA's Associate General Counsel for Litigation who had, in previous litigation, provided a declaration regarding how determinations are made under the Prurience Regulation; and the depositions of that person or those persons who made, or participated in any fashion in making, the decision to deny Plaintiff's loan forgiveness application. This motion and other similar motions filed by other Plaintiffs in the OHA are discussed and attached to this First Amended Complaint, *infra*.

152.    The next day, on December 13, 2023, OHA, *sua sponte*, denied that discovery motion, again, without any briefing from SBA.

153.    On January 2, 2024, SBA filed the 920-page administrative record in that appeal. Gold Club and its staff, as well as its attorneys and accountants, began reviewing the 920-page administrative record to determine whether objections were necessary and to prepare the same, if necessary, which, pursuant to 13 C.F.R. § 134.1207 and the scheduling order in the appeal, were due within 10 calendar days of SBA filing the administrative record.

154.    On January 8, 2024, Gold Club filed an unopposed motion for an extension of time to January 24, 2024, to file its objections to the administrative record.

155.    The next day, on January 9, 2024, SBA filed a motion to dismiss the appeal. Its stated basis for that motion was that it had, apparently, on January 3, 2024, withdrawn the FLRD

that was the subject of that appeal because SBA determined that it was necessary to complete a further review of the Loan.

156. That same day, without a response or an opportunity for a response from Gold Club, OHA granted SBA's motion and dismissed the appeal.

*Gold Club's Second Appeal to the OHA of SBA Denying Forgiveness of its Second Draw PPP Loan*

157. While Gold Club was eligible for forgiveness of its second draw Loan, the SBA conducted a further review of Gold Club's Loan and, on or about January 30, 2024, SBA issued a second FLRD regarding Gold Club's second draw Loan. This FLRD denied Gold Club's forgiveness application for its second draw PPP Loan, this time denying forgiveness based solely on SBA's conclusion that Gold Club was an ineligible business providing prurient sexual material. A true and accurate copy of this FLRD is attached hereto as **Exhibit EEE**.

158. On or about February 29, 2024, Gold Club timely appealed this second FLRD denying forgiveness of its second draw Loan seeking reversal of this FLRD (the "Appeal").

159. In the Appeal petition of its second denial of forgiveness on its second draw Loan, Gold Club argued, among other things, that SBA's decision was arbitrary and capricious for various reason including that it was not adequately explained, was not the product of reasoned decision making because it conflicts with the decision to award Gold Club's second draw Loan in the first place, and it treats Gold Club differently than similarly situated businesses; that SBA revisiting the eligibility issue at the loan forgiveness stage conflicts with the PPP statute and is otherwise in excess of SBA's jurisdiction/authority; that SBA lacks authority to provide a forgiveness amount different from the sum of specific costs incurred and expenditures made during the Loan's covered period; an estoppel theory; and that SBA's decision is violative of Gold Club's constitutional rights. Additionally, Gold Club argued that it should be entitled to its costs and fees, including attorneys'

fees, pursuant to the Administrative Procedures Act and the Equal Access to Justice Act. A true and accurate copy of Gold Club's second appeal petition of its second draw Loan is attached hereto as **Exhibit I**.

160.    On or about March 25, 2024, SBA filed the 951-page administrative record in the Appeal. Attached hereto as **Exhibit J** is a true and accurate copy of relevant excerpts from the administrative record SBA filed in Gold Club's second OHA appeal.

161.    Gold Club and its staff, as well as its attorneys and accountants, began reviewing the 951-page administrative record to determine whether objections thereto were necessary and, if so, to prepare the same. Pursuant to 13 C.F.R. § 134.1207 and the scheduling order in the Appeal, objections to the administrative record were due within 10 calendar days of SBA filing the administrative record.

162.    After an extension of time, on April 23, 2024, Gold Club filed various objections to the administration of record via a 17-page filing. Primarily, Gold Club objected to the redactions contained in the admirative record as well as the absence of certain documents, notes, and research referenced by SBA decision-makers in the administrative record that were not provided in the administrative record. A true and accurate copy of Gold Club's objections to the administrative record in the Appeal is attached hereto as **Exhibit K**.

163.    Simultaneously, on April 23, 2024, Gold Club filed a 23-page motion for discovery with 1,685 pages of exhibits seeking necessary discovery in the form of document requests; a Fed. R. Civ. P. 30(b)(6) deposition of the SBA; a deposition of Eric Benderson, SBA's Associate General Counsel for Litigation who had, in previous litigation, provided a declaration regarding how determinations are made under the Prurience Regulation; and the depositions of that person or those persons who made, or participated in any fashion in making, the decision to deny Plaintiff's

loan forgiveness application. A true and accurate copy of this discovery motion along with its exhibits are attached hereto as **Exhibit L**. Gold Club also included the lack of documents responsive to these discovery requests and the absence of a transcript of the Fed. R. Civ. P. 30(b)(6) deposition in its objections to the administrative record in the Appeal.

164.    That *same day*, on April 23, 2024, OHA, *sua sponte* and without any response from SBA, denied Gold Club's discovery request stating that discovery is not permitted in appeals from SBA final loan review decisions regarding PPP loans. A true and accurate copy of OHA's order denying Gold Club's discovery motion in the Appeal is attached hereto as **Exhibit M**.

165.    On May 8, 2024, SBA responded to Gold Club's Appeal.

166.    Included in its response was a Declaration from Sigmund Pannu (the "Pannu Declaration" with Sigmund Pannu being "Pannu"), a Supervisory Loan Specialist in the Office of Capital Access at SBA. The Pannu Declaration included numerous exhibits that were not included in the administrative record in the Appeal, which Pannu declared were "the same as or consistent with what I [he] reviewed during my [his] initial review of this loan prior to issuance of the final loan review decision." A true and accurate copy of SBA's response to Gold Club's Appeal, including the Pannu Declaration with all exhibits and attachments thereto, is attached hereto as **Exhibit N**.

167.    In its response to Plaintiff's Appeal, SBA relied on the "evidence" included in the Pannu Declaration, which was not included in the administrative record. SBA argued, among other things, that 1) Gold Club failed to state or argue that it does not present live performances of a prurient sexual nature or that Gold Club does not derive more than *de minimus* revenue from services of a prurient sexual nature, 2) SBA cannot be bound by lender decisions, 3) SBA cannot be estopped from enforcing the law by an earlier decision, 4) SBA's loan review of Gold Club's

eligibility for the Loan was consistent with the CARES Act and that SBA may review loans at any time, 5) SBA cannot be restricted under a promissory estoppel theory from denying loan forgiveness, 6) Gold Club cannot recover costs and fees before the OHA, and 7) OHA cannot adjudicate challenges to the constitutionality of SBA's implementation of the CARES Act and EAA.

168.    On May 10, 2024, Gold Club filed a Motion to Strike the Pannu Declaration and its exhibits and attachments in SBA's response to Gold Club's Appeal on, among other bases, the basis that these items were not included in the administrative record and should have been and SBA cannot add new evidence mid-appeal. *See* 13 C.F.R. § 134.1209. A true and accurate copy of Gold Club's Motion to Strike in the Appeal is attached hereto as **Exhibit O**.

169.    Four days later, on May 14, 2024, OHA issued an order affirming SBA's FLRD in the Appeal and denying as moot Gold Club's motion to strike (the "May 14 Order," which is attached hereto as **Exhibit P**).

170.    The May 14 Order addressed Gold Club's objections to the administrative record and overruled each and every one of them. The May 14 Order also denied Gold Club's Motion to Strike the Pannu Declaration as moot. The May 14 Order also affirmed the second FLRD issued regarding Gold Club's second draw Loan and concluded that Gold Club was eligible for the final forgiveness amount of $0 and that the second FLRD issued regarding Gold Club's second draw Loan was not based on clear error of fact or law.

171.    As to Gold Club's constitutional claims and claims for costs and fees under the EAJA raised in the Appeal, the May 14 Order stated that OHA "lack[s] authority to decide the[se] issues raised by" Gold Club.

172.   The required 30 days for the May 14 Order to become final has lapsed and, therefore, the OHA's May 14 Order and SBA's second FLRD issued regarding Gold Club's second draw Loan is ripe for judicial review and this petition for the same is timely. 13 C.F.R. § 134.1211.

173.   Gold Club has exhausted its administrative remedies prior to filing this First Amended Complaint and petition for judicial review.

174.   In light of OHA's orders and regulations regarding the PPP, Gold Club has resumed making repayments on its second draw Loan.

175.   If forced to repay its first and second draw PPP Loans, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, Gold Club may be forced to file for reorganization through bankruptcy, which may preclude the Gold Club from presenting First Amendment protected entertainment in the future.

***S.A.W. Entertainment, Ltd. ("SAW")***

176.   SAW is a licensed food and alcohol serving, bar/restaurant/nightclub open to the consenting adult public, which presents on its premises a variety of non-obscene, constitutionally protected, female performance dance entertainment.

177.   SAW has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on SAW's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at the facility owned and operated by SAW.

178.   SAW does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

179.   SAW operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

a.   H26/11579 License Certificate issued by the City of San Francisco that describes SAW as an H26 Restaurant over 2,000 SQ;

b.   Alcoholic Beverage License issued by the State of California Department of Alcoholic Beverage Control;

c.   Live entertainment permit; and

d.   Extended hours permit.

180.   As a consequence of the Pandemic, SAW was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, SAW suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

181.   In order to mitigate the financial impact caused to SAW by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, SAW submitted an application to its Lending Bank for a first draw PPP loan on or about April 14, 2020. At all times relevant hereto, SAW's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the first draw PPP loan sought by SAW.

182.   Because SAW operates a licensed food and alcohol-serving nightclub under the licenses/permits identified in paragraph 179, it is, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business. Since at least 2016, SAW has claimed NAICS code 722410 as its "business activity code number" on its federal income tax returns, and claimed NAICS code 722410 its SBA Form 3511.

40

183.    At all times related to the relevant period for its first draw PPP Loan, SAW had no more than 163 persons employed at its physical location.

184.    Under the PPP, SAW was eligible to obtain its first draw Loan and it received its first draw Loan.

185.    The Loan Proceeds amount that SAW applied for forgiveness of for its first draw Loan, SAW used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its first draw Loan.

*SAW's First Appeal to the OHA of SBA's First FLRD Denying Forgiveness of its First Draw PPP Loan*

186.    On or about November 12, 2021, SAW applied for forgiveness of its first draw PPP Loan. At all times during that forgiveness application process, SAW's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of forgiveness of SAW's first draw PPP Loan, and issued a forgiveness decision to SBA approving SAW's loan forgiveness application in the amount of $222,800.19.

187.    While SAW was eligible for forgiveness of its first draw Loan, the SBA conducted a review of SAW's Loan, and on or about October 31, 2023, issued SAW an FLRD denying SAW's forgiveness application of its first draw PPP Loan because, despite SAW's obvious qualification for the Affiliation Exception Provisions, SBA concluded that SAW was ineligible for the Loan on the sole basis that SAW, together with the businesses SBA claims it is affiliated with, exceeded the maximum number of employees of 500 for PPP first draw Loans. A true and accurate copy of this FLRD is attached hereto as **Exhibit Q**.

188.    SAW timely appealed this FLRD

41

189. On December 13, 2023, SAW filed a 13-page discovery motion accompanied by 27-pages of exhibits seeking necessary discovery in the form of document requests; a Fed. R. Civ. P. 30(b)(6) deposition of the SBA; a deposition of Eric Benderson, SBA's Associate General Counsel for Litigation who had, in previous litigation, provided a declaration regarding how determinations are made under the Prurience Regulation; and the depositions of that person or those persons who made, or participated in any fashion in making, the decision to deny Plaintiff's loan forgiveness application. This motion and other similar motions filed by other Plaintiffs in the OHA are discussed and attached to this First Amended Complaint, *infra*.

190. That same day, December 13, 2023, OHA, *sua sponte*, denied that discovery motion without any briefing from SBA.

191. On January 2, 2024, SBA filed a 6,206-page administrative record in that appeal. SAW and its staff, as well as its attorneys and accountants, began reviewing the 6,206-page administrative record to determine whether objections were necessary and to prepare the same, if necessary, which, pursuant 13 C.F.R. § 134.1207 and the scheduling order in the appeal, were due within 10 calendar days of SBA filing the administrative record. True and accurate excerpts (pages 3542, 3547, 3550, and 3553-55) from this administrative record are attached hereto as **Exhibit R**.

192. On January 8, 2024, SAW filed an unopposed motion for an extension of time to January 24, 2024, to file its objections to the administrative record, which was granted the same day.

193. On January 10, 2024, SBA filed a motion to dismiss the appeal. Its stated basis for that motion was that it had, apparently, that same day (January 10, 2024), withdrawn the FLRD that was the subject of that appeal because SBA determined that it was necessary to complete a further review of the Loan.

194. That same day, without a response or an opportunity for a response from SAW, Judge Richard Ambrow granted SBA's motion and dismissed the appeal.

*SAW's Second Appeal to the OHA of SBA Denying SAW Forgiveness of its First Draw PPP Loan*

195. While SAW was eligible for its first draw PPP Loan, SBA conducted a further review of SA''s Loan and, on or about January 30, 2024, SBA issued a second FLRD denying SAW's first draw Loan. This FLRD denied SAW's forgiveness application for its first draw PPP Loan, this time denying forgiveness based solely on SBA's conclusion that SAW was an ineligible business providing prurient sexual material.

196. SAW timely appealed this second FLRD denying forgiveness of its first draw PPP Loan.

197. In the Appeal petition of its second denial of forgiveness on its second draw Loan, SAW argued, among other things, that SBA's decision was arbitrary and capricious for various reason including that it was not adequately explained, was not the product of reasoned decision making because it conflicts with the decision to award SAW's first draw Loan in the first place, and it treats SAW differently than similarly situated businesses; that SBA revisiting the eligibility issue at the loan forgiveness stage conflicts with the PPP statute and is otherwise in excess of SBA's jurisdiction/authority; that SBA lacks authority to provide a forgiveness amount different from the sum of specific costs incurred and expenditures made during the Loan's covered period; an estoppel theory; and that SBA's decision is violative of SAW's constitutional rights. Additionally, SAW argued that it should be entitled to its costs and fees, including attorneys' fees, pursuant to the Administrative Procedures Act and the Equal Access to Justice Act.

198. On or about May 20, 2024, SBA filed a motion to dismiss the appeal. Its stated basis for that motion was that it had, apparently, on May 17, 2024, withdrawn the FLRD that was

the subject of that appeal because SBA determined that it was necessary to complete a further review of the Loan.

199.    That same day, OHA ordered SAW to respond to the motion to dismiss no later than June 4, 2024, which SAW did.

200.    On June 21, 2024, OHA dismissed SAW's OHA appeal.

201.    On June 28, 2024, SAW timely filed for reconsideration of that decision. SBA responded on July 11, 2024, and OHA denied reconsideration the next day on July 12, 2024. A true and accurate copy of the OHA's order denying reconsideration is attached hereto as **Exhibit S**.

202.    If forced to repay its first draw PPP Loan, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, SAW may be forced to file for reorganization through bankruptcy , which may preclude the SAW from presenting First Amendment protected entertainment in the future.

*Smithville Bistro, LLC ("Smithville")*

203.    Smithville is a licensed alcohol serving nightclub open to the consenting adult public, which presents on its premises a variety of non-obscene, constitutionally protected, female performance dance entertainment.

204.    Smithville has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on Smithville's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at the facility owned and operated by Smithville.

205.    Smithville does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

206.    Smithville operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains: Beer Permit issued by the County of DeKalb, Tennessee;

207.    As a consequence of the Pandemic, Smithville was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, Smithville suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

208.    In order to mitigate the financial impact caused to Smithville by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Smithville submitted an application to its Lending Bank for a second draw PPP loan on or about February 14, 2021. At all times relevant hereto, Smithville's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the second draw PPP loan sought by Smithville.

209.    Because Smithville operates a licensed alcohol-serving nightclub under the license/permit identified in paragraph 206, it is, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business. Smithville has also claimed NAICS code 722410 on its first draw PPP loan forgiveness application, the SBA Form 3511, its second draw PPP Loan application, and its second draw PPP loan forgiveness application.

210.    Smithville applied for and obtained a first draw PPP loan. Smithville obtained partial loan forgiveness of its first draw PPP loan pursuant to a settlement agreement it entered into with the SBA.

211.    At all times related to the relevant period for its second draw PPP Loan, Smithville had no more than 11 persons employed at its physical location.

212. Under the PPP, Smithville was eligible to obtain its second draw Loan and it received its second draw Loan.

213. The Loan Proceeds amount that Smithville applied for forgiveness of for its second draw Loan, Smithville used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its second draw Loan.

214. On or about May 16, 2022, Smithville applied for forgiveness of its second draw PPP Loan. At all times during that forgiveness application process, Smithville's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of forgiveness of Smithville's second draw PPP Loan, and issued a forgiveness decision to SBA approving Smithville's loan forgiveness application in the amount of $38,871.00.

215. While Smithville was eligible for forgiveness of its second draw PPP Loan, the SBA conducted a review of Smithville's Loan and denied forgiveness in an FLRD dated December 14, 2023. The claimed basis for the denial was due to alleged "size issues" based on SBA's application of the Affiliation Rules despite Smithville's obvious qualification for the Affiliation Exception Provisions, and alleged ineligibility due to SBA's application of the Prurience Regulation. Smithville timely appealed that FLRD to the OHA and that appeal remains pending.

216. If forced to repay its second draw PPP Loan, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, Smithville may be forced to close its business and file for bankruptcy, which would result in the cessation of both the presentation of and the ability to view entertainment that is presumptively protected under the First Amendment to the United States Constitution, as well

as the wholesale termination of its employees jobs; which the PPP was in fact designed to preclude from happening.

*Deja Vu Showgirls of Las Vegas, LLC ("DVSG of LV")*

217.    DVSG of LV is a licensed alcohol serving nightclub and service bar open to the consenting adult public, which presents on its premises a variety of non-obscene, constitutionally protected, female performance dance entertainment.

218.    DVSG of LV has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on DVSG of LV's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at the facility owned and operated by DVSG of LV.

219.    DVSG of LV does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

220.    DVSG of LV operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

a.    Business License Adult Book / Video Sales Rental issued by Clark County, Nevada;

b.    Business License Adult Entertainment Cabaret issued by Clark County, Nevada;

c.    Business License Adult Novelty issued by Clark County, Nevada;

d.

e.    Business License Amusement Machines issued by Clark County, Nevada;

f.    Business License Book Sales issued by Clark County, Nevada;

47

g.     Business License Erotic Dance Establishment issued by Clark County, Nevada; and

h.     Quarterly Liquor License issued by Clark County, Nevada.

221.   As a consequence of the Pandemic, DVSG of LV was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, DVSG of LV suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

222.   In order to mitigate the financial impact caused to DVSG of LV by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, DVSG of LV submitted an application to its Lending Bank for a second draw PPP loan on or about February 5, 2021. At all times relevant hereto, DVSG of LV's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the second draw PPP loan sought by DVSG of LV.

223.   Because DVSG of LV operates a licensed alcohol-serving nightclub under the licenses/permits identified in paragraph 220, it is, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business. DVSG of LV has also claimed NAICS code 722410 on its first draw PPP loan forgiveness application, the SBA Form 3511, and its second draw PPP Loan application.

224.   DVSG of LV applied for and obtained a first draw PPP loan. DVSG of LV obtained partial loan forgiveness of its first draw PPP loan pursuant to a settlement agreement it entered into with the SBA.

225.   At all times related to the relevant period for its second draw PPP Loan, DVSG of LV had no more than 72 persons employed at its physical location.

226. Under the PPP, DVSG of LV was eligible to obtain its second draw Loan and it received its second draw Loan.

227. The Loan Proceeds amount that DVSG of LV applied for forgiveness of for its second draw Loan, DVSG of LV used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its second draw Loan.

228. On or about July 6, 2022, DVSG of LV applied for forgiveness of its second draw PPP Loan. At all times during that forgiveness application process, DVSG of LV's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of forgiveness of DVSG of LV's second draw PPP Loan, and issued a forgiveness decision to SBA approving DVSG of LV's loan forgiveness application in the amount of $313,605.98.

229. While DVSG of LV was eligible for forgiveness of its second draw PPP Loan, the SBA conducted a review of DVSG of LV's Loan and denied forgiveness in an FLRD dated December 14, 2023. The claimed basis for the denial was due to alleged "size issues" based on SBA's application of the Affiliation Rules despite DVSG of LV's obvious qualification for the Affiliation Exception Provisions, and alleged ineligibility due to SBA's application of the Prurience Regulation. DVSG of LV timely appealed that FLRD to the OHA and that appeal remains pending.

230. If forced to repay its second draw PPP Loan, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, DVSG of LV may be forced to close its business and file for bankruptcy, which would result in the cessation of both the presentation of and the ability to view entertainment that is presumptively protected under the First Amendment to the United States Constitution, as

well as the wholesale termination of its employees jobs; which the PPP was in fact designed to preclude from happening.

***Office Minneapolis, LLC ("Office")***

231.    Office is a licensed alcohol serving bar and grill open to the consenting adult public.

232.    Office does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex

233.    Office operates its bar and grill pursuant to, and in accordance with, the following licenses/permits, which it maintains:

a.    Two Liquor Permits issued by the City of Minneapolis;

b.    A Liquor Permit allowing Office to close at 2 am; and

c.    A retail buyer's card for liquor.

234.    As a consequence of the Pandemic, Office was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, Office suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

235.    In order to mitigate the financial impact caused to Office by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Office submitted an application to its Lending Bank for a first draw PPP loan on or about April 7, 2020. At all times relevant hereto, Office's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the first draw PPP loan sought by Office.

236. Because Office operates a licensed alcohol-serving bar and grill under the licenses/permits identified in paragraph 233, it is, and was at all times relevant to the PPP, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business.

237. Office claimed NAICS code 722410 on its first draw PPP loan forgiveness application and the SBA Form 3511.

238. On or about June 1, 2021, Office applied for loan forgiveness of its first draw PPP loan. The Loan Proceeds amount that Office applied for forgiveness of for its first draw Loan, Office used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its first draw Loan.

239. On or about June 25, 2021, Office received forgiveness of the full amount of forgiveness requested on its first draw PPP Loan.

240. On or about January 30, 2024, via letter, SBA notified Office that it was initiating a Post-Payment Review of Office's first draw PPP Loan and requested that Office provide a number of documents. The stated purpose for SBA's requests via the Post-Payment Review was to review whether Office was eligible for the PPP Loan under, among other factors, the Prurience Regulation and Affiliation Rules.

241. At all times related to the relevant period for its first draw PPP Loan, Office had no more than 13 persons employed at its physical location.

*Cats Meow of Vegas, LLC ("Cats")*

242. Cats is a licensed alcohol serving, karaoke bar and nightclub open to the consenting adult public, which presents on its premises a variety of constitutionally protected live karaoke

production entertainment as well as other live performance entertainment including singing and dancing.

243. Cats does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

244. Cats operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

    a. A L38 Tavern – Limited License, issued by the City of Las Vegas, Nevada; and

    b. a D19-Karaoke Business Licenses, issued by the City of Las Vegas, Nevada.

245. As a consequence of the Pandemic, Cats was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, Cats suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses. In fact, Cats sued the state of Nevada in order to reopen. *See* Cats Meow of Vegas, LLC v. Nevada, No.: 2:20-cv-02055 (D. Nev. 2020).

246. In order to mitigate the financial impact caused to Cats by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Cats submitted an application to its Lending Bank for a first draw PPP loan on or about April 22, 2020, and a second draw PPP loan on or about April 1, 2021. At all times relevant hereto, Cats' Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the first and second draw PPP loan sought by Cats.

247. Because Cats operates a licensed alcohol-serving karaoke bar and nightclub under the licenses and permits identified in paragraph 244, it is, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business. Cats claimed NAICS code 722410 as its "business code number" on its 2019 federal income tax returns, and claimed NAICS code 722410 on both of its PPP loan applications and PPP loan forgiveness applications.

248. At all times related to the relevant period for its first draw PPP loan, Cats had no more than 35 persons employed at its physical location.

249. At all times related to the relevant period for its second draw PPP loan, Cats had no more than 57 persons employed at its physical location.

250. Under the PPP, Cats was eligible to obtain its first draw Loan and it received its first draw Loan.

251. Under the PPP, Cats was eligible to obtain its second draw Loan and it received its second draw Loan.

252. The Loan Proceeds amounts that Cats applied for forgiveness of for both its first and second draw Loans, Cats used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its first or second draw Loan.

253. On or about July 13, 2021, Cats applied for forgiveness of its first draw PPP Loan. At all times during that forgiveness application process, Cats' Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of forgiveness of Cats' first draw PPP Loan, and issued a forgiveness decision to SBA approving Cats' loan forgiveness application in the amount of $171,851.69.

254.    On or about November 30, 2021, Cats applied for forgiveness of its second draw PPP Loan. At all times during that forgiveness application process, Cats' Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of forgiveness of Cats' second draw PPP Loan, and issued a forgiveness decision to SBA approving Cats' loan forgiveness application in the amount of $128,866.00.

255.    Cats received forgiveness on both its first and second draw PPP Loans.

256.    Despite Cats being eligible for forgiveness of its first and second draw PPP Loans, and receiving forgiveness on the same, the SBA conducted a review of both of Cats' first and second draw PPP loans due to alleged "size issues," despite its obvious qualification for the Affiliation Exception Provisions, based on SBA's application of the Affiliation Rules, an allegation that the 25% reduction in aggregated gross receipts for its second draw PPP Loan may not have been met, and alleged "insufficient documentation" to enable SBA to calculate the Loan amounts and forgiveness amounts.

257.    If forced to repay its first and second draw PPP Loan, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, Cats may be forced to close its business and file for bankruptcy, which would result in the cessation of both the presentation of and the ability to view entertainment that is presumptively protected under the First Amendment to the United States Constitution, as well as the wholesale termination of its employees jobs; which the PPP was in fact designed to preclude from happening.

***Cats 701 Bourbon, LLC ("Cats NOLA")***

258.    Cats NOLA is a licensed alcohol serving, karaoke bar and nightclub open to the consenting adult public, which presents on its premises a variety of constitutionally protected live

karaoke production entertainment as well as other live performance entertainment including singing and dancing.

259.    Cats NOLA does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

260.    Cats NOLA operates its nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

      a.    A Liquor License issued by the City of New Orleans; and

      b.    A Liquor License issued by the State of Louisiana with a Restaurant endorsement.

261.    As a consequence of the Pandemic, Cats NOLA was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, Cats NOLA suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

262.    In order to mitigate the financial impact caused to Cats NOLA by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Cats NOLA submitted an application to its Lending Bank for a first draw PPP loan on or about April 7, 2020. At all times relevant hereto, Cats NOLA's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the first draw PPP Loan sought by Cats NOLA.

263.    Because Cats NOLA operates a licensed alcohol-serving karaoke bar and nightclub under the licenses and permits identified in paragraph 260, it is, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business.

264.    Cats NOLA claimed NAICS code 722410 as its "business code number" on its 2019 federal income tax returns, and claimed NAICS code 722410 on its PPP loan forgiveness application.

265.    At all times related to the relevant period for its first draw PPP loan, Cats NOLA had no more than 65 persons employed at its physical location.

266.    Under the PPP, Cats NOLA was eligible to obtain its first draw Loan and it received its first draw Loan.

267.    On or about July 8, 2021, Cats NOLA applied for forgiveness of its first draw PPP Loan. The Loan Proceeds amount that Cats NOLA applied for forgiveness of for its first draw Loan, Cats NOLA used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its first draw Loan.

268.    On or about September 20, 2021, Cats NOLA received forgiveness of the fully amount of forgiveness requested on its first draw PPP Loan.

269.    On or about January 30, 2024, via email, SBA notified Cats NOLA that it was initiating a Post-Payment Review of Cats NOLA's first draw PPP Loan and requested that Cats NOLA provide a number of documents.

270.    There was no stated purpose for the Post-Payment Review stated in the email informing Cats NOLA of the Post-Payment Review.

56

271.    If forced to repay its first draw PPP Loan, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, Cats NOLA may be forced to close its business and file for bankruptcy, which would result in the cessation of both the presentation of and the ability to view entertainment that is presumptively protected under the First Amendment to the United States Constitution, as well as the wholesale termination of its employees jobs; which the PPP was in fact designed to preclude from happening.

***Pole Position at Tacoma, LLC ("Pole Position")***

272.    Pole Position was a licensed alcohol and food serving sports bar open to the consenting adult public. Pole Position permanently closed its doors in March of 2023 as a result of the economic downturn due to COVID restrictions.

273.    Pole Position does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

274.    Pole Position operates its sports bar pursuant to, and in accordance with, the following licenses/permits, which it maintains:

a.    A business license issued by the State of Washington endorsed as a spirits/beer/wine restaurant lounge; and

b.    A food establishment and cocktail lounge permit issued by Pierce County.

275.    As a consequence of the Pandemic, Pole Position was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply

chain disruptions related thereto, Pole Position suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

276. In order to mitigate the financial impact caused to Pole Position by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Pole Position submitted an application to its Lending Bank for a second draw PPP loan and received the second draw PPP loan on or about May 3, 2021. At all times relevant hereto, Pole Position's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the second draw PPP Loan sought by Pole Position.

277. Because Pole Position operated a licensed alcohol-serving sports bar under the licenses and permits identified in paragraph 274, it is, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business.

278. Pole Position claimed NAICS code 722410 on its second draw PPP loan and loan forgiveness applications.

279. At all times related to the relevant period for its second draw PPP loan, Pole Position had no more than 31 persons employed at its physical location.

280. Under the PPP, Pole Position was eligible to obtain its second draw Loan and it received its second draw Loan.

281. Pole Position applied for forgiveness of its second draw PPP Loan. The Loan Proceeds amount that Pole Position applied for forgiveness of for its second draw Loan, Pole Position used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its second draw Loan.

282.     On or about March 26, 2022, Pole Position received forgiveness of the fully amount of forgiveness requested on its second draw PPP Loan.

283.     On or about December 21, 2023, via email, SBA notified Pole Position that it was conducting a "review" of the loan and informed Pole Position that it may "request more information on any PPP loan of any size at any time." The "review" requested that Pole Position provide a number of documents.

284.     There was no stated purpose for the "review" stated in the email informing Pole Position of the "review."

285.     Pole Position is closed, and, if forced to repay its second draw PPP Loan, Pole Position would be unable to do so.

***Jamme Holdings, LLC ("Jamme")***

286.     Jamme is a licensed alcohol serving nightclub open to the consenting adult public, which presents on its premises a variety of non-obscene, constitutionally protected, female performance dance entertainment.

287.     Jamme has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on Jamme's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at the facility owned and operated by Jamme.

288.     Jamme does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

289.     Jamme operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

      a.     A Liquor License issued by the State of Pennsylvania that includes Sunday sales, extended food hours, and an amusement permit;

      b.     A Certificate of Occupancy that includes an adult entertainment nightclub use permission; and

      c.     A Health Permit for a Food Facility.

290.    As a consequence of the Pandemic, Jamme was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, Jamme suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

291.    In order to mitigate the financial impact caused to Jamme by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Jamme submitted an application to its Lending Bank for a first draw PPP loan on or about April 7, 2020. At all times relevant hereto, Jamme's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the first draw PPP loan sought by Jamme.

292.    In order to further mitigate the financial impact caused to Jamme by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Jamme submitted an application to its Lending Bank for a second draw PPP loan on or about April 1, 2021. At all times relevant hereto, Jamme's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the second draw PPP loan sought by Jamme.

293.     Because Jamme operates a licensed alcohol-serving nightclub under the licenses/permits identified in paragraph 289, it is, and was at all times relevant to the PPP, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business.

294.     Jamme claimed NAICS code 722410 on its first draw PPP loan forgiveness application, the SBA Form 3511, its second draw PPP Loan application, and its second draw PPP loan forgiveness application.

295.     On or about July 1, 2021, Jamme applied for loan forgiveness of its first draw PPP loan. The Loan Proceeds amount that Jamme applied for forgiveness of for its first draw Loan, Jamme used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its first draw Loan.

296.     On or about July 30, 2021, Jamme received forgiveness of the full amount of forgiveness requested on its first draw PPP Loan.

297.     On or about January 30, 2024, via letter, SBA notified Jamme that it was initiating a Post-Payment Review of Jamme's first draw PPP Loan and requested that Jamme provide a number of documents. The stated purpose for SBA's requests via the Post-Payment Review was to review whether Jamme was eligible for the PPP Loan under, among other factors, the Prurience Regulation and Affiliation Rules.

298.     On or about May 23, 2022, Jamme applied for loan forgiveness of its second draw PPP Loan. The Loan Proceeds amount that Jamme applied for forgiveness of for its second draw Loan, Jamme used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its second draw Loan.

299.     As of the date of this filing, Jamme has not received a final forgiveness decision from SBA regarding Jamme's second draw PPP Loan.

300.     At all times related to the relevant period for its first and second draw PPP Loans, Jamme had no more than 38 persons employed at its physical location.

301.     If forced to repay its first draw PPP Loan, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, Jamme may be forced to close its business and file for bankruptcy, which would result in the cessation of both the presentation of and the ability to view entertainment that is presumptively protected under the First Amendment to the United States Constitution, as well as the wholesale termination of its employees jobs; which the PPP was in fact designed to preclude from happening.

*90's Minneapolis, LLC ("90s")*

302.     90s is a licensed alcohol serving nightclub open to the consenting adult public, which presents on its premises a variety of non-obscene, constitutionally protected, male and female performance dance entertainment.

303.     90s has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on 90s's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at the facility owned and operated by 90s.

304.     90s does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

305.   90s operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

   a.   A Liquor License;

   b.   A Food License-Sidewalk Café; and

   c.   A Liquor Permit allowing 90s to close at 2 am.

306.   As a consequence of the Pandemic, 90s was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, 90s suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

307.   In order to mitigate the financial impact caused to 90s by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, 90s submitted an application to its Lending Bank for a first draw PPP loan on or about April 7, 2020. At all times relevant hereto, 90s's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the first draw PPP loan sought by 90s.

308.   In order to further mitigate the financial impact caused to 90s by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, 90s submitted an application to its Lending Bank for a second draw PPP loan on or about April 27, 2021. At all times relevant hereto, 90s's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the second draw PPP loan sought by 90s.

309.   Because 90s operates a licensed alcohol-serving nightclub under the licenses/permits identified in paragraph 305, it is, and was at all times relevant to the PPP, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business.

310.    90s claimed NAICS code 722410 on its first draw PPP loan forgiveness application, the SBA Form 3511, its second draw PPP Loan application, and its second draw PPP loan forgiveness application.

311.    On or about July 8, 2021, 90s applied for loan forgiveness of its first draw PPP loan. The Loan Proceeds amount that 90s applied for forgiveness of for its first draw Loan, 90s used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its first draw Loan.

312.    On or about July 22, 2021, 90s received forgiveness of the full amount of forgiveness requested on its first draw PPP Loan.

313.    On or about January 30, 2024, via letter, SBA notified 90s that it was initiating a Post-Payment Review of 90s's first draw PPP Loan and requested that 90s provide a number of documents. The stated purpose for SBA's requests via the Post-Payment Review was to review whether 90s was eligible for the PPP Loan under, among other factors, the Prurience Regulation and Affiliation Rules.

314.    On or about May 13, 2022, 90s applied for loan forgiveness of its second draw PPP Loan. The Loan Proceeds amount that 90s applied for forgiveness of for its second draw Loan, 90s used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its second draw Loan.

315.    On or about May 23, 2023, 90s received forgiveness of the full amount of forgiveness requested on its second draw PPP Loan.

316.    At all times related to the relevant period for its first and second draw PPP Loans, 90s had no more than 49 persons employed at its physical location.

317.   If forced to repay its first draw PPP Loan, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, 90s may be forced to close its business and file for bankruptcy, which would result in the cessation of both the presentation of and the ability to view entertainment that is presumptively protected under the First Amendment to the United States Constitution, as well as the wholesale termination of its employees jobs; which the PPP was in fact designed to preclude from happening.

**Las Vegas Bistro, LLC ("LVB")**

318.   LVB is a licensed alcohol serving nightclub open to the consenting adult public, which presents on its premises a variety of non-obscene, constitutionally protected, male and female performance dance entertainment.

319.   LVB has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on LVB's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at the facility owned and operated by LVB.

320.   LVB does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

321.   LVB operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

  a. An Adult Entertainment Cabaret License issued by Clark County

  b. A Liquor License issued by Clark County; and

  c. A Food (Restaurant) License issued by Clark County

65

322.    As a consequence of the Pandemic, LVB was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, LVB suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

323.    In order to mitigate the financial impact caused to LVB by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, LVB submitted an application to its Lending Bank for a first draw PPP loan on or about April 7, 2020. It submitted a revised application on May 21, 2020. At all times relevant hereto, LVB's Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the first draw PPP loan sought by LVB.

324.    Because LVB operates a licensed alcohol-serving nightclub under the licenses/permits identified in paragraph 321, it is, and was at all times relevant to the PPP, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business.

325.    LVB claimed NAICS code 722410 on its first draw PPP loan forgiveness application and the SBA Form 3511.

326.    On or about July 1, 2021, LVB applied for loan forgiveness of its first draw PPP loan. The Loan Proceeds amount that LVB applied for forgiveness of for its first draw Loan, LVB used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its first draw Loan.

327.    On or about July 27, 2021, LVB received forgiveness of the full amount of forgiveness requested on its first draw PPP Loan.

328. On or about January 30, 2024, via letter, SBA notified LVB that it was initiating a Post-Payment Review of LVB's first draw PPP Loan and requested that LVB provide a number of documents. The stated purpose for SBA's requests via the Post-Payment Review was to review whether LVB was eligible for the PPP Loan under, among other factors, the Prurience Regulation and Affiliation Rules.

329. At all times related to the relevant period for its first draw PPP Loan, LVB had no more than 120 persons employed at its physical location.

***Stockton Enterprises, LLC ("Stockton Enterprises")***

330. Stockton Enterprises is a licensed alcohol serving nightclub open to the consenting adult public, which presents on its premises a variety of non-obscene, constitutionally protected, female performance dance entertainment.

331. Stockton Enterprises has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on Stockton Enterprises' premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at the facility owned and operated by Stockton Enterprises.

332. Stockton Enterprises does not present any live performances, depictions or displays, or sell any products or services, of a prurient sexual nature or that otherwise appeal to a shameful, morbid, prurient, or unhealthy interest in sex.

333. Stockton Enterprises operates it nightclub pursuant to, and in accordance with, the following licenses/permits, which it maintains:

    a. Business License issued by San Joaquin County;

    b. Liquor License #364893 issued by the State of California; and

    c. A Health Permit for a Restaurant / Bar (#PT0002172).

334. As a consequence of the Pandemic, Stockton Enterprises was subject to various governmental closures orders imposed to mitigate the effects and spread of the COVID-19 virus. As a direct and proximate result thereof, the lingering effects of the Pandemic, and the supply chain disruptions related thereto, Stockton Enterprises suffered, as did a large percentage of businesses throughout the United States, devastating and catastrophic financial losses.

335. In order to mitigate the financial impact caused to Stockton Enterprises by the Pandemic and the consequences thereof, including but not limited to its ability to retain and pay its employees, Stockton Enterprises submitted an application to its Lending Bank for a first draw PPP loan on or about April 7, 2020. At all times relevant hereto, Stockton Enterprises' Lending Bank operated as a delegate of the SBA in processing and approving/disapproving of the first draw PPP loan sought by Stockton Enterprises.

336. Because Stockton Enterprises operates a licensed alcohol-serving nightclub under the licenses/permits identified in paragraph 333, it is, and was at all times relevant to the PPP, for purposes of the PPP and the Affiliation Rules, a NAICS code 72 business.

337. Stockton Enterprises claimed NAICS code 722410 on its first draw PPP loan forgiveness application and the SBA Form 3511.

338. On or about July 15, 2021, Stockton Enterprises applied for loan forgiveness of its first draw PPP loan. The Loan Proceeds amount that Stockton Enterprises applied for forgiveness of for its first draw Loan, Stockton Enterprises used exclusively for the Permitted Uses in full accordance with the PPP and its Loan Agreement. Consequently, it no longer possesses any of the Loan Proceeds from its first draw Loan.

339. On or about July 23, 2021, Stockton Enterprises received forgiveness of the full amount of forgiveness requested on its first draw PPP Loan.

340. On or about January 30, 2024, via letter, SBA notified Stockton Enterprises that it was initiating a Post-Payment Review of Stockton Enterprises' first draw PPP Loan and requested that Stockton Enterprises provide a number of documents. The stated purpose for SBA's requests via the Post-Payment Review was to review whether Stockton Enterprises was eligible for the PPP Loan under, among other factors, the Prurience Regulation and Affiliation Rules.

341. At all times related to the relevant period for its first draw PPP Loan, Stockton Enterprises had no more than 115 persons employed at its physical location.

342. If forced to repay its first draw PPP Loan, and because of the precarious financial condition in which it finds itself still as a result of the lingering impact of the Pandemic and the consequences thereof, Stockton Enterprises may be forced to close its business and file for bankruptcy, which would result in the cessation of both the presentation of and the ability to view entertainment that is presumptively protected under the First Amendment to the United States Constitution, as well as the wholesale termination of its employees jobs; which the PPP was in fact designed to preclude from happening.

## GENERAL ALLEGATIONS

343. The causes of action contained herein all revolve around the actions of the SBA in administering the Loans under the PPP.

344. As a result of the issuance of its PPP Loan at issue, each Plaintiff was required to enter into a loan agreement, normally by way of executing a Promissory Note (the "Loan Agreements"), with its Lending Bank. The Loan Agreements of the Plaintiffs are collectively attached hereto as **Exhibit T**.

345. Procedurally, Plaintiffs fall into five categories (although, as demonstrated, some Plaintiffs actually fall into more than one category because of multiple PPP Loans obtained by

69

them). First, Plaintiffs Gold Club (first draw), DV SG of LV, and Smithville have had their Loans granted but forgiveness thereof denied by the SBA through the issuance of an FLRD. Second, Plaintiffs Meacham, SAW, Dallas Food and Beverage, and Gold Club (second draw) have had their Loans granted but forgiveness denied by the SBA through the issuance of FLRDs, with the SBA then, following those Plaintiffs having appealed to the OHA, withdrawing the applicable FLRD and indicating that the SBA would be undertaking further investigation, and, upon motion by the SBA, the OHA subsequently dismissing such appeal. Third, Plaintiffs Gold Club (second draw) and Meacham have had their Loans granted but forgiveness denied by the SBA through the issuance of FLRDs, with the SBA then, following those Plaintiffs having appealed to the OHA, withdrawing the applicable FLRD and indicating that the SBA would be undertaking further investigation, and, upon motion by the SBA, the OHA subsequently dismissing such appeal, and with the SBA then issuing a second "new and improved" FLRD. Third, Plaintiff Gold Club (second draw) has had its Loan granted but forgiveness denied by the SBA through issuance of multiple FLRDs, which were appealed, with the OHA having affirmed SBA's "new and improved" FLRD such that Gold Club seeks judicial review of those orders by way of this lawsuit. Fourth, Plaintiff Meacham has had its Loan granted but forgiveness denied by the SBA through issuance of multiple FLRDs, which Meacham timely appealed, with the OHA having granted Meaham's appeal of SBA's "new and improved" FLRD and remanded the same back to SBA and SBA has not issued a new FLRD or otherwise issued forgiveness on that Loan. Fifth, Plaintiffs Cats of Vegas, the Office, Pole Position, Jamme, 90's, Las Vegas Bistro, Stockton, Reeder, and Cat's NOLA, have had both their Loans *and forgiveness thereof granted*, yet the SBA has recently informed those Plaintiffs that it was reconsidering the Plaintiffs' eligibility for such Loans and requested from them voluminous documentary materials. This has required the staffs and professionals of such

70

Plaintiffs to devote substantial resources, and the Plaintiffs to expend substantial sums, to comply with such requests.

346.    Under the PPP and Bank Fraud Enforcement Harmonization Act of 2022, Pub. L. 117-166 , 136 Stat. 1365 (Jan. 3, 2022), now codified at 15 U.S.C. § 636(a)(36)(W) and (a)(37)(P), criminal charges or civil enforcement actions alleging that a borrower engaged in fraud with respect to a PPP Loan may be brought not later than 10 years after the alleged offense was committed.

347.    Under and/or pursuant to 15 U.S.C. § 636m(l); 15 U.S.C. § 636m(E); 13 C.F.R. § 120.461(d); and/or SBA 7(a) Loan Servicing and Liquidation, SOP 50 57 3, § 3.D.5 (Aug. 1, 2023), the SBA has six years after a PPP loan is forgiven to audit and reconsider the decision. At the pace that the undersigned firm has seen the SBA recently issue such audit notices, it is expected that a large number of the clients of the undersigned firm will be audited in the near future.

348.    For those Plaintiffs that have had forgiveness of their Loans denied through the issuance by the SBA of an un-withdrawn FLRD, since the SBA is—under the terms of the PPP— the guarantor of such Loans, the Lending Banks have demanded, are demanding, and/or will be demanding, repayment of such Loans.

349.    As reported by NPR based on SBA data, 92% of all PPP loans have been forgiven.

350.    All attached Exhibits are incorporated by reference as though fully set forth herein.

**THE SBA'S AND CONGRESS' GERRYMANDERING OF EMERGENCY PANDEMIC FUNDING TO ASSIST PREVIOUSLY EXCLUDED BUSINESS ACTIVITIES AND TO DAMAGE "DISFAVORED" SPEECH**

351.    Congress created the SBA on July 30, 1953, through the Small Business Act of 1953, Pub. L. 83-163, tit. II, 67 Stat. 232, *et seq.*, (1953); *see also* https://www.sba.gov/about-sba/organization#:~:text=Congress%20created%20SBA%20with%20the,is%20periodically%20a

mended%20by%20Congress (last visited Feb. 12, 2024). The Small Business Act referenced in the previous sentence and all subsequent amendments thereto are collectively referred to hereinafter as the "SBA Act."

352.    On March 28, 2020, the President signed the CARES Act into law which, among other things, created the PPP.

353.    The PPP is part of the SBA Act.

354.    The PPP instructs the SBA to promulgate rules as follows:

SEC. 1114. EMERGENCY RULEMAKING AUTHORITY.

Not later than 15 days after the date of the enactment of this Act, the Administrator shall issue regulations to carry out this title and the amendments made by this title without regard to the notice requirements under section 553(b) of title 5, United States Code.

CARES Act, Pub. L. 116-136 § 1114; codified as 15 U.S.C. § 9012.

355.    The CARES Act specifically tasked the SBA with administering the PPP. The PPP further provides:

(I) In general

For purposes of making covered loans for the purposes described in clause (i), a lender approved to make loans under this subsection shall be deemed to have been delegated authority by the Administrator to make and approve covered loans, subject to the provisions of this paragraph.

(II) Considerations

In evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower—

(aa) was in operation on February 15, 2020; and

(bb)(AA) had employees for whom the borrower paid salaries and payroll taxes; or

(BB) paid independent contractors, as reported on a Form 1099-MISC.

(iii) Additional lenders

> The authority to make loans under this paragraph shall be extended to additional lenders determined by the Administrator and the Secretary of the Treasury to have the necessary qualifications to process, close, disburse and service loans made with the guarantee of the Administration.

15 U.S.C. § 636(a)(36)(F)(ii).

356.    Nowhere in the CARES Act did Congress authorize the SBA to make value judgments in determining which small businesses should survive the Pandemic through the issuance of emergency funding and which businesses should be allowed to fail without such funding.

357.    Pursuant to the PPP, and in particular 15 U.S.C. § 636(a)(36)(F)(ii), the SBA did, in fact, promulgate numerous regulations.

358.    On April 15, 2020, the SBA published, in the Federal Register, 85 Fed. Reg. 20811-17 (Interim Final Rule, Apr. 15, 2020), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program," which reads, in relevant part:

> Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible. (SOP 50 10 can be found at https://www.sba.gov/ document/sop-50-10-5-lenderdevelopment- company-loan-programs.).

85 Fed. Reg. 20812 (Apr. 15, 2020).

359.    On April 15, 2020, the SBA published, in the Federal Register, 85 Fed. Reg. 20817-21 (Interim Final Rule, Apr. 15, 2020), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program," which reads, in relevant part:

> This rule exempts otherwise qualified faith-based organizations from the SBA's affiliation rules, including those set forth in 13 CFR part 121, where the application of the affiliation rules would substantially burden those organizations' religious exercise.

*        *        *

73

The Administrator has also concluded that she does not have a compelling interest in denying emergency assistance to faith-based organizations that are facing the same economic hardship to which the CARES Act responded and who would be eligible for PPP but for their faith-based organizational and associational decisions.

*    *    *

In light of these exemptions, it is difficult to maintain that denying relief to these faith-based organizations is necessary to further a compelling government interest, let alone the least restrictive means of doing so.

85 Fed. Reg. 20819.

360.   In its April 15, 2020, Interim Final Rule (85 Fed. Reg. 20817-21) the SBA classified the PPP as a benefit program:

The affiliation rules would deny an *important benefit* (participation in a program for which they would otherwise be eligible under the CARES Act) because of the exercise of sincere religious belief (affiliation with other religious entities).

85 Fed. Reg. 20819 (emphasis added; all clarifications in original).

361.   On April 20, 2020, the SBA published, in the Federal Register, 85 Fed. Reg. 21747-52 (Interim Final Rule, Apr. 20, 2020), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program—Additional Eligibility Criteria and Requirements for Certain Pledges of Loans," which reads, in relevant part:

*b. Are businesses that receive revenue from legal gaming eligible for a PPP Loan?*

A business that is otherwise eligible for a PPP Loan is not rendered ineligible due to its receipt of legal gaming revenues if the existing standard in 13 CFR 120.110(g) is met or the following two conditions are satisfied: (a) The business's legal gaming revenue (net of payouts but not other expenses) did not exceed $1 million in 2019; and (b) legal gaming revenue (net of payouts but not other expenses) comprised less than 50 percent of the business's total revenue in 2019. Businesses that received illegal gaming revenue are categorically ineligible. The Administrator, in consultation with the Secretary, believes this test appropriately balances the longstanding policy reasons for limiting lending to businesses primarily and substantially engaged in gaming activity with the policy aim of making the PPP Loan available to a broad segment of U.S. businesses and their employees.

85 Fed. Reg. 21751 (all clarifications in original).

362. A few days later, on April 28, 2020, the SBA published, in the Federal Register, 85 Fed. Reg. 23450 (Interim Final Rule, Apr. 28, 2020), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorizations, Affiliation, and Eligibility," which expanded gambling establishments' eligibility and reads, in relevant part:

> d. Part III.2.b. of the Third PPP Interim Final Rule (85 FR 21747, 21751) is revised to read as follows:
>
> Are businesses that receive revenue from legal gaming eligible for a PPP Loan?
>
> A business that is otherwise eligible for a PPP Loan is not rendered ineligible due to its receipt of legal gaming revenues, and 13 CFR 120.110(g) is inapplicable to PPP loans. Businesses that received illegal gaming revenue remain categorically ineligible. On further consideration, the Administrator, in consultation with the Secretary, believes this approach is more consistent with the policy aim of making PPP loans available to a broad segment of U.S. businesses.

85 Fed. Reg. at 23451.

363. That same Interim Final Rule also "determined that this exception to the general ineligibility of government-owned entities, 13 CFR 120.110(j), is inappropriate to effectuate the purpose of the CARES Act," thereby allowing government-owned hospitals to receive PPP loans. Id. Such entities would otherwise have been ineligible for PPP loans under 13 C.F.R. § 120.110(j)

364. On June 26, 2020, the SBA published, in the Federal Register, 85 Fed. Reg. 38301 (Interim Final Rule, Jun. 26, 2020), an Interim Final Rule titled "Business Loan Temporary Changes; Paycheck Protection Program—Additional Eligibility Revisions to First Interim Final Rule."

365. Via 85 Fed. Reg. at 38302, the SBA relaxed its rule in the first interim final rule (85 Fed. Reg. 20811) that provided that "an applicant is ineligible for a PPP loan if an owner of 20

percent or more . . . is presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction" by determining that "should be limited to pending criminal charges for felony offenses, which aligns with the Administrator's prior determination that only felony convictions . . . will limit an applicant's eligibility for the PPP." Prior to these two interim final rules, such entities would have been categorically excluded from SBA's 7(a) loans via 13 C.F.R. § 120.110(n).

366.    On June 30, 2020, the SBA published, in the Federal Register, 85 Fed. Reg. 39066 (Interim Final Rule, Jun. 30, 2020), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program—Certain Eligible Payroll Costs."

367.    Prior to the June 30, 2020, Interim Final Rule (85 Fed. Reg. 39066, *et seq.*), crewmembers of commercial fishing boats were "treated as independent contractors or otherwise self-employed" and "because independent contractors have the ability to apply for a PPP loan on their own, they [the crewmembers] do not count for purposes of another applicant's PPP loan calculation." 85 Fed. Reg. 39066 (clarification added). In other words, prior to this Interim Final Rule, boat owners could not count the payments made to their crewmembers as payroll costs for the PPP because the crewmembers were themselves eligible for a PPP. The SBA's June 30, 2020, Interim Final Rule negated that limitation:

> The Administrator, in consultation with the Secretary, has determined that the relationship of a fishing boat owner and a crewmember described in Section 3121(b)(20) of the Code is analogous to a joint venture or partnership.

> \*        \*        \*

> Accordingly, as described below, this interim final rule (1) provides that a fishing boat owner may include compensation reported on Box 5 of Form 1099–MISC and paid to a crewmember described in Section 3121(b)(20) as a payroll cost in its PPP loan application, and (2) addresses a fishing boat owner's eligibility to obtain loan forgiveness of payroll costs paid to a crewmember who has obtained his or her own PPP loan.

85 Fed. Reg. at 39066-67.

368.    On January 27, 2021, the President signed the Appropriations Act into law, which,

among other things, created the second draw loans under the PPP, and which is largely codified at

15 U.S.C. § 636(a)(37).

369.    The second draw PPP provisions of the Appropriation Act states:

Except as otherwise provided in this paragraph, the Administrator may guarantee covered loans to eligible entities under the same terms, conditions, and processes as a loan made under paragraph [15 U.S.C. § 636(a)](36).

15 U.S.C. § 636(a)(37)(B) (clarification added).

370.    The Appropriation Act provides, in regard to Second Draw PPP eligibility:

(iv) the term "eligible entity"—

(III) does not include—

(aa) any entity that is a type of business concern (or would be, if such entity were a business concern) described in section 120.110 of title 13, Code of Federal Regulations (or in any successor regulation or other related guidance or rule that may be issued by the Administrator) other than a business concern described in subsection (a) or (k) of such section; or

(bb) any business concern or entity primarily engaged in political or lobbying activities, which shall include any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents;

(cc) any business concern or entity—

(AA) for which an entity created in or organized under the laws of the People's Republic of China or the Special Administrative Region of Hong Kong, or that has significant operations in the People's Republic of China or the Special Administrative Region of Hong Kong, owns or holds, directly or indirectly, not less than 20 percent of the economic interest of the business concern or entity, including as equity shares or a capital or profit interest in a limited liability company or partnership; or

(BB) that retains, as a member of the board of directors of the business concern, a person who is a resident of the People's Republic of China;

(dd) any person required to submit a registration statement under section 612 of Title 22; or

(ee) an eligible person or entity (as defined under section 24 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act) that receives a grant under such section 24;

15 U.S.C. § 636(a)(37)(A)(iv)(III). Hereafter, 15 U.S.C. § 636(37)(A)(iv)(III)(aa) shall be referred to as the "Incorporating Statute."

371.    The Appropriation Act expanded eligibility for the second draw PPP loans to include, as eligible businesses, churches and religious organizations:

(c) ELIGIBLE CHURCHES AND RELIGIOUS ORGANIZATIONS.—

(1) SENSE OF CONGRESS.—It is the sense of Congress that the interim final rule of the Administration entitled ''Business Loan Program Temporary Changes; Paycheck Protection Program'' (85 Fed. Reg. 20817 (April 15, 2020)) properly clarified the eligibility of churches and religious organizations for loans made under paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)).

Appropriations Act, § 311(c). Such entities would otherwise have been ineligible for PPP loans under 13 C.F.R. § 120.110(k).

372.    The Appropriation Act expanded eligibility for the Second Draw PPP, by amending the PPP to include, as eligible businesses, among other entities:

a. "housing cooperatives" and "small agricultural cooperatives," *see* EAA § 311(a) (adding 15 U.S.C. § 636(a)(37)(A)(i)), which, until 2017, may have been ineligible pursuant to 13 C.F.R. § 120.110(l) (*see* 82 Fed. Reg. 39491, 39492 (Final, Aug. 21, 2017);

b. a wider range of religious entities, by waiving SBA's rule prohibiting loans to certain faith-based entities, *see* EAA § 311(a) (adding 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa); EAA § 311(c)(ii), which were previously ineligible pursuant to 13 C.F.R. § 120.110(k); and

c. non-profit businesses, by waiving SBA's rule prohibiting loans to the same, *see*

EAA § 311(a) (adding 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa).

373. The Appropriation Act further expanded eligibility for the Second Draw PPP, by amending the PPP to include, as eligible businesses, certain news businesses:

(II) Eligibility of news organizations

(aa) Definition

In this subclause, the term "included business concern" means a business concern, including any station which broadcasts pursuant to a license granted by the Federal Communications Commission under title III of the Communications Act of 1934 (47 U.S.C. 301 et seq.) without regard for whether such a station is a concern as defined in section 121.105 of title 13, Code of Federal Regulations, or any successor thereto—

(AA) that employs not more than 500 employees, or the size standard established by the Administrator for the North American Industry Classification System code applicable to the business concern, per physical location of such business concern; or

(BB) any nonprofit organization or any organization otherwise subject to section 511(a)(2)(B) of the Internal Revenue Code of 1986 that is a public broadcasting entity (as defined in section 397(11) of the Communications Act of 1934 (47 U.S.C. 397(11))).

(bb) Eligibility

During the covered period, an included business concern shall be eligible to receive a covered loan if—

(AA) the included business concern is majority owned or controlled by a business concern that is assigned a North American Industry Classification System code beginning with 511110 or 5151 or, with respect to a public broadcasting entity (as defined in section 397(11) of the Communications Act of 1934 (47 U.S.C. 397(11))), has a trade or business that falls under such a code; and

(BB) the included business concern makes a good faith certification that proceeds of the loan will be used to support expenses at the component of the included business concern that produces or distributes locally focused or emergency information.

15 U.S.C. § 636(a)(36)(D)(iii)(II) (previously, Appropriations Act, § 317 (a)(2)). Such entities' eligibility under the CARES Act would have otherwise been uncertain pursuant to 13 C.F.R. § 120.110(r).

374.    Via 87 Fed. Reg. 38900 (June 30, 2022), SBA fully eliminated that prohibition against providing loans, including PPP loans, to "businesses principally engaged in teaching, instructing, counseling or indoctrinating religion or religious beliefs, whether in a religious or secular setting," found at 13 C.F.R. § 120.110(k), specifically stating that "SBA has determined that . . . paragraph (k) of section 120.110 should be removed from the Agency's regulations, and reserved[.]" 87 Fed. Reg. 38900, 38901. Via the proposed rule:

> SBA explained that this provision, which was promulgated in 1996, could be interpreted as impermissible exposing a special disability on organizations based on their religious status. Thus, the regulation may have caused uncertainty for Lenders and Borrowers determining the eligibility of an applicant for an SBA loan. . . .
>
> The removal of section 120.110(k) will eliminate uncertainty for Lenders and Borrowers and . . . SBA will continue to apply relevant Supreme Court caselaw to ensure that the proceeds of SBA business loans are used in a manner consistent with the First Amendment to the U.S. Constitution. Although this change is beneficial to increase clarity and uncertainty, it will not result in any specific way SBA implements this provision. SBA is currently following the Supreme Court precedent when analyzing eligibility for SBA financial assistance *as it believes that any regulation which may be inconsistent with that precedent cannot be given effect*.

Id. at 38906-07 (emphasis added).

375.    The Appropriations Act also expanded eligibility for the second draw PPP loans by amending the PPP to include, as eligible businesses, certain lobbying and destination marketing businesses:

(vii) Eligibility for certain 501(c)(6) organizations

(I) In general

Any organization that is described in section 501(c)(6) of the Internal Revenue Code and that is exempt from taxation under section 501(a) of such Code (excluding professional sports leagues and organizations with the purpose of promoting or participating in a political campaign or other activity) shall be eligible to receive a covered loan if—

(aa) the organization does not receive more than 15 percent of its receipts from lobbying activities;

(bb) the lobbying activities of the organization do not comprise more than 15 percent of the total activities of the organization;

(cc) the cost of the lobbying activities of the organization did not exceed $1,000,000 during the most recent tax year of the organization that ended prior to February 15, 2020; and

(dd) the organization employs not more than 300 employees.

(II) Destination marketing organizations

Any destination marketing organization shall be eligible to receive a covered loan if—

(aa) the destination marketing organization does not receive more than 15 percent of its receipts from lobbying activities;

(bb) the lobbying activities of the destination marketing organization do not comprise more than 15 percent of the total activities of the organization;

(cc) the cost of the lobbying activities of the destination marketing organization did not exceed $1,000,000 during the most recent tax year of the destination marketing organization that ended prior to February 15, 2020; and

(dd) the destination marketing organization employs not more than 300 employees; and

(ee) the destination marketing organization—

(AA) is described in section 501(c) of the Internal Revenue Code and is exempt from taxation under section 501(a) of such Code; or

(BB) is a quasi-governmental entity or is a political subdivision of a State or local government, including any instrumentality of those entities.

15 U.S.C. § 636(a)(36)(D)(vii) (previously, Appropriations Act, § 318(2)(C). Such entities would

otherwise have been ineligible for PPP loans under 13 C.F.R. § 120.110(j) and (r); *see also* 86 Fed.

Reg. 3692, 3697 n.26 (Interim Final Rule Jan. 14, 2021)

376.    The Appropriations Act also expanded eligibility for the second draw PPP loans by

amending 11 U.S.C. § 364 to include, as eligible businesses, businesses in bankruptcy:

'(g)(1) The court, after notice and a hearing, may authorize a debtor in possession or a trustee that is authorized to operate the business of the debtor under section 1183, 1184, 1203, 1204, or 1304 of this title to obtain a loan under paragraph (36) or (37) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), and such loan shall be treated as a debt to the extent the loan is not forgiven in accordance with section 7A of the Small Business Act or subparagraph (J) of such paragraph (37), as applicable, with priority equal to a claim of the kind specified in subsection (c)(1) of this section.

'(2) The trustee may incur debt described in paragraph (1) notwithstanding any provision in a contract, prior order authorizing the trustee to incur debt under this section, prior order authorizing the trustee to use cash collateral under section 363, or applicable law that prohibits the debtor from incurring additional debt.

'(3) The court shall hold a hearing within 7 days after the filing and service of the motion to obtain a loan described in paragraph (1). Notwithstanding the Federal Rules of Bankruptcy Procedure, at such hearing, the court may grant relief on a final basis.'

Appropriations Act, § 320(a). SBA had previously determined that such entities were ineligible for

PPP loans. 85 Fed. Reg. 23450, 23451(Interim Final Rule, Apr 28, 2020) ("Will I be approved for

a PPP loan if my business is in bankruptcy? No.").

377.    The provisions of the Appropriation Act regarding second draw PPP loans instruct

the SBA to promulgate rules as follows:

(M) Publication of guidance

Not later than 10 days after December 27, 2020, the Administrator shall issue guidance addressing barriers to accessing capital for minority, underserved, veteran, and women-owned business concerns for the purpose of ensuring equitable access to covered loans.

15 U.S.C. § 636(a)(37)(M).

378.    Title III, Section 303 of the Appropriations Act (also known by the "Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act"), instructs the SBA to promulgate rules as follows:

> Not later than 10 days after the date of enactment of this Act, the Administrator shall issue regulations to carry out this Act and the amendments made by this Act without regard to the notice requirements under section 553(b) of title 5, United States Code.

Appropriations Act, § 303 (now codified as 15 U.S.C. § 9012).

379.    Pursuant to the provisions of the Appropriations Act that apply to second draw PPP loans, the SBA did, in fact, promulgate numerous regulations.

380.    On March 8, 2021, the SBA published, in the Federal Register, 86 Fed. Reg. 13149-56 (Interim Final Rule, Mar. 8, 2021), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program—Revisions to Loan Amount Calculation and Eligibility," which:

> remove[s] the eligibility restriction that prevents businesses with owners who have non-financial fraud felony convictions in the last year from obtaining PPP loans and remove[s] the eligibility restriction that prevents businesses with owners who are delinquent or in default on their Federal student loans from obtaining PPP loans. The changes apply to both First Draw PPP Loans and Second Draw PPP Loans.

86 Fed. Reg. 13149 (clarification added). The SBA reasoned that removing these eligibility restrictions were:

> appropriate to ensure consistency with Congressional intent to provide relief to small businesses and their employees, expand access to the PPP, and remove barriers people with prior convictions face when working to restart their lives and contribute to our economy. SBA has determined that the one-year lookback restriction related to non-financial fraud felonies should be removed and only the five-year lookback restriction for those felonies involving fraud, bribery, embezzlement, or a false statement in a loan application or an application for federal financial assistance will limit an applicant's eligibility for the PPP. Removing the one-year lookback restriction related to non-financial fraud felonies

is consistent with Congressional support for reducing criminal background checks in the PPP and the important policies underlying recent criminal justice reforms in Congress, such as last year's Fair Chance to Compete for Jobs Act of 2019 (Pub. L. 116–92, Div. A, Tit. XI, Subtit. B,) and the First Step Act of 2018 (Pub. L. 115–391).

\*      \*      \*

By removing barriers for applicants with non-financial fraud felonies, this interim final rule balances the need to increase access to the PPP and remove barriers for people with prior convictions while still ensuring basic guardrails against fraud exist for this emergency program. Preserving the five-year lookback for financial fraud-related felonies is one of these guardrails.

\*      \*      \*

SBA has determined that eliminating consideration of delinquent or defaulted Federal student loans is appropriate to ensure consistency with Congressional intent to provide relief to small businesses and their employees and expand access to the PPP. This change will make PPP loans available to more borrowers with financial need and is consistent with Congress's intent that PPP loans be prioritized for small business concerns owned and controlled by socially and economically disadvantaged individuals as defined in section 8(d)(3)(c) of the Small Business Act.13 According to the Department of Eduction [*sic*], "Black and Brown students rely more heavily on student loan debt than their peers and experience delinquency at disproportionately high rates. As a result prohibiting delinquent student loan borrowers from obtaining PPP loans is more likely to exclude business owners of color from access to the loans they need." In addition, this change is consistent with the policy set in section 3513 of the CARES Act and the Department of Education's ongoing actions to provide economic relief to student loan borrowers whose loans are held by the agency by suspending Federal student loan payments and collections during the pandemic and keeping the interest rate at 0 percent.

At the request of the Department of Education by letter dated February 27, 2021, Treasury also has granted an exemption from the bar in 31 U.S.C. 3720B and 31 CFR 285.13, with respect to PPP borrowers with Federal student loans in delinquent status.

The change in PPP regulations relating to Federal student loans and the Treasury exemption apply to new PPP applicants as well as those borrowers who have already received a PPP loan. In this way, PPP borrowers with delinquent or defaulted student loan debts are treated equally, without regard to when they submitted their PPP application.

86 Fed. Reg. 13154-55.

381.    On March 11, 2021, the President signed ARPA into law, which, among other things, modified both first and second draw PPP loan provisions via Section 5001 thereof.

382.    On March 22, 2021, the SBA published, in the Federal Register, an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by American Rescue Plan Act," 86 Fed. Reg. 15083 (Interim Final Rule, Mar 22, 2021), which provides that "[t]he intent of the CARES Act, the Economic Aid Act, and the American Rescue Plan Act is that SBA provide relief to America's small businesses and nonprofit organizations expeditiously." Id. at 15084.

383.    Generally, Section 5001 of ARPA amended the PPP to increase eligibility for certain non-profit organizations, including non-profit organizations that conduct lobbying activities and internet publishing organizations.

384.    Specifically, ARPA added the following to 15 U.S.C. § 36(a):

"(xvii) the term 'additional covered nonprofit entity'—

"(I) means an organization described in any paragraph of section 501(c) of the Internal Revenue Code of 1986, other than paragraph (3), (4), (6), or (19), and exempt from tax under section 501(a) of such Code; and

"(II) does not include any entity that, if the entity were a business concern, would be described in section 120.110 of title 13, Code of Federal Regulations (or in any successor regulation or other related guidance or rule that may be issued by the Administrator) other than a business concern described in paragraph (a) or (k) of such section."; and

(B) in subparagraph (D)—

(i) in clause (iii), by adding at the end the following:

"(III) ELIGIBILITY OF CERTAIN ORGANIZATIONS.—
Subject to the provisions in this subparagraph, during the covered period—

"(aa) a nonprofit organization shall be eligible to receive a covered loan if the nonprofit organization employs not more than 500 employees per physical location of the organization; and

"(bb) an additional covered nonprofit entity and an organization that, but for subclauses (I)(dd) and (II)(dd) of clause (vii), would be eligible for a covered loan under clause (vii) shall be eligible to receive a covered loan if the entity or organization employs not more than 300 employees per physical location of the entity or organization."; and

(ii) by adding at the end the following:

"(ix) ELIGIBILITY OF ADDITIONAL COVERED NONPROFIT ENTITIES.—An additional covered nonprofit entity shall be eligible to receive a covered loan if—

"(I) the additional covered nonprofit entity does not receive more than 15 percent of its receipts from lobbying activities;

"(II) the lobbying activities of the additional covered nonprofit entity do not comprise more than 15 percent of the total activities of the organization;

"(III) the cost of the lobbying activities of the additional covered nonprofit entity did not exceed $1,000,000 during the most recent tax year of the additional covered nonprofit entity that ended prior to February 15, 2020; and

"(IV) the additional covered nonprofit entity employs not more than 300 employees.".

(2) ELIGIBILITY FOR SECOND DRAW LOANS.—Paragraph (37)(A)(i) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260), is amended by inserting " 'additional covered nonprofit entity'," after "the terms".

ARPA, § 5001(a)(1)(A)-(B) & (a)(2).

## **FACTS RELATING TO PLAINTIFFS' ESTOPPEL CAUSE OF ACTION**

385.    In reliance upon the terms of the Loan Agreements and the provisions of the PPP, the Plaintiffs used the portions of the Loan Proceeds that they seek forgiveness of only for the Permitted Uses and no other uses whatsoever. More specifically, as a result of receiving the Loan Proceeds, Plaintiffs kept as many of their employees as possible employed during the various

86

Pandemic governmental shutdowns so that those employees would not be required to seek and obtain unemployment compensation or other forms of governmental assistance.

386. At all times, each Plaintiff has fully abided by all of its obligations under the Loan Agreement or Loan Agreements to which it is bound.

387. But for receipt of the Loans Proceeds, the Plaintiffs would not have been able, during governmental shutdowns and the immediate time periods thereafter because of the significant drop of business resulting from the Pandemic, to continue the employment of many of their employees. Through and with the Loan Proceeds, the Plaintiffs paid wages to the retained employees and paid and/or remitted all withholding taxes due on such wages or related thereto to the applicable federal and state authorities.

388. But for the receipt of the Loan Proceeds, the Plaintiffs, during the governmental shutdowns and the immediate time periods thereafter, may not have continued the employment of many of their employees during that time period. In other words, but for the receipt of the Loan Proceeds permitted Plaintiffs to keep a number of their employees on payroll such that, without the Loan Proceeds, these employees would have either a) not been paid or b) have applied for other governmental assistance programs such as unemployment.

389. Nevertheless, due to the extent of certain governmentally mandated Pandemic shutdowns and/or closure orders, a number of the Plaintiffs were not able to use all of their Loan Proceeds for the Permitted Uses; primarily as a result of the inability to have numerous employees actually undertake work-related activities for which compensation in the form of wages would then be due and payable.

390. As a result of the circumstances set forth in the paragraph immediately above, Plaintiffs Deja Vu Showgirls of Las Vegas, LLC; Office Minneapolis, LLC; Cats 701 Bourbon,

LLC; 90's Minneapolis, LLC; Las Vegas Bistro, LLC; Stockton Enterprises, LLC returned to their Lending Banks those portions of their Loan Proceeds that they were unable to use for the Permitted Uses, to wit: Plaintiff Deja Vu Showgirls of Las Vegas, LLC returned $7,207.02; Plaintiff Office Minneapolis, LLC returned $55,966.51; Plaintiff Cats 701 Bourbon, LLC returned $70,350.77; Plaintiff 90's Minneapolis, LLC returned $25,486.74; Plaintiff Las Vegas Bistro, LLC returned $303,039.48; and Plaintiff Stockton Enterprises, LLC returned $96,738.94.

391.    For all other Loan Proceeds, the Plaintiffs used them, as stated above, in accordance with the Loan Agreements and the PPP, and therefore no longer have possession of any of such Loan Proceeds.

392.    In addition, because Plaintiffs' employees provided the work for which they had been retained, Plaintiffs have no legal remedy to recoup such Loan Proceeds from their employees and ex-employees in the event that the SBA is successful in negating the Loans.

393.    Further, because Plaintiffs paid, among other things, various utility bills as they became due, rent, and mortgages, during the Pandemic, all of which are Permitted Uses, Plaintiffs have no legal remedy to recoup such Loan Proceeds from, for example, their trash service provider, internet service provider, landlord, etc., in the event that the SBA is successful in negating the Loans.

394.    Through the distribution of the Loan Proceeds pursuant to the Loan Agreements and the PPP, a substantial portion of the Loan Proceeds have already been returned to the Treasury in the form of income and payroll taxes paid by or on behalf of the ultimate recipients of the Loan Proceeds; most of whom were the employees of the Plaintiffs, service providers of the Plaintiffs, or landlords of the Plaintiffs.

88

395.    For Loan Proceeds that have already been returned to the Treasury in the form of payroll taxes paid on behalf of Plaintiffs' employees, the Plaintiffs themselves remitted such taxes to the Treasury.

396.    In addition to the Loan Proceeds discussed in the paragraph immediately above, other Loan Proceeds have also already been returned to the Treasury in the form of income and other taxes due on or related to the purchase of goods and services by Plaintiffs' employees out of the wages they received from the Plaintiffs through the Loan Proceeds.

397.    In addition to the Loan Proceeds discussed in two paragraphs immediately above, other Loan Proceeds have also already been returned to the Treasury in the form of, for example, income taxes from Plaintiffs' landlords, income taxes for personal protective equipment (i.e., "worker protection expenditures," *see* 15 U.S.C. § 636(a)(36)(F)(i)(XI)), purchased by Plaintiffs and paid by the vendors that sold such equipment, and income taxes on utilities such as trash and internet services paid by Plaintiffs' vendors of these services.

398.    As a result of the facts and circumstances set forth in the seven paragraphs immediately above, if Plaintiffs are required to pay back the Loan Proceeds (which they no longer themselves possess), the federal government will realize a substantial, inequitable, and "double dipping" of compensation in the form of the Loan Proceeds.

### FACTS RELATING TO PRIOR OHA PROCEEDINGS

399.    Prior to the matters involved in this action, the undersigned firm had initiated approximately16 appeals in the OHA.

400.    Of the prior administrative appeals that the undersigned firm has filed, not a single one resulted in a final ruling by the OHA. One was dismissed on procedural grounds. In all of the others, the SBA withdrew its final determination in order to permit it to come up with a "new"

reason to justify denial of eligibility; with all such matters subsequently being resolved by formal settlements between the undersigned firm's clients and the SBA.

401.    In the previous OHA appeals where the SBA had withdrawn its final determination, it either stayed the appeal pending issuance of the "new and improved" FLRD or moved for dismissal of the OHA appeal (one such motion having been granted by the OHA the same day as the filing of the SBA's motion for dismissal, without the appellant there even being permitted the opportunity to respond, despite 13 C.F.R. § 134.211(c) permitting the non-moving party fifteen days to respond to a motion).

402.    In one particular instance, the undersigned firm filed an appeal with the OHA; the SBA then withdrew that FLRD; the OHA appeal was then dismissed; the SBA then came up with a second reason to deny forgiveness and issued a second FLRD; the undersigned firm then filed a second appeal in the OHA on behalf of that client; and the SBA then withdrew that second FLRD as well (litigation thereafter being avoided by the SBA subsequently resolving its dispute with that entity as part of a "group" settlement).

403.    In several of the instances where the SBA has withdrawn the FLRD, it has done so not at the early stages of the appeal; but rather, after reviewing the appeal brief, filing the administrative record, and reviewing the appellant's objections to the administrative record. Such instances increased the cost of these appeals, in terms of professional fees (both attorney and accountant), exponentially.

**FACTS AND LAW RELATING TO THE OHA PROCEEDINGS UNDERLYING THIS LAWSUIT, AND PLEADINGS IN AVOIDANCE OF ADMINISTRATIVE REMEDIES EXHAUSTION**

404.    13 C.F.R., Ch. I, Pt. 134, Subpart L, titled "Borrower Appeals of Final Sba Loan Review Decisions," 13 C.F.R. §§ 134.1201 – 1217, provides "rules of practice" that apply only "to

appeals to OHA from certain final SBA loan review decisions under the Paycheck Protection Program[.]" 13 C.F.R. § 134.1201(a). These regulations will be collectively referred to hereinafter as the "Special OHA Rules." Plaintiffs only challenge these Special OHA Rules that apply solely to PPP loans, *i.e.*, 13 C.F.R., Ch. I, Pt. 134, Subpart L; they do *not* challenge the "normal" OHA appellate rules that apply to appeals related to all other SBA-related funding decisions generally found at 13 C.F.R., Ch. I, Pt. 134, Subparts A – M, *excluding* Subpart L.

405.    The OHA was never designed to handle the number of appeals emanating from the PPP and other Pandemic funding programs. As a result, in order to administer and decide such appeals, the OHA uses "administrative law judges" or "administrative judges" from other federal agencies and does not even require, for PPP related appeals, administrative law judges to adjudicate appeals. Rather, the Special OHA Rules permit outside attorneys hired by the SBA, and referred herein to as "OHA Attorneys," to sit in consideration of, and to decide, appeals in the OHA. *See* 13 C.F.R. § 134.1206. The screenshot attached hereto as **Exhibit U** demonstrates that OHA Attorney Loreen McCloskey submitted the order signed by the Administrative Judge dismissing the appeal the same day that SBA filed a motion to dismiss and, upon information and belief, Constance T. O'Bryant is a retired administrative law judge. *See* https://www.linkedin.com/in/constance-obryant-109b0385/.

406.    13 C.F.R. § 134.1209(c) provides that all appeals in the OHA are to be "decided solely on a review of the administrative record, the appeal petition, any response, any reply or supplemental pleading, and filings related to objection to the administrative record." There is no right for the appellant to obtain any form of hearing in the OHA for PPP loans. Id.

407.    13 C.F.R. § 134.1209(a) provides that "[g]enerally, the Judge may not admit evidence beyond the administrative record."

408.    Under the general rules of the OHA, a party may obtain discovery "upon motion, and for good cause shown." 13 C.F.R. § 134.213(a). Permissible discovery includes requests for admissions, requests for production of documents, interrogatories, and depositions. *See* 13 C.F.R. § 134.213(b).

409.    However, the SBA has promulgated a rule, initially without public notice or comment, specifically precluding discovery "in appeals from final SBA loan review decisions" under the PPP. 13 C.F.R. § 134.1209(b); *see also* 13 C.F.R. § 134.1201(h) (enumerating select provisions of 13 C.F.R., Ch. I, Pt. 134, Subpart B for incorporation into Subpart L, and expressly stating that "[o]ther provisions from subpart B of this part that are not specifically referenced in this subpart do not apply to this subpart.").

410.    As a result of the provisions of 13 C.F.R. § 134.1209(b), all of these Plaintiffs are, by adopted regulation, precluded from obtaining *any discovery whatsoever* in the OHA before their matters can proceed to court.

411.    Upon information and belief, the SBA will contend in this litigation or any litigation resulting from an OHA appeal that the Court is limited to the factual record "developed" in the OHA (and see further discussion below in this regard).

412.    In various OHA appeals, SBA has attempted to add "evidence" to support its FLRD after issuance of the FLRD and which is not contained in the administrative record; including in the OHA appeals of Meacham and Gold Club.

413.    On or about May 14, 2024, Meacham "won" its OHA appeal by, among other things, demonstrating a lack of evidence in the administrative record to support SBA's conclusions set forth in the FLRD and that OHA judge's refusal to accept SBA's late "evidence" proffered by declaration accompanying SBA's response in that appeal.

414.    To support the FLRDs that SBA issued Meacham and SAW, SBA included the same type of evidence, namely, google maps photographs of the street view of these Plaintiffs' buildings, in both of those Plaintiff's administrative records.

415.    Upon information and belief, SBA, fearing SAW's second appeal of SBA's denial of forgiveness on its first draw PPP Loan would be meritorious for the same reasons as Meacham's was, withdrew the FLRD that SAW was appealing—thereby needlessly increasing SAW's costs in this process of achieving Loan forgiveness

416.    SBA's tactics as described in the previous paragraph could forever prohibit these plaintiffs from obtaining review by an Article III judge.

417.    This action asks this Court to resolve numerous constitutional matters; including both facial challenges and challenges to the SBA's application of the various regulations and statutes challenged herein, as well as to conduct a judicial review of the second FLRD issued by SBA on Gold Club's second draw PPP Loan and the May 14 Order affirming the same (summarized above and specifically delineated below).

418.    As consistently stated by the Supreme Court, constitutional questions are beyond the jurisdiction of administrative agencies, and therefore beyond the jurisdiction of the OHA. *See*, *e.g.*, Carr v. Saul, 593 U.S. 83, 92 (2021) (numerous citations omitted) (". . . this Court has often observed that agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' area of technical expertise"); Califano v. Sanders, 430 U.S. 99, 109 (1977) ("Constitutional questions are obviously unsuited to resolution in administrative hearing procedures and, therefore, access to the court is essential to the decision of such questions."); Johnson v. Robison, 415 U.S. 361, 368 (1974) ("Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction

of administrative agencies."); Mobility Workx, LLC v. Unified Pats., LLC, 15 F.4th 1146, 1150 (Fed. Cir. 2021) (cleaned up; collecting cases) ("Under Supreme Court and circuit precedent, agencies generally do not have authority to declare a statute unconstitutional. It follows that constitutional challenges to the statute under which the agency operates need not be raised before the agency."); *see also* 5 U.S.C. § 706 (". . . the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions . . . ."); Crowell v. Benson, 285 U.S. 22, 60 (1932) ("In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function.").[3]

419.    In addition, administrative agencies do not have the jurisdiction to decide the constitutionality of their own regulations. *See, e.g.*, Gilbert v. Nat'l Transp. Safety Bd., 80 F.3d 364, 366 (9th Cir. 1996) (collecting cases) ("Generally, challenges to the constitutionality of a statue or regulation promulgated by an agency are beyond the power or the jurisdiction of an agency."); Motor & Equip. Mfrs. Ass'n, Inc. v. E.P.A., 627 F.2d 1095, 1114-15 (D.C. Cir. 1979), cert denied 446 U.S. 952; Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 215 (1994); Gonzalez v. Metro. Transp. Auth., 174 F.3d 1016, 1018 (9th Cir. 1999) (noting that "[t]he constitutionality of agency drug testing regulations is reviewed *de novo*.").

420.    In particular, the OHA does not have the ability to consider the validity of an SBA regulation. [*See, e.g.*, **Exhibit V** (SBA Response to Plaintiff Meacham's Motion for Discovery in

---

[3] Plaintiffs acknowledge that citation to case law is not normally encouraged in formal federal complaints. However, since Plaintiffs have the burden to plead in avoidance of the requirement that they first exhaust their administrative remedies before repairing to this Court, Plaintiffs include citations to establish just that point and to carry that burden. Other case citations are included to accurately describe the legal standards applicable to a number of the Plaintiffs' constitutional challenges contained herein.

the OHA, arguing that OHA does *not* have the "ability to consider the validity of an SBA regulation" and that Administrative Law Judges "do not have constitutionally-backed judicial power" and therefore cannot entertain constitutional challenges); **Exhibit W** (the Administrative Law Judge in Plaintiff Gold Club's first draw OHA appeal specifically stating "[n]othing in the Administrative Procedures Act, the Small Business Act, or SBA regulations gives OHA the ability to consider the validity of an SBA regulation"); **Ex. P** (OHA Order in Gold Club's second appeal of the denials of forgiveness regarding its second draw PPP Loan, the OHA judge, at page 10 of the order, stating, in regards to Gold Club's constitutional and EAJA claims, "I lack authority to decide the issues raised by Appellant")]; 13 C.F.R. § 134.102.

421.    Nevertheless, the SBA's administration of the PPP purports to require Plaintiffs to first seek review by the OHA before moving to federal court. *See* 134 C.F.R. § 134.1201(d).

422.    The Supreme Court has acknowledged "a futility exception to exhaustion requirements." <u>Carr</u>, 593 U.S. at 93. As stated by the Supreme Court, "[i]t makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested." <u>Id.</u>

423.    Pursuant to the Special OHA Rules, each Plaintiff that has been denied Loan forgiveness has filed an appeal of each denial with the OHA as discussed herein, *supra*.

424.    Unlike normal "court" appeals, the actual appeal brief in the OHA, where the appellant argues the factual and legal merits of its appellate claims, must be filed as part of the appellant's initial submissions and *before* the appellant has received the administrative record from the SBA which documents (or purports to document) the SBA's reasoning for its decision. *See* 13 C.F.R. §§ 134.1202(a) (noting the 30-day timeline from receipt of the FLRD to file an appeal petition); 134.1204(a) (noting the content requirements for an appeal petition, which specifically

includes "[a] full and specific statement as to why the [FLRD] is alleged to be erroneous, together with all factual information and legal arguments supporting the allegations"); 134.1204(b) (noting an appeal may be dismissed if it does not contain the required information); 134.1206 (requiring the OHA judge to issue a Notice and Order to "establish[] a deadline for production of the administrative record and specify[] a date by which SBA may respond to the appeal," after the appeal has been filed); 134.1207(a) (noting that the "administrative record will be due 20 calendar days after issuance of the Notice and Order"); 134.1207(b) (discussing the required contents of the administrative record, which, apparently, does *not* include "all documents pertaining to the appellant," only those the SBA deems "relevant" to its consideration when making the FLRD "or that were before SBA at the time of the" FLRD); 134.1208(b) (noting SBA has 45 calendar days to respond to the appeal petition after issuance of the Notice and Order); *see also* Notice and Order (Scheduling Order) for Dallas Food and Beverage's OHA Appeal [**Exhibit X**].

425.    The administrative records involving the Plaintiffs, filed by the SBA in the OHA *after* the appellant has submitted its brief on the merits, can comprise thousands of pages of documents. For example, the administrative record for the OHA appeal of Plaintiff SAW comprised 6,206 pages.

426.    Regardless of the length of the administrative record, the appellant is only provided 10 days to review the entire administrative record and to then file with the OHA any objections to the contents thereof. 13 C.F.R. §§ 1207(a) (noting that the administrative record is due "20 calendar days after issuance of the Notice and Order"); 1207(e) (noting that objections "to the administrative record must be filed with OHA and served on SBA no later than 30 days after the issuance of the Notice and Order," and allowing for an additional 10 calendar day extension "from

the date SBA is required to file the administrative record" "[i]f additional time to file the administrative record was requested").

427.    After receipt of the administrative record, an OHA appellant has no unconditional right to submit further briefing in support of its position and to place the contents, or lack thereof, of the administrative record in context to the appellate arguments that had previously been made by the appellant. 13 C.F.R. § 134.1208(e) ("Generally, a reply to a response is not permitted unless the Judge directs otherwise.").

428.    Although an OHA appeal is purportedly to be based upon the administrative record applicable to that particular appeal, some of the Plaintiffs have actually received administrative records from the SBA that contain numerous redactions (through simply "blacked out" text) without any further explanation and SBA has been permitted to supply "evidence" with its response to OHA appellants' appeals via declaration.

429.    As a result of the redactions to the administrative records as stated in the paragraph immediately above, a number of the Plaintiffs have not even been provided with a full record of the documentation pertaining to their administrative appeals; they do not know the full contents of the administrative record being used against them to justify denial of their loan forgiveness applications; and it is simply impossible for them to file full and substantive objections to those portions of the administrative record that they simply have not seen.

430.    In most of Plaintiffs' OHA appeals, the particular Plaintiff filed, contemporaneously with the submission of the appeal or shortly thereafter, a motion for discovery seeking leave to obtain certain discovery that the appellants (Plaintiffs here) felt was essential for the proper consideration of its OHA appeal and for the proper adjudication of any such ruling by a federal

court. The motions also requested that the responses to the discovery sought be included in the administrative record for such appeal.

431.    In order to demonstrate the unconstitutional nature of the Special OHA Rules, Plaintiffs attach only three examples of the discovery motions filed by the Plaintiffs. **Exhibit Y** is the motion (including exhibits A-H thereto), filed on December 12, 2023, pertaining to the appeal of the denial of the application for forgiveness on Plaintiff Gold Club's first draw PPP Loan; **Exhibit Z** is the motion (including exhibits A-D thereto), filed on December 13, 2023, pertaining to the appeal of the denial of the application for forgiveness on Plaintiff SAW's first draw PPP Loan; **Exhibit AA** is the motion (including exhibits A-F thereto, filed on February 27, 2024, pertaining to the appeal of the denial of the application for forgiveness on Plaintiff Meacham's second draw PPP Loan.

432.    The Gold Club (first and second draw loan appeals) and SAW matters were assigned to Richard Ambrow, who is an administrative law judge from the Department of Health and Human Services and who normally handles appeals dealing with Medicare claims.

433.    Each of the four discovery motions attached laid out in elaborate detail the discovery being sought and the legal and factual reasons why that discovery was essential to the full adjudication of appellants' legal and factual claims. In addition, each motion contained a document production request that specifically identified the documents requested, as well as a deposition notice of the SBA that listed each area of inquiry. To the extent possible, the discovery requests followed the format of the Federal Rules of Civil Procedure (the Special OHA Rules not including any discovery format rules), and in particular the deposition notice provisions of FRCP 30(b)(6).

434. The discovery motions filed in Plaintiffs' OHA appeals specifically asserted that the denial of such a motion would be a flagrant denial of the appellant's fundamental due process rights. [*See, e.g.,* **Ex. Y**, at ¶ 77]. Each motion also stated appellant's concern that the SBA would argue in court that the court's consideration of the appellant's claims would be limited to the administrative record contained in the OHA (hence the need for the discovery sought), and that the response of the SBA to such motion would permit counsel for the SBA to address the appellant's concern. [Id., ¶ 14].

435. Mr. Ambrow denied Gold Club's discovery motion on December 13, 2023, within 20 hours of its submission [Order Denying Motion for Discovery, **Ex. W**]. For SAW, Mr. Ambrow denied SAW's discovery motion the same day, within three hours of its submission [Order Denying Motion for Discovery, **Exhibit Z**]. Both motions were denied before counsel for the SBA filed any response and, in the case of the SAW motion, before any counsel for the SBA had even been assigned.

436. The Gold Club and SAW motions were denied on the basis that no discovery was permitted in the OHA on appeals relating to PPP loans. Neither of these two OHA orders denying discovery addressed the impact upon the appellant's due process rights as a result of the lack of such discovery other than containing a comment regarding the lack of authority of the OHA to "consider the validity of an SBA regulation." [*E.g.*, **Ex. W**].

437. As a result of such expedited denials, Plaintiffs' Gold Club and SAW and the OHA were deprived of a response by the SBA as to whether the SBA will contend that subsequent court review of an OHA decision is limited to the facts contained in the formal administrative record prepared by the SBA.

438.   Further demonstrating the unconstitutional nature of the Special OHA Rules is the fact that in Meacham and Gold Club's appeals, SBA is seeking to or sought to, as applicable, add evidence to support its FLRD that is not contained in the administrative record and to do so, SBA contends that it has the authority to withdraw an FLRD at any point in time and reissue after updating the administrative record. In other words, SBA can amend the administrative record at whim, while the appellant cannot and also cannot take discovery.

439.   As evidenced by the OHA's decision in SAW's reconsideration petition, OHA, apparently, agrees that SBA may withdraw an FLRD at any point in time. *See* **Ex. S.**

440.   Pursuant to scheduling orders that had been entered in the OHA appeals related to Plaintiff Gold Club's second and first draw PPP Loan and Plaintiff SAW's second draw PPP Loan, the administrative records were produced (951 pages for Gold Club's second draw PPP Loan appeal, 5,967 pages for Gold Club's first draw PPP Loan appeal, and 6,206 pages for SAW's first draw PPP Loan appeal).

441.   Following the production of the administrative records as described in the paragraph immediately above and the administrative records relating to the Plaintiffs' other OHA appeals, the attorneys and accountants of the Plaintiffs began reviewing the administrative records in order to be able to submit to the OHA any necessary objections thereto in the timeframes as established by the Special OHA Rules and the scheduling orders issued by the OHA adjudicator. This required each appellant to incur thousands of dollars, and in some circumstances tens of thousands of dollars, in professional fees in furtherance of undertaking steps that are purported to be necessary in order for those Plaintiffs to be able to comply with the Special OHA Rules.

442.   As those reviews of the administrative records were occurring, and as legal counsel was preparing the filings of the actual OHA appeals for a number of the other Plaintiffs, the

undersigned law firm received, on January 9, 2024, a motion to dismiss the OHA appeal related to the forgiveness denial of Plaintiff Gold Club's second draw PPP loan. That motion, with an accompanying declaration, is attached as **Exhibit CC**.

443.    The motion to dismiss the OHA appeal of Plaintiff Gold Club's second draw PPP loan forgiveness request was based upon the fact that the SBA had withdrawn, on January 3, 2024, the FLRD on appeal. In the motion, the SBA contended that it had done so:

> . . . because it determined that it is necessary to complete a further review of the Loan. This review will include, but is not limited to, additional requested information submitted with the Appeal.

[**Ex. CC**, at p. 2 (citations omitted)].

444.    Under the Special OHA Rules, a party to an appeal is given 15 days to respond to a motion. 13 C.F.R. § 134.211(c), which is expressly incorporated into the Special OHA Rules via 13 C.F.R. § 134.1201(h). Irrespective of that regulation and without permitting Plaintiff Gold Club to respond to the motion to dismiss, Mr. Ambrow granted the motion the *same day* it was filed. [*Compare* Order of Dismissal, Plaintiff Gold Club's second draw PPP appeal, **Exhibit DD** (issued on January 9, 2024, *with* SBA's Motion to Dismiss Plaintiff Gold Club's second draw PPP appeal, **Ex. CC** (filed on January 9, 2024)].

445.    As a direct and proximate result of the withdrawal by the SBA of its FLRD and the OHA's subsequent dismissal of the appeal based thereon, Plaintiff Gold Club has needlessly expended significant sums of money in attorney fees and accountant fees in preparing and filing its initial OHA appeal documents, in preparing and filing its discovery motion, and in reviewing the administrative record in furtherance of filing objections thereto.

446.    As noted, *supra*, SBA, the day after the filing of the motion to dismiss the appeal and the entry of the dismissal order in Plaintiff Gold Club's second draw appeal, filed an almost

identical motion in Plaintiff SAW's first draw appeal, with the same thing happening. Without allowing Plaintiff SAW to file a response to the motion and to be heard, Mr. Ambrose granted that motion the same day that it was filed as well. [**Exhibits EE** and **FF** respectively].

447.    As a direct and proximate result of the withdrawal by the SBA of its FLRD and the OHA's subsequent dismissal of the appeal based thereon, Plaintiff SAW has needlessly expended significant sums of money in attorney fees and accountant fees in preparing and filing its initial OHA appeal documents, in preparing and filing its discovery motion, and in reviewing the administrative record in furtherance of filing objections thereto.

448.    Because Plaintiff Gold Club's first and second draw OHA appeals and Plaintiff SAW's first draw OHA appeal were filed as a group and contained similar issues (denials based on the Prurience Regulation and/or the Affiliation Rules), and because the attorneys and accountants for Plaintiff Gold Club were also reviewing the administrative record on Plaintiff Gold Club's first draw PPP loan appeal for objection purposes, attorney Zachary Youngsma, representing Plaintiff Gold Club in the OHA, emailed SBA's counsel, Lane Siems, to inquire whether the SBA intended to do the same thing in Plaintiff Gold Club's first draw PPP loan appeal; that being withdrawing the FLRD and seeking dismissal of the appeal.

449.    The OHA portal for Gold Club's second draw appeal states that the "OHA Attorney" is Christopher Hicks.

450.    In response to the email of Mr. Youngsma, attorney Siems stated, in an email of January 11, 2024, that "[a]t this time there are no plans to withdraw the remaining Gold Club's FLRD." [*See* email string attached as **Exhibit GG**].[4] As a result, Plaintiff Gold Club's attorneys

---

[4] On February 6, 2024, Mr. Siems emailed Mr. Youngsma informing him that SBA is "currently taking another look at this loan and there is a good likelihood the FLRD gets pulled[.]" That

and accountant are required to continue and complete their review of the SBA's claimed administrative record for the purposes of filing objections thereto, and Plaintiff Gold Club is required to pay their fees for such work.

451.    There are no material legal or factual differences between the Gold Club second draw appeal and SAW's first draw appeal on the one hand, and the Gold Club first draw appeal on the other hand, that could justify the disparate handling by the SBA of the OHA appeals of these Plaintiffs as demonstrated in Mr. Siems' email quoted in the paragraph immediately above.

452.    SBA, however, changed its mind because on February 6, 2024, attorney Siems emailed Mr. Youngsma informing him that SBA was "currently taking another look at this loan and there is a good likelihood that the FLRD gets pulled." Attorney Siems and Mr. Youngsma obtained an additional extension for Gold Club to file its objections to the administrative record.

453.    On February 27, 2024, at 12:54 p.m., in response to an email from Mr. Youngsma inquiring as to whether the SBA had made a decision on whether it would withdraw Gold Club's FLRD or not, attorney Siems emailed Mr. Youngsma a copy of a three (3) page motion to dismiss Gold Club's second draw appeal based on SBA's decision to withdraw the FLRD, which was accompanied by a three (3) page declaration in support thereof. Attorney Siems email stated that he would "file [the Motion] here shortly." A true and accurate copy of that email exchange is attached hereto as **Exhibit HH**.

454.    Seven minutes later, at 1:01 pm on February 27, 2024, Mr. Youngsma received an email from the OHA stating that a new filing had been added to Gold Club's second draw appeal, which was the motion to dismiss that attorney Siems had sent to Mr. Youngsma seven minutes

---

prediction came true on February 27, 2024, when SBA filed a motion to dismiss the appeal stating that it had withdrawn the FLRD under appeal.

earlier. Roughly four hours later, at 5:25 pm, Mr. Youngsma received two emails from the OHA; one stating that a filing had been added to the appeal and one stating that a decision had been rendered in the appeal. True and accurate copies of these three emails from the OHA with the corresponding documents associated with those emails, along with screenshots of their appearance in Mr. Youngsma's email inbox and in the OHA portal, as well as the order dismissing the appeal, are attached hereto as **Exhibit II**.

455.    The order granting SBA's motion to dismiss Gold Club's second draw appeal is two pages long, is signed by Mr. Ambrow, and is accompanied by a one-page Notice of Appeal Rights and Procedures.

456.    The disparate handling by the SBA of the OHA appeals of Plaintiff Gold Club's first and second draw loans runs counter to the statements of SBA's lead representative as noted, *infra*; primarily, that SBA would not negotiate regarding second draw loans.

457.    Plaintiff Meacham filed a motion for discovery similar to those filed in Gold Club and SAW's OHA appeals. [**Ex. AA**]. Plaintiff Meacham's aforementioned discovery motion was denied similar to those of Plaintiffs Gold Club and SAW.

458.    Plaintiff Dallas Food & Beverage anticipated filing a motion for discovery similar to Gold Club, SAW, and Meacham, however SBA filed a motion to dismiss on February 29, 2024, stating that it had withdrawn the FLRD the day prior, and OHA granted that motion and dismissed the appeal the same day.

459.    Gold Club timely appealed the second FLRD SBA issued regarding Gold Club's second draw PPP Loan and, in the OHA, the matter was assigned to Mr. Ambrow assigned as the judge and Christopher Hicks assigned as the "OHA Attorney."

460.    The SBA did a very similar routine with Plaintiff Meacham's OHA appeal as it did with Gold Club's second draw PPP Loan appeal described above.

461.    The disparate actions of the SBA as reflected in its conduct regarding the OHA appeals of Plaintiff Gold Club's second draw PPP Loan, Plaintiff SAW's first draw PPP Loan, Plaintiff Gold Club's first draw PPP Loan, and Plaintiff Meacham's second draw PPP Loan, demonstrate the lack of reasoned decision making and completely arbitrary and capricious way, and indeed the vindictive and retaliatory nature, that the SBA is treating these Plaintiffs.

462.    Given the history of the clients of the undersigned law firm with the SBA as detailed above, the constitutional claims of those Plaintiffs that have had their FLRD's withdrawn, and their OHA appeals dismissed, are nevertheless capable of repetition yet evading review (exemplified by the recent events concerning Plaintiffs Gold Club and Meacham's second draw Loans ). Moreover, the claims of all Plaintiffs under the Equal access to Justice Act, *see* Count IV, dictate that dismissal of some of the Plaintiffs' OHA appeals does not moot out their claims. And, given the history of the SBA regarding PPP loans as set forth above, those Plaintiffs that have had their OHA appeals dismissed can *certainly* be subject to FLRD denials in the future and therefore further OHA proceedings (again, as is specifically exemplified by the SBA's actions in regard to Plaintiffs Gold Club and Meacham's second draw Loans).

463.    In addition, as demonstrated above, the Special OHA Rules are a flagrant denial of fundamental due process, and further administrative appeals by these Plaintiffs in the OHA would be expensively futile. Plaintiffs should not, therefore, be required to exhaust any administrative remedies before being able to have their claims heard by this Court.

### **FACTS AND LAW RELATING TO THE PRURIENCE REGULATION**

464. The actual text of the Prurience Regulation, adopted by the SBA via 61 Fed. Reg. 3226, and which is now lodged at 13 C.F.R. § 120.110(p) states:

The following types of businesses are ineligible [for SBA business loans]:

* * *

(p) Businesses which:

(1) Present live performances of a prurient sexual nature; or

(2) Derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature[.]

(Clarification added).

465. 28 U.S.C. § 2201 is inapplicable to Plaintiffs' facial attack on the Prurience Regulation because, as described herein, Defendants persist in enforcing this unlawful regulation in a manner that affects Plaintiffs; namely, to deny the grant of or forgiveness of PPP Loans. Deanda v. Becerra, 645 F. Supp. 3d 600, 615 (N.D. Tex. 2022) ("Plaintiffs claims accrue continually as Defendants persist in enforcing unlawful statutes or agency rules in a manner that affects Plaintiff" such that "Section 2401(a) is inapplicable to [the plaintiff's] claims.").

466. The Prurience Regulation defines neither the term "prurient" nor the phrase "prurient sexual nature."

467. Prior to the Pandemic, the term "prurient" had, in the published case law of this nation, one singular legal definition and that was under the legal standards for "obscenity."

468. The constitutional criteria for legal obscenity—meaning expression that falls outside of the protections of the First Amendment—require determinations by the trier of fact of whether:

The average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;

106

Applying contemporary community standards, the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by applicable state law; and

A reasonable person would find that the work lacks serious literary, artistic, political, or scientific value.

These standards derive from three Supreme Court cases: Miller v. California, 413 U.S. 15, 24 (1973); Smith v. United States, 431 U.S. 291, 300 n.6 (1977); and Pope v. Illinois, 481 U.S. 497, 500-01 & n.3 (1987).

469.    The Supreme Court has held that each element of the three-part test of obscenity set forth in the paragraph immediately above must be satisfied before expression can be found to be obscene and therefore beyond the protections of the First Amendment. *See* Reno v. ACLU, 521 U.S. 844, 872 (1997).

470.    The phrase "prurient appeal" under the obscenity standards has been defined, through other Supreme Court precedents, to mean a shameful, morbid, or unhealthy interest in sex. The "shameful or morbid" standard was first articulated in Roth v. United States, 354 U.S. 476, 487 n.20 (1957), and the "unhealthy" aspect was added in Brockett v. Spokane Arcades, 472 U.S. 491, 498-99 (1985).

471.    These constitutional standards of obscenity, as articulated in Miller, Smith, Pope, Roth, and Brockett, and in particular that of prurient appeal, are collectively referred to hereinafter simply as the "Miller Test."

472.    In Brockett, the Court was clear to point out what would *not* be considered to be "prurient." In noting that the Roth standard should not be construed to extend obscenity to expression that invoked merely "lustful thoughts," or that appealed to "normal, healthy sexual desires," the Court observed that the government may not outlaw expression which, "taken as a

whole, does no more than arouse, 'good, old fashioned, healthy' interest in sex." Brockett, 472

U.S. at 498-99 (quoting the opinion being reversed there; J-R Distributors, Inc. v. Eikenberry, 725

F.2d 482, 492 (9th Cir. 1984)).

473.    Most importantly for the legal matters here, the DOJ, which will certainly represent

the SBA in this action, filed an amicus brief in the Supreme Court in the Brockett case where it

recommended to the Supreme Court the concepts that it, the DOJ, contended would satisfy

expressive materials being "prurient." Specifically, the DOJ argued that the Washington State

statutory definition of "prurient" as meaning "that which incites lasciviousness or lust" was

"plainly authorized by the decisions of this [the Supreme] Court." [Brief for the United States as

Amicus    Curiae,    Brockett    v.    Eikenberry,    No.    84-28,    No.    84-148    (1984),

https://www.justice.gov/sites/default/files/osg/briefs/1984/01/01/sg840109.txt#:~:text=The%20c

ourt%20stated%20that%20the,69a). (last visited Feb. 13, 2024; clarification added)].[5] Again, the

Supreme Court specifically rejected, in its Brockett decision, this argument of the DOJ.

474.    For reasons that will become abundantly clear to this Court in the later summary

judgment motion practice in this action, and irrespective of the Supreme Court's rejection of the

DOJ's concept of "prurience" as set forth in the Brockett decision, the SBA wants to define, and

has attempted to define in Pandemic funding litigation (as discussed below), "prurient" under the

Prurience Regulation as being *anything but* the constitutional standard set forth in the Miller Test.

475.    Shortly after the enactment of the SBA Act, the SBA adopted, through regulation,

what became known as the "opinion molder rule," which precluded funding through the SBA for

any businesses involved in the "creation, origination, expression, dissemination, propagation or

distribution of ideas, values, thoughts, opinions or similar intellectual property." Business Loan

---

[5] The online amicus brief of the DOJ contains no page numbering for specific citation purposes.

Policy—Media Policy Rule, 59 Fed. Reg. 15872 (Proposed, Apr. 5, 1994) (quoting 13 C.F.R. § 120.101-2(b) (1993)).

476.   In Mission Trace Investments, Ltd. V. SBA, 622 F. Supp. 687 (D. Colo. 1985), the opinion molder rule was declared to be unconstitutional under the First Amendment to the United States Constitution, and the SBA was enjoined from enforcing it.

477.   The SBA appealed only the district court's award of damages in the Mission Trace case, which the appellate court vacated on the basis of sovereign immunity in a ruling under the name of Ascot Dinner Theatre, Ltd v. SBA, 887 F.2d 1024 (10th Cir. 1989); with that ruling acknowledging, however, that the holding of the district court finding the opinion molder rule unconstitutional was not being disturbed. Id. at 1026.

478.   Then, on July 15, in 1994, the SBA formally repealed, through the Media Policy Rule, 59 Fed. Reg. 36042 (Jul. 15, 1994), the opinion molder rule.

479.   In response thereto, Congress undertook actions to permit the SBA to decline the funding of businesses engaged in certain expressive activities.

480.   In particular, through and from the enactment of the Small Business Reauthorization and Amendments Act of 1994, Pub. L. 103-403 (1994), which was signed into law on October 22, 1994, the SBA Act itself (and irrespective of any promulgated regulations) has precluded loans to businesses that have been involved in the sale or distribution of *legal obscenity*.

481.   Specifically, Congress, through the Small Business Reauthorization and Amendments Act of 1994, Pub. L. 103-403, § 611 (1994), enacted what is now codified at 15 U.S.C. § 633(e) (hereinafter simply "§ 633(e)"), which applies to any type of SBA assistance—grant, loan, or otherwise—provides in relevant part:

(e) Prohibition on provision of assistance

109

> Notwithstanding any other provision of law, the Administration is prohibited from providing any financial or other assistance to any business concern or other person engaged in the production or distribution of any product or service that has been determined to be obscene by a court of competent jurisdiction.

(Emphasis added).

482.   When first proposed by the House of Representatives, this provision contained no requirement of a determination by a *court* of legal obscenity. The Senate included such a requirement, and the legislative history of the conciliation conference provides as follows:

> The conferees adopted the Senate provision with the clarification that any materials in question must have been judicially determined, in either a civil or criminal action, to be legally obscene under the prevailing constitutional standards in order for the ban to apply.

H.R. CONF. REP. 103-824, 54, 1994 U.S.C.C.A.N. 3436, 3455 [**Exhibit JJ**].

483.   The related Senate Report explains why this Bill was changed before adoption:

> During Committee markup of the bill, Senator Pressler offered an amendment, that was unanimously accepted by the Committee, to prohibit the Administration from providing assistance to businesses engaged in the production and distribution of obscene products or services. The amendment was offered in response to the Administration's recent repeal of its "opinion molder rule" promulgated in 1953. Under that rule, the Administration, with few exceptions, could not provide assistance to small businesses engaged in the "creation, origination, expression, dissemination, propagation or distribution of ideas, values, thought, opinions or similar intellectual property, regardless of medium, form, or content" (13 CFR 120.101–2(b)). With the repeal of the rule, businesses such as newspapers, movie theaters, radio stations and bookstores now are eligible for Administration assistance. However, members of the Committee were concerned a blanket repeal of the rule would allow businesses involved in the production and distribution of obscene products and services to seek Administration support and that the agency would have no means by which to deny such loans or other assistance. Senator Pressler's amendment makes it clear the Administration is not authorized to provide any assistance to those engaged in "obscene" businesses (and thus not entitled to First Amendment protection) as defined by the U.S. Supreme Court.

S. Rep. No. 103-332 § 612, at 3430-31 (1994).

484.   Accordingly, as of October 1994, SBA funding to businesses that engage in the sale of expressive materials or entertainment could only be precluded, through § 633(e), upon an actual

110

adjudication of legal obscenity under the "prevailing constitutional standards"; those being the criteria articulated through the Miller Test.

485.    Consequently, prior to the enactment of the PPP, the SBA Act had, through § 633(e), conceptualized the term "prurient" in accordance with Roth and Brockett; that being a shameful, morbid, and/or unhealthy interest in sex.

486.    Shortly following adoption of the CARES Act and during the evening of the day before the PPP loan application portals were to open, the SBA issued two "Final Interim Rules," one of which claimed to incorporate into the newly created PPP the laundry list of regulatory eligibility exclusions for "normal" Section 7(a) SBA loans found at 13 C.F.R. § 120.110. 85 Fed. Reg. 20811, 20812 (Interim Final Rule, Apr. 15, 2020). This included the Prurience Regulation. The publication of this Interim Final Rule resulted in a number of businesses across the country filing federal lawsuits seeking to enjoin the SBA from applying the Prurience Regulation to Pandemic funding programs.

487.    One such action was filed by the undersigned firm, which, in fact, resulted in the issuance of an injunction prohibiting the use of the Prurience Regulation when evaluating the PPP applications of those plaintiffs. See DV Diamond Club of Flint v. SBA, 459 F. Supp.3d 943, 954-962 (E.D. Mich. 2020) (the "DV Diamond Club" action).

488.    In another such action, filed in the Southern District of Texas, the DOJ (representing the SBA) admitted in open court that the Prurience Regulation was vague. At a preliminary injunction hearing, the following colloquy occurred:

THE COURT:    Who's to determine what's a prurient interest? You know, there's the famous, what is it, Potter Stewart opinion, you know, the pornography opinion that came out, what, in the '50s? I think Stewart was on the Court at that time. He said he can't define it but he knows it when he sees it? Are we in an area like that?

MR. KINCHELOE   [Assistant United States Attorney; Attorney for the SBA]: It's vague, your Honor.

Transcript of Preliminary Injunction Hearing, D. Houston, Inc. v. SBA, 4:20-cv-02308 (S.D. Tex. Sept. 11, 2020), ECF 27, at p. 29:23-25 – 30:1-4 (clarification added) [**Exhibit KK**].

489.   The concession set forth in the paragraph immediately above caused the court to then note, prior to enjoining the Prurience Regulation: "Okay. But that's one of their complaints is that it's vague." [**Ex. KK**, at p. 30:5-6 (cleaned up)].

490.   In other pandemic-related lawsuits, the SBA's conflicting and ever-changing explanations as to the meaning of the term "prurient" approached the comical.

491.   For example, at an April 30, 2020, hearing in the DV Diamond Club action in Michigan, the SBA took the position that "prurient" meant "tending to arouse a 'lustful' or, you know 'lascivious' interest in sex." "The SBA's interpretation of 'prurient,' simply refers to, you know, invoking an avert [*sic*] strong sexual interest." Transcript of Apr. 30, 2020, Hearing on Motion for TRO and/or Preliminary Injunction, DV Diamond Club, 20-cv-10899 (E.D. Mich. Jun 12, 2020), ECF 54, at 8:18-19; 58:5-6, excerpts attached as **Exhibit LL**.

492.   However, in the Camelot Banquet Case in Wisconsin, the SBA took the position that:

> Businesses that feature live dancing explicitly intended to be "erotic" undoubtedly falls within the plain language of the regulation.

*     *     *

> The SBA has restricted government-backed small-business loans to businesses engaged in live erotic performances for nearly twenty-five years.

Government Motion for Emergency Stay, Camelot Banquet, 2:20-cv-00601 (E.D. Wis. May 4, 2020), ECF 30, at pp. 4, 8, excerpts attached as **Exhibit MM**.

493.     In fact, the SBA continued to maintain, in its pleadings on appeal from the District Court's ruling in the Camelot Banquet case (which ultimately resulted in the injunction ruling found at Camelot Banquet Rooms, Inc. v. SBA, 458 F.Supp.3d 1044, 1055-1057 (E.D. Wisc. 2020)) that the term "prurient" simply meant "erotic." Specifically, this is what the SBA stated in its emergency motion for stay to the Seventh Circuit:

> The SBA's restriction on providing Section 7(a) loans to businesses that present live erotic performances dates back to 1996. *See* 61 Fed. Reg. 3226, 3240 (Jan. 31, 1996) (final rule); 60 Fed. Reg. 64356, 64360 (Dec. 15, 1995) (proposed rule).
>
> *         *         *
>
> Businesses that feature live dancing explicitly intended to be "erotic" undoubtedly fall within the plain language of the regulation.
>
> *         *         *
>
> The SBA has restricted government-backed small-business loans to businesses engaged in live erotic performances for nearly twenty-five years.

Government's Emergency Motion for Stay Pending Appeal, Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin., 20-1729 (7th Cir. May 4, 2020), Doc 4, at p. 4, 13, 17, excerpts attached as **Exhibit NN**.

494.     And in its reply brief on that motion to the Seventh Circuit, the SBA again asserted, in regard to the Prurience Regulation:

> Plaintiffs' businesses— "Gentlemen's Clubs" which present live nude and semi-nude dance performances that are explicitly intended to be erotic—thus fall within the heart of the regulation's scope.
>
> *         *         *
>
> And although Congress explicitly lifted some of those restrictions in creating the Paycheck Protection Program, Congress did not lift or alter the SBA's longstanding restriction on loans to businesses that present live erotic performances.
>
> *         *         *
>
> The SBA could reasonably determine that, since Congress has expressly barred it from providing financial assistance to businesses that provide "obscene" products and services, the agency's limited resources are best directed to subsidizing

businesses other than those that, although not "obscene" in the legal sense, are nonetheless "sexually oriented" and explicitly intended to be erotic.

Government's Reply In Support of Its Motion for Stay Pending Appeal, <u>Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin.</u>, 20-1729 (7th Cir. May 11, 2020), Doc. 14, at pp. 5, 7, 8, excerpts attached as **Exhibit OO**.

495.    However, after then being confronted in the Michigan <u>DV Diamond Club</u> action that it—the SBA—had articulated a different standard for the term "prurient" in the <u>Camelot Banquet</u> Wisconsin case (i.e., "erotic"), and after the federal judge in the <u>DV Diamond Club</u> matter pointed out that such a standard (erotic) would render the Prurience Regulation to be unconstitutionally overbroad, the SBA retreated to its previous position that "prurient" meant "lascivious or lustful." Transcript of May 5, 2020 Continued Hearing for Motion for TRO and/or Preliminary Injunction, <u>DV Diamond Club</u>, 20-cv-10899 (E.D. Mich. Jun. 12, 2020), ECF 55, at 41:18 – 43:7, excerpts attached as **Exhibit PP**.

496.    In a second action involving Camelot Banquet, the SBA's Associate General Counsel for Litigation, Eric Benderson ("Benderson"), submitted a declaration. Declaration of Eric S. Benderson, <u>Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.</u>, No.: 2:21-cv-00447 (E.D. Wis. 2021), Doc. 21-7 [**Exhibit QQ**, hereafter, the "Benderson Declaration"].

497.    In the Benderson Declaration, Benderson declared that "[s]ince September 23, 1982, [he] [] served as the Associate General Counsel for Litigation in the Office of General Counsel at the U.S. Small Business Administration[.]" [**Ex. QQ** at ¶ 1].

498.    In the Benderson Declaration, Benderson stated that the term "prurient" was used "in its colloquial sense, simply to mean, for example, lustful, lascivious, or arousing of sexual interest or desire, which is equated in many dictionaries with the term 'erotic.'" [**Ex. QQ** at ¶ 10].

499.    Neither Benderson nor the Benderson Declaration were subjected to cross-examination.

500.    Under the SBA's interpretation of the word "prurient," it means absolutely nothing in context of the Prurience Regulation.

501.    While the Prurience Regulation uses the phrase "prurient sexual nature," given how the SBA in litigation, and in particular through the Benderson Declaration, has construed the meaning of the word "prurient," the SBA is literally and completely reading the word "prurient" out of the Prurience Regulation and asserting that the Prurient Regulation applies, rather, to entertainment that is merely of a "sexual nature."

502.    Nothing issued by the SBA for the notice and comment period related to the adoption of the Prurience Regulation would have alerted a person of ordinary intelligence that the Prurience Regulation would be construed and applied by the SBA in the manner as set forth in the paragraph immediately above.

503.    Under the SBA's interpretation of the word "prurient" in the Prurience Regulation as set forth above, and because of the Regulation's incorporation into the PPP via the Incorporating Statute, § 633(e) of the SBA Act, in incorporating all three prongs of the Miller Test and the definitions of the words and phrases contained therein as dictated by the Supreme Court, including but not limited to the term "prurient," is rendered superfluous.

504.    To date, in all of the litigation with the SBA in which the undersigned firm has been involved, the SBA has not produced a single *document*, created either before the beginning of the Pandemic or after, that establishes that the SBA had or has some type of uniform, objective, established, and articulated standard for defining and applying the word "prurient," or the phrase "prurient sexual nature," under the Prurience Regulation.

115

505.    Nevertheless, this is what Associate General Counsel Benderson stated under penalty of perjury in the Benderson Declaration filed in the second Camelot Banquet case:

> SBA has *never interpreted* 13 C.F.R. § 120.110(p)'s "prurient sexual nature" standard as equivalent to prurience as that term is specifically defined for purposes of the obscenity test established under <u>Miller v. California</u>, 413 U. S. 15 (1973).

**[Ex. QQ**, ¶ 10 (emphasis added)].

506.    Benderson's statement in the Benderson Declaration, as quoted in the paragraph immediately above, is not true.

507.    Benderson's statement in the Benderson Declaration, as quoted in paragraph 505, was not true when made.

508.    Upon information and belief, Benderson's statement in the Benderson Declaration, as quoted in paragraph 505, was known by Benderson to be untrue when made.

509.    The SBA issues, from time-to-time, what are known as "Standard Operating Procedures" ("SOP's") to provide guidance to lending banks in administering the SBA's various loan and grant programs.

510.    Those SOPs that address the Prurience Regulation seem to be constantly and ever-changing, as discussed immediately below.

511.    A limited number of the SOP's can be found on the SBA's website.

512.    Those online SOP's only go back, however, to 2008. SBA Website, https://www.sba.gov/document/sop-50-10-lender-development-company-loan-programs  (last visited Feb. 14, 2024).

513.    That earliest applicable SOP available on the SBA's website is SOP 50 10 (5) (the numbering itself acknowledging that earlier SOP's exist), which is listed on SBA's website as

"Version 5." SBA Website, https://www.sba.gov/document/sop-50-10-lender-development-company-loan-programs (last visited Feb. 14, 2024).

514.    In SOP 50 10 (5), the SBA states that:

> The lender must consider whether the *nature and extent* of the sexual component causes it, *in view of community standards*, to be prurient.

SOP 50 10 (5), § B, Ch. 2(3)(d)(3)(xvi) (effective August 1, 2008) (emphasis added) [**Exhibit RR**].

515.    By using the phrase "community standards" in SOP 50 10(5), the SBA publicly represented that it was in fact *directly borrowing at least* the concept of "prurient appeal" from the Miller Test (the first element of which, again, requiring an evaluation of "whether the 'average person, *applying contemporary community standards*,' would find that the work, taken as a whole, appeals to the prurient interest").[6]

516.    By using the phrase "extent" in SOP 50 10(5), it also appears that the SBA was applying the concept of "taken as a whole" (i.e., "the "extent"); which is also a component of the "prurient appeal" prong of the Miller Test.

517.    By using the word "nature" in SOP 50 10(5), it further appears that the SBA was applying the "patent offensiveness" prong of the Miller Test, (the second element of which, again, requires evaluating whether "[a]pplying contemporary community standards, the work depicts or describes, in a patently offensive way, the sexual conduct specifically defined by applicable state law"),[7] as well for use under the Prurience Regulation.

518.    While lending banks had been advised under previous SOP's to review the "nature and extent" of the "sexual component," the SBA has produced nothing to date in litigation, or

---

[6] Miller, 413 U.S. at 24 (emphasis added) (quoting Kois v. Wisconsin, 408 U.S. 229, 230 (1972), quoting Roth, 354 U.S. at 489).

[7] Miller, 413 U.S. at 24.

otherwise, explaining what such banks were/are to look for, and thus what the SBA would look for, that would render expression to be "prurient" and therefore the business at issue then not subject, arguably (in the SBA's view), to funding.

519.   Regardless of the fact that the SBA used from *at least* 2008 the concept of "community standards" by which to judge the potential prurient nature of expression, Plaintiffs are unaware of any documents from the SBA identifying *which community standards* the "nature and extent" of the sexual component of the expression is or was to be measured by (obscenity jurisprudence allowing, among other things, a state or local standard and, at least prior to the invention of the Internet, rejecting a national standard).

520.   Just prior to the beginning of the Pandemic, the SBA issued another SOP which, while omitting specific reference to the community standards, still stated:

> The Lender must consider whether the *nature and extent* of the sexual component causes the business activity to be prurient.

SOP 50 10 5(K) § B, Ch. 2(III)(A)(15)(b) (effective April 1, 2019) (emphasis added) [**Exhibit SS**].

521.   SOP 50 10 5(K) further stated that if the lender found that an applicant may have a business aspect of a prurient sexual nature, then, prior to submitting an application or requesting a loan number, the lender was to "document and submit the analysis and supporting documentation to the Associate General Counsel for Litigation" (*i.e.*, Mr. Benderson) "for a final agency decision on eligibility." SOP 50 10 5(K) §B, Ch. 2(III)(A)(15)(c) [**Id.** at p. 114].

522.   SOP 50 10 5(K) also provided an email address that lenders were to use to send "supporting documentation the Associate General Counsel for Litigation." That email address is PSMReview@sba.gov, which, upon information and belief, is an abbreviation for "prurient sexual material review." SOP 50 10 5(K) §B, Ch. 2(III)(A)(15)(c) [**Id.**].

523.    From the very language of SOP 50 10 5(K) quoted in the two paragraphs immediately above, from entries in various administrative records that members of the undersigned law firm have reviewed as part of numerous OHA appeals, and from further investigations undertaken by the undersigned attorneys, including but not limited to discussions with members of local SBA loan boards, Plaintiffs understand and believe that Benderson is the person at the SBA who makes final loan and forgiveness determinations when application of the Prurience Regulation is involved, and is the person behind the denials at issue in this lawsuit.

524.    Effective just last August 1, 2023, the SBA promulgated yet another SOP, SOP 50 10 7, that notes the Prurience Regulation as being relevant to loan ineligibility but deletes any reference to the "nature and extent of the sexual component" of the expression. *See* SOP 50 10 7 § A, Ch. 1(F)(14) (effective August 1, 2023) [**Exhibit TT**]. That SOP, however, still provided the PSMReview@sba.gov email discussed, *supra*, for the submission by the lender of an "analysis and supporting documentation for an applicant that may have a business aspect of a prurient sexual nature." Id. at Appendix 12.

525.    SOP 50 10 7 did not, however, last unchanged for very long. On November 15, 2023, the SBA promulgated yet another SOP, SOP 50 10 7.1, that *completely deleted* any reference to a lending bank having to send to the SBA an analysis and documentation of a business that may have an aspect of a prurient sexual nature. *See* SOP 50 10 7.1 [**Exhibit UU**].

526.    Regardless of all of the above, the SBA continues, as reflected by its actions leading to this suit, to impose whatever definitions and understandings it so chooses at any given time in order to utilize the Prurience Regulation to deny loan forgiveness or to "reevaluate" granted and even forgiven PPP loans and to then deny eligibility.

527.    The SBA is doing those things listed in the previous paragraph even though recent case law demonstrates the unconstitutionality of the SBA's *interpretation* of the word "prurient."

528.    For example, various courts have recently addressed Florida's anti-"drag show" statute, which uses some of the same words or their equivalents that the SBA has contended apply to language used in the Prurience Regulation.

529.    Specifically, in HM Florida-ORL, LLC v. Griffin, 2023 WL 4157542, at *6-9 (M.D. Fla. June 23, 2023), the United States District Court in Florida found that because the statute did not define the phrases "lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts," it was most likely unconstitutionally vague and overbroad, and enjoined Florida from enforcing the statute.

530.    Florida requested a partial stay of the district court's injunction, which the Eleventh Circuit denied. 2023 WL 678-5071, No. 23-12160 (11th Cir. October 11, 2023).

531.    This should be compared to the comments of the federal judge in the DV Diamond Club case referenced above who had pointed out that virtually all dictionaries equate lewdness to lasciviousness; a term that the SBA and the DOJ have *specifically* claimed in litigation to describe how *they* define the term "prurient" in the Prurience Regulation.

532.    In addition, in enjoining the Florida anti-drag show statute, the district court pointed out that the failure to define certain terms rendered the law unconstitutional. "These ambiguities, especially those pertaining to 'lewd' conduct and exposure of prosthetics, represent a material departure from the established obscenity outline set forth in Miller." 2023 WL 4157542, at * 7.

533.    This is the exact same argument that the undersigned firm has repeatedly made in litigation across the country involving the Prurience Regulation.

120

534.    Yet, irrespective of these rulings by the Florida district court and the Eleventh Circuit, and regardless of the fact that the Supreme Court recently denied an application for stay of the district court ruling (144 S. Ct. 1, No. 23A366 (November 16, 2023)), the SBA continues to apply the Prurience Regulation in a manner that has the exact same constitutional failings.

### FACTS RELATED TO *HOW* THE SBA IS ACTUALLY DETERMINING WHETHER A BUSINESS SHOULD BE DENIED A LOAN, OR LOAN FORGIVENESS, UNDER THE PRURIENCE REGULATION

535.    The Prurience Regulation purports to make businesses ineligible for certain SBA loans if those businesses "present live performances of a prurient sexual nature," or "[d]erive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature[.]" 13 C.F.R. § 120.110(p).

536.    A rational person might then believe that before declaring a business ineligible for a PPP loan under the Prurience Regulation, representatives of the SBA would *actually view* the "live performances," or the "products or services," or the "presentation of depictions or displays," in order to determine whether *they* are of a prurient sexual nature.

537.    A rational person as described in paragraph 536, however, would be wrong. The SBA does not actually view the live performances it deems to be prurient.

538.    A review of the administrative records in certain OHA appeals that the undersigned firm has handled document SBA investigators making eligibility determinations just as Benderson stated in his declaration. [**Ex. QQ**, at ¶ 9 ("SBA will revie the potential borrower's website)].

539.    Denial Letters received by a number of the Plaintiffs further indicate that eligibility determinations under the Prurience Regulation were made through "open source research" (i.e., online searches). This is further discussed below.

121

540.    Similarly, in an Affiliate Narrative Worksheet Mohney et al #127 made for a number of the Plaintiffs, the SBA determined in a conclusory and circular fashion, though Kevin Clay as the "Reviewer" and Sharon K. Drake as the "Approver" of the Affiliate Narrative Worksheet Mohney et al #127, that businesses were ineligible for loans under the Prurience Regulation based upon Google Earth photographs because they were "adult entertainment clubs, an ineligible business of prurient nature." Excerpts of Plaintiff Gold Club's first draw PPP Appeal Administrative Record attached here to as **Exhibit VV**.

541.    Here are just a few examples of the photos contained in that Affiliate Narrative Worksheet Mohney et al #127, taken from Plaintiff Gold Club's first draw PPP OHA appeal Administrative Record, but which also appeared in a number of administrative records reviewed by the undersigned firm, that are claimed by the SBA to justify ineligibility determinations:



Ln# 4961037708 Rouge Portland LLC, Per Google Address 403 SW Harvey Milk St, Portland, OR 97204



Ln# 1723727301 Ypsilanti Art Theatre Corp. 26 S WASHINGTON ST YPSILANTI MI 48197



Ln# 1522057305 Gold Club SF LLC 650 Howard St, San Francisco, CA 94105



Ln# 7560437005 Paradise Bar of Tampa, LLC 6087 E State Rd 60 Tampa FL

[**Ex. VV**].

542.    The SBA engaged in similar conclusory and circular reasoning to conclude that Plaintiff Meacham was ineligible for loans under the Prurience Regulation. For example, on Meacham's administrative record, the "Acceptor," Sharon Drake, on April 24, 2023, stated that "[a] visual search of Google (Addendum B) determined these businesses [Meacham] to be adult entertainment clubs, or of a prurient nature." The referenced Addendum B is found on AR pages 266-268 (exhibit pages 8-10 and includes these photos:

## Addendum B – Google Search

11000 Reeder LLC



### Bucks Wild

| Website | Directions | Save |

4.1 ★★★★☆ 390 Google reviews

Adult entertainment club

**Address:** 11327 Reeder Rd STE 200, Dallas, TX 75229

**Hours:** Open · Closes 4 AM ▾

**Phone:** (972) 484-9453

2345 Meacham, LLC



The End Zone, Inc.



400 Sam Houston LLC



5316 Superior LLC



[**Ex. B**, at AR pp. 16, 266-68; exhibit pages 5, 8-10].

543. Those photos are literally the basis—and the *only* basis—that the SBA states that it used to determine loan and forgiveness ineligibility under the Prurience Regulation for a number of the Plaintiffs.

544. Upon information and belief, at no time did any representatives of the SBA ever view any of the "live performances," or "products or services," or "presentations of depictions or displays," at the Plaintiffs' businesses, as applicable, in order to determine whether they *themselves* (the performances, products, services, and/or presentations) were of a prurient sexual nature (whatever *that* may mean) prior to deciding to deny loan forgiveness of the Plaintiffs' PPP loans at issue here.

545. Upon information and belief, when applying the Prurience Regulation to Plaintiffs' PPP Loans, no representative of the SBA actually viewed the "live performances," or the "products or services," or the "presentation of depictions or displays" at Plaintiffs' businesses, as applicable.

### FACTS RELATED TO THE SBA'S "SIZE" DETERMINATION OF LOAN INELIGIBILITY

546. The SBA was established to assist "small" businesses. The SBA Act and the regulations promulgated thereto restrict funding to certain "size" businesses and "business concerns."

547. One of the reasons that the SBA purports to have denied forgiveness of a number of the Plaintiffs' Loans is because the SBA asserts that the particular Plaintiff, when including its "affiliates," is "too big" from an employee-count standpoint to be eligible for PPP loans.

548. Similarly, one of the reasons that the SBA has recently opened audits of other Plaintiffs that have had their Loans *forgiven* is to examine whether that Plaintiff, when including

128

its "affiliates," was "too big" from an employee-count standpoint to have qualified for PPP loans in the first place.

549.    For first draw PPP loans, the normal employee count limit was 500, 15 U.S.C. § 636(a)(36)(D)(i)(I), and for second draw PPP loans it was 300 employees. 15 U.S.C. § 636(a)(37)(A)(iv)(I)(aa).

550.    For pre-pandemic loans, the SBA had (and still has "affiliation" regulations in order to determine whether a business, together with its "related" entities, is under the "size" threshold for financial assistance to small businesses. The Affiliation Rules that Plaintiffs challenge herein are, again, collectively found in 13 C.F.R. § 121.101, 13 C.F.R. § 121.103; 13 C.F.R. § 121.201, 13 C.F.R. § 121.301.

551.    Under SBA's rules, Affiliation between two businesses can be determined by, for example, stock ownership, stock options, common management, "identity of interest," the "newly organized concern rule," joint ventures, and franchise and license agreements. *See* 13 C.F.R. § 121.103(c - i).

552.    Nevertheless, 13 C.F.R. § 121.103(a)(5) actually states:

> In determining whether affiliation exists, SBA will consider the totality of the circumstances, and may find affiliation even though no single factor is sufficient to constitute affiliation.

553.    The provisions of 13 C.F.R. §121.103(a)(5) set forth in the paragraph immediately above establish that the Affiliation Rules are completely subjective.

554.    The provisions of 13 C.F.R. §121.103(a)(5) set forth in paragraph 552 establish that they lack any form of constraints upon governmental officials.

555.    The provisions of 13 C.F.R. §121.103(a)(5) set forth in paragraph 552 establish they permit SBA personnel to render arbitrary and capricious decisions in regard to "affiliation."

556. Simply put, the Affiliation Rules provide no standards or guidance to govern representatives of the SBA in determining whether affiliation under the Affiliation Rules in fact exists and permits SBA personnel to make ad hoc, arbitrary, and discriminatory determinations based upon their own predilections and biases.

557. Because of the national financial emergency brought on by the Pandemic, the PPP contains a specific waiver of the Affiliation Rules for NAICS code 72 businesses (which constitute, among other things, establishments that serve food and beverages). *See* 15 U.S.C. § 636(a)(36)(D)(iii)(I) and 15 U.S.C. § 636(a)(36)(D)(iv)(I) (for first draw loans); and 15 U.S.C. § 636(a)(37)(D) & (E) (for second draw loans) (again, collectively the "Affiliation Exception Provisions").

558. Under the Affiliation Exception Provisions, business concerns with a NAICS code beginning with 72 are eligible for PPP loans so long as the employee count of each "*physical location*" of the business concern is not more than the numerical employee threshold (again, 500 employees for first draw loans, and 300 employees for second draw loans).

559. The determination of which NAICS code applies to a particular business for PPP loan purposes has not been self-apparent given the ever-changing loan application forms, instructions, and rules issued by the SBA since the beginning of the Pandemic.

560. The Affiliation Exception Provisions actually state that the PPP exceptions to the normal SBA Affiliation Rules apply to businesses "assigned" a NAICS "code beginning with 72." That language is actually a non sequitur.

561. Except for certain governmental contractors (not applicable to these Plaintiffs), NAICS codes are not actually "assigned" in the normal understanding of that term. They are, in fact, self-selected by the business itself.

130

NAICS is a Self-Assigned System; no one assigns you a NAICS Code. What this means is that a company selects the code that best depicts the primary business activity and then uses it when asked for their code. If your Business Activities include more than one Unique Line of Business, you may want to use more than one NAICS Code.

https://www.naics.com/what-is-a-naics-code-why-do-i-need-one, dated January 18, 2017 (last visited Feb. 14, 2024); *see also* New York Department of Taxation and Finance, Jun. 26, 2018, https://www.tax.ny.gov/pubs_and_bulls/tg_bulletins/st/naics.htm#:~:text=NAICS%20is%20a%20self%2Dassigned,North%20American%20Industry%20Classification%20System (last visited Feb. 14, 2024) ("NAICS is a self-assigned system. You pick the code that best describes your business or organization.").

562.    SBA's own instructions as to finding a NAICS code states that "[t]o find your NAICS code, view the NAICS code list at U.S. Census Bureau." https://www.sba.gov/federal-contracting/contracting-guide/basic-requirements (last visited Feb. 14, 2024).

563.    SBA's website also states that "[a] business will generally have a primary NAICS code, but it can also have multiple NAICS codes if it sells multiple products and services." https://www.sba.gov/federal-contracting/contracting-guide/basic-requirements (last visited Feb. 14, 2024).

564.    Even prior to the enactment of the PPP through the CARES Act, the Affiliation Rules addressed NAICS codes.

565.    13 C.F.R. § 121.101(a) states:

SBA's size standards define whether a business entity is small and, thus, eligible for Government programs and preferences reserved for "small business" concerns. Size standards have been established for types of economic activity, or industry, generally under the North American Industry Classification System (NAICS). (Clarification in original).

566.    13 C.F.R. § 121.101(b) states, in part:

131

NAICS is described in the North American Industry Classification Manual-United States, which is available from the National Technical Information Service, 5285 Port Royal Road, Springfield, VA 22161; by calling 1(800) 553-6847 or 1(703) 605-6000; or via the Internet at http://www.ntis.gov/products/naics.aspx.

567.    The website link provided in 13 C.F.R. § 121.101(b), however, is broken.

568.    The website link provided in 13 C.F.R. § 121.101(b) has in it "ntis," or the National Technical Information Service ("NTIS"). A search of NTIS's website, https://www.ntis.gov/ (last visited Feb. 14, 2024), for "NAICS" brings back zero results.

569.    13 C.F.R. § 121.101(b) also states:

NAICS assigns codes to all economic activity within twenty broad sectors. Section 121.201 provides a *full table* of small business size standards matched to the U.S. NAICS industry codes. A *full table* matching a size standard with each NAICS Industry or U.S. Industry code is also published annually by SBA in the Federal Register. (Emphasis added).

570.    The "full table" of NAICS codes contained in 13 C.F.R. § 121.201, as referenced in 13 C.F.R. § 121.101(b), does not match, and is far less comprehensive than, the NAICS code list contained in the North American Industry Classification System list on the U. S. Census Bureau website, both the 2017 and 2022 found thereat.

571.    In addition, irrespective of the statement found in 13 C.F.R. § 121.101(b) quoted in paragraph 569 above, the SBA does not, in fact, annually publish a "full table matching a size standard with each NAICS Industry or U.S. code" in the Federal Register. Rather, the SBA annually publishes *updates* of this list. From Plaintiffs' review of the Federal Register, the SBA has not updated any information in regard to any of the NAICS codes that could even potentially be applicable to the Plaintiffs since before the Pandemic.

572.    NAICS codes appear to be somewhat tangentially related to the "business code number" or "business activity code" on business tax returns.

573.    All Plaintiffs are either corporations or limited liability companies.

132

574. Corporations file an IRS Form 1120 tax return, and limited liability companies file an IRS Form 1065 tax return as partnership income.

575. The IRS Form 1065 (2021 version attached hereto as **Exhibit WW**) requires, as the very first entry on the document, inclusion of the "Principal business activity" of the taxpayer.

576. The IRS's Instructions for Form 1065 (excerpts from the 2021 version being attached hereto as **Exhibit XX**) explain that the code for the principal business activity is to be taken from a list of principal business activity and principal product or service codes near the end of the instructions. [**Id.**, at p. 18]. That chart of the business activity codes states: "These Principal Business Activity Codes are based on the North American Industry Classification System." [ **Id.**, at p. 56].

577. The IRS Form 1120 (2021 version attached hereto as **Exhibit YY**) and Instructions for Form 1120 (excerpts from the 2021 version being attached hereto as **Exhibit ZZ**) are similar.

578. The IRS Form 1120 requires entry, at Schedule K, line 2a, of the "Business activity code no." [**Ex. YY**]. The Instructions for Form 1120 also refer to a chart of codes, which in turn similarly states that "[t]hese principal business activity codes are based on the North American Industry Classification System." [**Ex. ZZ**, at p. 28].

579. The list of the business activity codes contained in the instructions to the IRS Forms 1120 and 1065, which specifically state that they are based on the North American Industry Classification System, do not correlate verbatim to, and are not as comprehensive as, the list of NAICS codes contained in 13 C.F.R. § 121.201.

580. The list of the business activity codes contained in the instructions to the IRS Forms 1120 and 1065, which specifically state that they are based on the North American Industry Classification System, do not correlate verbatim to, and are not as comprehensive as, the NAICS

code list contained in either the 2017 or 2022 version of the NAICS Manual found on the U.S. Census Bureau's website, https://www.census.gov/naics/ (last visited Feb. 14, 2024).

581.   The initial PPP loan applications and instructions contained no information or directions regarding how an applicant, or an accounting professional assisting in the preparation of an application, was to determine whether the applicant was a NAICS code 72 for purposes under the PPP so as to be exempted from the Affiliation Rules.

582.   First draw PPP loan application forms, SBA Form 2483, are found on SBA's website and contain versions 1, effective April 2, 2020, through version 10, effective March 18, 2021.   https://www.sba.gov/document/sba-form-2483-ppp-first-draw-borrower-application-form (last visited Feb. 14, 2024).

583.   The first draw PPP loan application forms promulgated by SBA did not reference a NAICS code, or in any way require an applicant to list a NAICS code on the application form, until version 7, which was effective as of January 8, 2021. [**Exhibit AAA**]. Thereon, for the first time, SBA's instructions to Form 2483, stated: "[f]or purposes of reporting NAICS Code, applicants must match the business activity code provided on their IRS income tax filings, if applicable." [Id. at p.3].

584.   Second draw PPP loan application forms, SBA Form 2483-SD, are found on SBA's website and contain versions 1, effective January 8, 2021, through version 4, effective March 18, 2021. https://www.sba.gov/document/sba-form-2483-sd-ppp-second-draw-borrower-application-form (last visited Feb. 14, 2024).

585.   All of the second draw PPP loan application forms promulgated by SBA state that "[f]or purposes of reporting NAICS Code, applicants must match the business activity code provided on their IRS tax income filings, if applicable." [**Exhibit BBB**].

586.    SBA used the same form, SBA Form 3508, for both first and second draw PPP loan forgiveness applications.

587.    For loans of $150,000.00 and below, borrowers were to use the SBA Form 3508S.

588.    For loans of over $150,000.00, borrowers could use SBA Form 3508 or Form 3508EZ to apply for forgiveness.

589.    SBA Form 3508 is found on SBA's website, which contains versions 1, effective May 15, 2020, through 10, effective July 30, 2021. https://www.sba.gov/document/sba-form-3508-ppp-loan-forgiveness-application-instructions (last visited Feb. 14, 2024).

590.    The SBA Form 3508 did not require an applicant to list a NAICS code on the application form until version 8, which was effective as of January 19, 2021. [**Exhibit CCC**]. Thereon, for the first time, SBA's instructions to Form 3508, stated: "[e]nter the same information as on your Borrower Application Form, unless there has been a change in address or contact information. If NAICS code was not on the Borrower Application Form, match the business activity code provided on IRS income tax filings, if applicable." [**Id.**].

591.    As discussed above, all of the Plaintiffs are licensed bars or taverns, serve alcohol, and some provide live entertainment. Some also have specific "nightclub" licenses in addition to their liquor licenses.

592.    The 2017 NAICS Manual, found at https://www.census.gov/naics/?48967 (last visited, Feb. 14, 2024), states, in regard to NAICS code 722410, that "[t]his industry comprises establishments known as *bars*, *taverns*, *nightclubs*, or drinking places," and specifically lists, among other things, "*nightclubs*, alcoholic beverage" as an appropriate entity under this code. https://www.census.gov/naics/?input=722410&year=2017&details=722410 (last visited Feb. 14,

135

2024; and which represents the electronic version of the aforementioned 2017 NAICS Manual) (emphasis added).

593.   The 2022 NAICS Manual, found at https://www.census.gov/naics/?48967 (last visited, Feb. 14, 2024), contains identical language to that quoted for the 2017 Manual in the preceding paragraph.

594.   The 2017 NAICS Manual, in regard to NAICS code 722410, also states, in its "Cross-References" section, that "[o]perating discotheques or dance clubs without selling alcoholic beverages—are classified in Industry 713990, All Other Amusement and Recreation Industries."   https://www.census.gov/naics/?input=722410&year=2017&details=722410   (last visited Feb. 14, 2024; and which represents the electronic version of the aforementioned 2017 NAICS Manual).

595.   The 2022 NAICS Manual, in regard to NAICS code 722410' "Cross-Reference" section, states essentially the same thing as the 2017 NAICS Manual as quoted in the preceding paragraph, however, changes it ever so slightly: "[o]perating *nightclubs* or dance clubs without selling alcoholic beverages—are classified in Industry 713990[.]" https://www.census.gov/naics/?input=722410&year=2022&details=722410 (last visited Feb. 14, 2024) (emphasis added).

596.   Based upon the statements found in the official NAICS Manuals and website as quoted in the preceding paragraphs, the Plaintiffs and their accounting professionals who assisted in the various Loan and forgiveness applications believed at the time, and still believe, that each of the Plaintiffs is appropriately a NAICS 722410 entity; that as a consequence thereof the Plaintiffs are exempt under the PPP from the Affiliation Rules; and that the Plaintiffs are therefore entitled to the Loans and to the forgiveness thereof as applied for.

136

597.   Plaintiffs are NAICS code 722410 entities.

598.   NAICS code 722410 entities are exempt under the PPP from the Affiliation Rules.

599.   As NAICS code 722410 entities, Plaintiffs are exempt under the PPP from the Affiliation Rules.

600.   In addition, and regardless of the above, subsequent developments in the PPP loan and forgiveness application process, as discussed above, further support Plaintiffs' exclusion from the Affiliation Rules.

601.   In regard to the belated instructions set forth in the forms discussed in paragraphs 584 and 589, Plaintiffs Gold Club, SAW, and Meacham had, *for years* prior to the Pandemic, identified themselves on their federal tax returns with a business activity code beginning with the number 72 (specifically 722410; equivalent to NAICS code 722410). For these Plaintiffs, at least, the decision of the SBA to deny forgiveness, or at least initially deny forgiveness, based upon the Affiliation Rules is actually directly contrary to the SBA's own revised application forms and the instructions relating thereto.

602.   In addition, the application and instruction set forth in the forms discussed in paragraphs 582, 584, and 589, are in numerous instances, misleading and internally incorrect. For example, a number of the Plaintiffs used a *business activity code* on their tax returns of 713900 ("Other Amusement & Recreation"), although neither the Affiliation Regulations nor the NAICS Manual (either 2017 or 2022) contain a NAICS code of 713900. So, in applying for a PPP loan or forgiveness it would literally be impossible for the applicant to identify a specific *NAICS code* that simply does not exist.

603.   Regardless of all of above in this subsection of facts, for those Plaintiffs that had Loan forgiveness denied by the SBA, most of them (Plaintiffs Meacham and Reeder being the

exceptions) were belatedly determined by the SBA to be ineligible for loans, and therefore for loan forgiveness, based upon the claim by the SBA that the particular Plaintiff, together with Mohneys (as that term is defined below) being alleged "affiliated" entities (Plaintiffs again, Meacham and Reeder being the exceptions), are "too large" of a "business concern" under the Affiliation Rules to be entitled to loans guaranteed by the SBA. More specifically, the SBA does not accept that such Plaintiffs are NAICS code 72 businesses under the Affiliation Exception Provisions.

604. More specifically, the SBA is lumping all of these Plaintiff businesses together (Plaintiff Meacham excepted) based upon their association, or perceived (by the SBA) association, with businessmen by the name of Harry Mohney ("H.Mohney") and Jason Mohney ("J.Mohney," when combined with H.Money, the "Mohneys"). Through its action as described herein, the SBA seeks to assert that because of their "affiliation" with either, H.Mohney, J.Mohney, or both, each Plaintiff (again, except Meacham), together with its "Mohney affiliates," renders this "business concern" too large for SBA funding.

605. As it relates to Plaintiffs Reeder and Meacham, however, SBA has since initiated Post Payment Review audits of these Plaintiffs and one of the asserted reasons therefor is that, SBA asserts, these Plaintiffs, together with their alleged "affiliated" entities are too large of a business concern under the Affiliation Rules to be entitled to loans guaranteed by the SBA. More specifically, the SBA does not accept that such Plaintiffs are NAICS code 72 businesses under the Affiliation Exception Provisions.

606. The Plaintiffs that received both Loans and forgiveness thereof, but which are now under audit from the SBA, are—based upon the documents and information requested—being audited for the same reason (too large of a business concern under the Affiliation Rules); the SBA

not accepting those Plaintiffs' identification as being a NAICS code 72 business on their PPP Loan and forgiveness applications.

607.    Benderson has a particular and admitted disdain (as discussed later herein) for the type of "adult" businesses with which H. Mohney, J. Mohney, or both, associated to the extent that the SBA is now going after businesses associated with Mohneys that have nothing whatsoever to do with perceived (by the SBA) "adult" entertainment, exemplified by Plaintiffs Cats Vegas and Cats NOLA which are simply *karaoke bars*, or Plaintiffs Office and Pole Position which are just licensed bars that do not regularly present *any form of entertainment whatsoever*.

608.    From the document requests and Denial Letters that numerous Plaintiffs have received from the SBA and/or the Lending Banks, it seems clear that the SBA contends that it has the authority to "reassign" the Plaintiffs' self-designated NAICS code, or to rely solely on what SBA may perceive to be the primary NAICS code, despite admitting that a business may have more than one NAICS code, based upon what the SBA contends was the main income source of the business. And, in doing so, the SBA also believes that it has absolute discretion to assign various income streams to certain aspects of a business in order to justify its desired "conclusion" that the Plaintiffs' self-designated NAICS 72 code designation was not correct.

609.    The SBA has no basis in fact or law to "assign" NAICS codes for PPP purposes based on sources of income.

610.    The SBA has not published any guidance, legislative rule, general statement of policy, or otherwise, that provides authority to assign, or guidance for assigning, NAICS codes for PPP purposes based on sources of income.

611.    Even though it has no basis in fact or law for doing so, the SBA's focus on sources of income as discussed in the preceding few paragraphs immediately breaks down when viewed

139

in the context of Plaintiffs Cats Vegas, Cats NOLA, and the Office, which either do not regularly present live entertainment or that have simple karaoke entertainment which itself does not have its own NAICS code. Yet, the SBA's examinations of these businesses aptly demonstrate the vindictive, harassing, targeted, discriminatory, and retaliatory nature of the SBA's treatment of these Plaintiffs and others SBA claims are related to Mohneys.

612.    The SBA's focus on income sources for its affiliation analysis of a number of these Plaintiffs also breaks down when viewed in context of the most recent events concerning Plaintiffs Gold Clubs' second draw Loan and Meacham's second draw Loan where the SBA, in its "new and improved" Denial Letters, abandoned affiliation as a basis for forgiveness denial even though those Plaintiffs have numerous sources of income, including that from entertainment.

613.    Upon information and belief, the actions of the SBA in regard to these "size" issues are not being taken in good faith and are being taken, rather, to financially bleed the Plaintiffs through the professional fees that have to be incurred in responding to the SBA's never-ending requests that are themselves the direct and proximate result of Benderson's aversion to any forms of "adult" entertainment or to those associated in any regard or degree with the same.

614.    During a settlement conference conducted via Zoom that occurred on March 24, 2023, with attorneys of the undersign firm and SBA attorneys Erica Hoppes, Arlene Embrey, and Benderson. During the conference, Benderson commented that clients of the undersigned firm should not be receiving SBA monies because they are, he stated, merely "fronts for prostitution." Benderson further stated that with regard to second draw loans, the SBA would not even negotiate with clients of the undersigned firm that present "adult" entertainment. Regardless of the fact that each Plaintiff is a licensed bar and is under constant governmental supervision as a result of such licenses, and the fact that none of the Plaintiffs have *ever* been charged with prostitution or

prostitution-related crimes, the comments of Benderson at this settlement conference clearly demonstrate his bias against these Plaintiffs. And, given Benderson's position of authority—as discussed herein—in making ultimate eligibility determinations affecting these Plaintiffs, these comments of Benderson explain the vindictive, harassing, discriminatory, and retaliatory nature of the SBA's treatment of these Plaintiffs as described in elaborate detail herein.[8]

615.   As a further example of the vindictive, harassing, discriminatory, and retaliatory nature of the SBA's treatment of these Plaintiffs, while the SBA has not technically denied Loan forgiveness for Plaintiff Meacham based upon "affiliation" with Mohneys, the treatment of Meacham by the SBA in denying Loan forgiveness is still nevertheless related to Benderson's disdain for Mohneys in that Meacham is owned by an individual who is a member in Plaintiff Dallas Food & Beverage, which is in part indirectly owned by J.Mohney. And, because of all of the "affiliation" information these Plaintiffs have been required to submit to the SBA as part of their Loan and forgiveness applications, the SBA and Benderson know that.

616.   On the other hand, the SBA has forgiven PPP loans for numerous "adult" businesses located all throughout the country that have no association with Mohney.

617.   In addition, as part of its continued vindictive, harassing, discriminatory, and retaliatory treatment of these particular Plaintiffs, the SBA has not been above actually lying in its Denial Letters.

---

[8] Under Fed. R. Evid. 408, settlement negotiations are normally privileged and cannot be admitted into evidence, at least not in the proceeding that was the subject of the settlement negotiations. There are, however, exceptions to Fed. R. Evid. 408's prohibition on admittance of evidence related to compromise/settlement negotiations. One of the exceptions to Fed. R. Evid. 408's prohibition on admittance of evidence related to compromise/settlement negotiations includes proving a witness's bias or prejudice.

618.    For example, in the Denial Letter for Plaintiff Dallas Food & Beverage's second draw PPP Loan [**Exhibit DDD**], the SBA states, in denying Loan forgiveness both under the Prurience Regulation and the Affiliation Rules, that:

> It is noted borrower claimed NAICS code 722515 on 2483 however Tax returns List NAICS Code 71390, *Adult Entertainment*, which is in line with SBA guidelines classification based on the business primary industry type and limited revenue figure from Tax Returns.

[**Id.** (emphasis added)].

619.    Plaintiff Dallas Food & Beverage never listed a business activity code on its tax returns (based on NAICS codes, as discussed above) of "71390."

620.    There *is no 71390 NAICS code*.

621.    There is no NAICS code for "Adult Entertainment" nor does "Adult Entertainment" or the content of entertainment operate to exclude a business from any applicable NAICS code.

622.    Nothing contained in the PPP, any regulations promulgated thereto, or in the Affiliation Regulations, permits the SBA to "reassign" a NAICS code number to a loan applicant that is a licensed bar, let alone to a loan grantee.

623.    As such, there is no basis for the SBA to have denied Loan eligibility and therefore forgiveness in regard to, for example, Plaintiffs Dallas Food and Beverage and Meacham because of the fact that they had not provided, as the SBA contends, sufficient "documentation" on their various streams of income (SBA's FLRDs request "an itemized breakdown of the Business Revenue/Sales"). Such information is completely irrelevant to the question of whether the business is as a licensed bar or tavern, or a liquor-serving nightclub.

624.    In all of the FLRDs, SBA has failed to identify which NAICS code it believes the particular Plaintiff should be.

625. Since each Plaintiff is properly a NAICS code 72 business for PPP purposes, and because each had, in regard to first draw PPP Loans fewer than 500 employees at its physical location and in regard to second draw PPP Loans fewer than 300 employees at its physical location, all Plaintiffs are exempt from the Affiliation Rules. As such, there is no factual or legal basis to have denied, for some of the Plaintiffs, forgiveness of their Loans based upon the Affiliation Rules and, for other Plaintiffs, to have now commenced audits of their forgiven Loans in order to target and reexamine Loan eligibility based upon the Affiliation Rules.

## COUNT I

### THE PRURIENCE REGULATION AND INCORPORATING STATUTE VIOLATE THE FIRST AMENDMENT

626. Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

627. In raising their First Amendment challenges to the Prurience Regulation and the Incorporating Statute here, those Plaintiffs affected assert not only their own rights but also the rights of their owners and employees; the entertainers who perform on their premises; the customers who have in the past frequented, and intend in the future to frequent, those Plaintiffs' premises in order to be able to observe First Amendment protected entertainment and otherwise engage in First Amendment-protected activities; as well as the rights of other businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs and have suffered from the same type of vindictive, retaliatory, harassing and discriminatory conduct by the SBA as detailed herein.

628. The Prurience Regulation and the Incorporating Statute violate, and are contrary to, the First Amendment to the United States Constitution, both on their face and in particular as applied by the SBA to Plaintiffs, for numerous and various reasons, including but not limited to:

143

a.     They are impermissible viewpoint-based restrictions on speech and expression that are not necessary to any compelling governmental interest and are not sufficiently narrowly tailored;

b.     They are impermissible content-based restrictions on speech and expression that are not necessary to any compelling governmental interest and are not sufficiently narrowly tailored;

c.     As agreed by the SBA in D. Houston Inc. v. United States Small Bus. Admin., 579 F. Supp. 3d 959, 968, ¶ 34 and also n.10 (S.D. Tex. 2020), the Prurience Regulation is a content-based restriction of speech and expression;

d.     As admitted by the SBA, they invidiously and impermissibly discriminate against disfavored speech and expression and are being applied by the SBA particularly against speech and expression that its personnel find to be disagreeable;

e.     They are being applied by SBA personnel in a discriminatory fashion in retaliation for the nature of the speech and expression engaged in by some of these Plaintiffs and for some of them and/or their principals having participated in other litigation against the SBA arising out of Pandemic funding programs;

f.     The SBA is applying them in an unconstitutional fashion in that SBA personnel do not even review the expression at issue and are reaching eligibility determinations in a conclusory fashion;

g.     They violate, as applied to the First Amendment, the doctrine of unconstitutional conditions by conditioning the receipt of PPP loans upon the Plaintiffs not engaging in entertainment that the SBA opines, determines, or assumes without any analysis whatsoever, to be of a "prurient sexual nature" (whatever that may mean);

h.      They effectuate, in order to obtain PPP loans, an impermissible prior restraint on speech and expression;

i.      Even if deemed to be content-neutral (which they cannot under any existing precedent), they do not further any permissible and important governmental interest;

j.      They fail to conform to the constitutional standards regarding obscenity;

k.      As applied by the SBA, they are in conflict with § 633(e) of the SBA Act and render that provision to be meaningless and a nullity; thereby depriving speech and expression-related businesses of the First Amendment protections that Congress imposed by enacting § 633(e);

l.      They deprive fundamental First Amendment protections to speech and expression-related businesses in SBA funding decisions imposed by Congress through § 633(e) of the SBA Act and, in clear violation of fundamental canons of statutory construction, render § 633(e) to be meaningless and a nullity;

m.      They impermissibly single out, and are being applied to single out, First Amendment-protected businesses for denial of PPP benefits without justification;

n.      The exceptions of loan eligibility under the PPP have been legislatively and administratively gerrymandered so that such exceptions now, under the modified PPP, apply to disfavored speech and expression and to little else, in other words, the exceptions swallow the rule;

o.      They are unconstitutionally vague on their face and as applied by the SBA, particularly under the enhanced vagueness standards that are imposed upon laws that impact upon speech and expression-related activities, because: 1) they do not provide standards that can be readily understood by persons of common intelligence; 2) they do not

145

provide clear guidance to governmental officials so that no ad hoc, arbitrary, or discriminatory enforcement decisions are made; and 3) they do not contain the full three standards of obscenity as established under the <u>Miller</u> Test which the Supreme Court has acknowledged in <u>Reno v. ACLU</u>, 521 U.S. 844, 865, 871, 873-74 (1997) are necessary in order for the individual components of the <u>Miller</u> Test not to be impermissibly vague;

     p.     They are impermissibly and substantially overbroad in relation to their plain legitimate sweep; and

     q.     They, as applied by the SBA, have been impermissibly manipulated beyond defining the contours of the PPP funding program to impermissibly defining its recipients (i.e., not Plaintiffs).

629.    As a direct and proximate result of the unconstitutional aspects of the Prurience Regulation and the Incorporating Statute, as well as the Defendants', and their delegates', application and enforcement of them against the affected Plaintiffs and their interests, all as referenced above, the affected Plaintiffs, as well as their owners and employees, the entertainers who perform on their premises and the customers who frequent their establishments, have suffered, and/or will suffer, and/or will continue to suffer irreparable injuries including but not limited to financial collapse, business ruination, and/or the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment.

630.    Because of the First Amendment rights being infringed upon by Defendants' application and enforcement of the Prurience Regulation and the Incorporating Statute, all as referenced in detail above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here. It should also permanently enjoin enforcement by the SBA of the Prurience Regulation and the Incorporating Statute.

631.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of the Prurience Regulation and the Incorporating Statute, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

632.    For the reasons set forth above, Plaintiffs are entitled to judicial review in regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT II

**THE PRURIENCE REGULATION AND INCORPORATING STATUTE VIOLATE THE FIFTH AMENDMENT**

633.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

634.    The Regulation and the Incorporating Statute violate, and are contrary to, the Fifth Amendment to the United States Constitution, both on their face and particularly as applied by the SBA to Plaintiffs, for numerous and various reasons, including but not limited to:

a.    They treat establishments presenting certain forms of live performance dance entertainment, such as some of these Plaintiffs, differently from establishments presenting other forms of entertainment or no entertainment at all, for no compelling, important, or rational reason;

b.    They treat, under the PPP, businesses that employee persons who work at establishments presenting certain forms of entertainment, as demonstrated by some of the

147

Plaintiffs here, unequally and differently from businesses that employ workers at establishments presenting other forms of entertainment or no entertainment at all, for no compelling, important, or rational reason;

c.      They violate the occupational liberty rights of the affected Plaintiffs, their employees, and the entertainers who perform on their premises;

d.      They violate the substantive and procedural Due Process rights of the affected Plaintiffs, their employees, and the entertainers who perform on their premises;

e.      They treat, have been used to treat, and could continue to treat in the future, similarly situated persons and businesses differently without justification;

f.      They deny, for the reasons set forth in detail above, the affected Plaintiffs of equal protection under the laws of the United States of America;

g.      They treat First Amendment-protected businesses differently by waiving other prior statutory and administrative expression-related exclusions to PPP eligibility under the SBA Act that applied to certain expressive businesses and business concerns, while denying the affected Plaintiffs access to PPP benefits via denial of loan forgiveness;

h.      They treat First Amendment-protected businesses differently from non-constitutionally protected businesses by waiving, for PPP purposes, other prior statutory and administrative exclusions to PPP eligibility under the SBA Act that applied to certain non-constitutionally protected businesses, while continuing to deny the affected Plaintiffs access to PPP benefits;

i.      They are being arbitrarily and capriciously applied by the Defendants; and

j.      They are impermissibly vague on their face and as applied to these Plaintiffs for the reasons discussed above.

635.    As a direct and proximate result of the unconstitutional aspects of the Prurience Regulation and the Incorporating Statute, as well as the Defendants', and their delegates', application and enforcement of them against the affected Plaintiffs and their interests, all as referenced above, the affected Plaintiffs, as well as their owners and employees, the entertainers who perform on their premises and the customers who frequent their establishments, have suffered, and/or will suffer, and/or will continue to suffer irreparable injuries including but not limited to financial collapse, business ruination, and/or the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment.

636.    Because of the Fifth Amendment rights being infringed upon by Defendants' application and enforcement of the Prurience Regulation and the Incorporating Statute, all as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

637.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of the Prurience Regulation and the Incorporating Statute, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

638.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## <u>COUNT III</u>

149

**THE SBA'S INTERPRETATION(S) OF THE PRURIENCE REGULATION AND THE INCORPORATING STATUTE ARE INVALID**

639.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

640.    The SBA and/or the Administrator's defining of "prurient" as "lustful," "lascivious," an "overt strong sexual interest," "erotic," and/or "arousing of strong sexual interest or desire" under the Prurience Regulation is not a legitimate or lawful exercise of the SBA's or its Administrator's authority, and is otherwise invalid under the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* and applicable law because, among other reasons:

    a.    Such construction of the term "prurient" is inconsistent with the SBA Act, particularly § 633(e) thereof, the SOP's that the SBA has issued, and the legal definition of the term "prurient" as articulated by the United States Supreme Court;

    b.    Such construction of the term "prurient" is not a reasonable interpretation of the term;

    c.    Such construction of the term "prurient" renders that very term of the Prurience Regulation irrelevant, superfluous, and of no effect since the term "erotic," which the SBA has asserted in litigation to be what the term "prurient" is meant to convey, is generally understood to mean a tendency to arouse sexual desire or excitement, which is *already* included in the Prurience Regulation through the phrase "prurient *sexual* nature,"

    d.    Such construction, for the reasons set forth in the subsection immediately above, demonstrates that the SBA deceived the general public in the notice and comment process by not conveying just what the SBA was attempting to exclude from funding by way of the Prurience Regulation;

150

e.      Such construction of the term "prurient" is arbitrary, capricious, an abuse of discretion in light of, and is directly contrary to, the SBA Act, and in particular § 633(e) thereof;

f.      Such construction of the term "prurient" is arbitrary, capricious, and an abuse of discretion in light of, as a result of, and as exemplified by, the ever-changing SOP's issued by the SBA that discuss, and that purport to provide guidance to Lending Banks in regard to, the Prurience Regulation;

g.      Such construction of the term "prurient" would render § 633(e) of the SBA Act meaningless, void, a nullity, and of no effect;

h.      Such construction of the term "prurient" is not supported by the Prurience Regulation's findings because in promulgating the Prurience Regulation the SBA specifically acknowledged the Miller v. California, 413 U.S. 15 (1983) test of obscenity, with which the Prurience Regulation does not comply, *see* Business Loan Programs, 60 Fed. Reg. 64356, 64360 (Proposed, Dec. 15, 1995);

i.      Such construction of the term "prurient" is not supported by current constitutional standards of obscenity which, as articulated by the United States Supreme Court, defines and operationalizes the term "prurient" to mean a "shameful or morbid" and "unhealthy" interest in sex, as opposed to "normal, healthy sexual desires";

j.      Such construction of the term "prurient" is not supported by current constitutional standards of obscenity which, as articulated by the United States Supreme Court, reject "lustful" as satisfying the constitutional standard for prurient appeal; and

k.      Such construction of the term "prurient" is inconsistent with Congress's goals under the CARES Act and the Appropriations Act.

641.    Because, as applied by the SBA and/or the Administrator, the Prurience Regulation and the Incorporating Statute are inconsistent with the SBA Act, as well as the broad form of relief provided by the CARES Act and the Appropriations Act, all as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

642.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of the Prurience Regulation and the Incorporating Statute, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

643.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT IV

### OTHER INVALIDITY OF THE PRURIENCE REGULATION

644.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

645.    The Prurience Regulation is not a legitimate or lawful exercise of the SBA's or the Administrator's authority as applied to first and second draw PPP loans, and is otherwise invalid under the Administrative Procedure, 5 U.S.C. § 551 *et seq.* and applicable law because, among other reasons:

152

a.      It fails to serve any lawful or legitimate regulatory purpose for the SBA or the Administrator as to first and second Draw PPP loans or otherwise;

b.      The SBA and/or the Administrator failed to make a sufficient record, or to otherwise articulate a satisfactory explanation, as to why the Prurience Regulation is a rational or reasonable response to a problem that the agency was charged with solving under the CARES Act or the Appropriations Act, and in particular the first and second Draw PPP loans;

c.      As applied to Plaintiffs by the SBA and/or the Administrator, the Prurience Regulation conflicts with the decision to award first and/or second draw PPP Loans to Plaintiffs in the first place because, among other reasons, only eligible entities were to receive PPP loans;

d.      As applied to Plaintiffs by the SBA and/or the Administrator, Defendants have used the Prurience Regulation to engage in unreasoned decision making by utterly failing to explain how Defendants allegedly violated the Prurience Regulation in the FLRDs; and

e.      Applying the Prurience Regulation at the PPP loan forgiveness stage is in excess of SBA's jurisdiction because, pursuant to the loan forgiveness statute, 15 U.S.C. § 633m, only eligible recipients are entitled to loan forgiveness and eligible recipient is defined as simply "the recipient of a covered loan," 15 U.S.C. § 636(a)(10), and Plaintiffs received covered loans.

646.    Because the Prurience Regulation and the Incorporating Statute, as applied by the SBA and/or the Administrator, are inconsistent with the SBA Act, as well as the broad form of relief provided by the CARES Act and the Appropriations Act, all as referenced above, and because

they do not, again as applied and enforced by the SBA and/or the Administrator, represent a rational and reasonable response to a problem that the agency was charged with solving, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

647.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of the Prurience Regulation and the Incorporating Statute, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

648.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT V

### THE SBA'S APPLICATION OF THE AFFILIATION EXCEPTION PROVISIONS VIOLATES THE FIRST AMENDMENT

### (RETALIATION)

649.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

650.    The SBA has stated and/or claimed that Plaintiffs (except Plaintiffs Meacham and Reeder) are affiliated with, among other entities related to Mohneys, DV Diamond Club of Flint, LLC. [*See* **Ex. VV** at AR p. 5851, exhibit p. 2 (noting that the Affiliation Narrative Worksheet

154

Mohney et al #127 lists, among others, these Plaintiffs as alleged "affiliates" of DV Diamond Club of Flint)].

651.    In the DV Diamond Club action against the SBA to gain access to PPP funds, the PPP funds were being withheld based on the SBA's apparent disgust at the constitutionally protected entertainment presented by these Plaintiffs and the SBA's erroneous application of the Prurience Regulation.

652.    By filing the DV Diamond Club action against the SBA, those Plaintiffs were engaged in conduct protected by the First Amendment.

653.    Plaintiffs have presented, currently present, and desire to continue to present entertainment that is protected by the First Amendment.

654.    Since the DV Diamond Club action, the SBA, and in particular Benderson, has selected any business the SBA alleges to be an adult entertainment business or to be affiliated with the Mohneys for additional scrutiny on any pandemic related funding program, including the PPP, and has been looking for ways to deny Plaintiffs, and any business SBA alleges to be affiliated with the Mohneys, pandemic aid funding, including to the PPP, to claw back any pandemic aid funding the Plaintiffs received, or to simply run up the entities costs associated with obtaining loan forgiveness. Examples and other indicia of the retaliatory actions by the SBA include:

a.    The fact that Plaintiffs Gold Club and SAW were initially denied access to RRF grants based on SBA's extra-statutory incorporation of the Prurience Regulation into its defective legislative rule couched as a general statement of policy or general statement of policy that did not carry the force of law, Restaurant Revitalization Funding Program Guide. It was only after these Plaintiffs sued in a case captioned as <u>MAG Enterprises, Inc.</u>

v. U.S. Small Bus. Admin., No. 2:21-cv-02213 (E.D. Pa. 2021) that these Plaintiffs were granted access to these funds;

b. The fact that SBA has concluded that Plaintiffs were not entitled to PPP loan forgiveness based on SBA's failure to apply the Affiliation Exception Provisions to these Plaintiffs despite, as noted herein, the fact that they are clearly a NAICS 72 entity, serve alcohol/beverages and/or food and are licensed bars and taverns;

c. The statements made by Benderson in the Zoom settlement meeting that occurred on March 24, 2023, as discussed herein;

d. The targeting of J.Mohney and H.Mohney for incessant audits, requests for documentation, and additional scrutiny of any business SBA claims that they are affiliated with;

e. The fact that Benderson, via the Benderson Declaration, submitted untrue statements to a court in support of advocacy against, among others, various businesses alleged by the SBA via the Affiliation Narrative Worksheet Mohney # 127 to be affiliated with some of the Plaintiffs and which presented similar constitutionally protected entertainment as several of the Plaintiffs here, receiving second draw PPP loans;

f. The fact that Benderson stated the SBA refuses to even negotiate over various Plaintiffs' second draw loans as it did with regard to first draw loans, presumably, on the basis that with the second draw, the Regulation is incorporated into the PPP via the Incorporating Statute;

g. The fact that, on or about February 1, 2024, the SBA initiated an internal review of the RRF award to Plaintiff SAW—which came by way of a settlement agreement with the SBA, which specifically stated that SBA would not apply the Prurience Regulation

156

or the definitions and instructions concerning "Affiliates" and "Affiliated Businesses" as found on page 19 of SBA's April 28, 2021, Restaurant Revitalization Funding Program Guide—demanding, among other documents, a list of all businesses that the principal owners of SAW hold at least a 20% interest ownership in and their physical locations so as to make a determination under page 19 of SBA's April 28, 2021, Restaurant Revitalization Funding Program Guide as to whether Plaintiff SAW was eligible for the RRF grant in the first place. In other words, SBA is acting in direct contravention to the settlement agreement under which Plaintiff SAW received its RRF grant in order to claw back the RRF grant;

h.    The fact that, for Plaintiff Meacham, SBA identified Meacham as allegedly being ineligible for the PPP under the Prurience Regulation back on April 24, 2023, at the latest, [**Ex. B** at AR p. 16, exhibit p. 5], (really, back on June 24, 2022, [id. at AR p. 17, exhibit p. 6], yet issued Meacham its first FLRD which does not reference this alleged ineligibly reason. It was only *after* Meacham appealed that FLRD in the OHA and SBA withdrew that FLRD did SBA issue the second FLRD, which raised, for the first time, Meacham's alleged ineligibility based on the Prurience Regulation. This scheme was designed to cause Meacham to unnecessarily incur significant professional fees when SBA knew the present reason for its denial of Meacham's forgiveness request all along; and

i.    The fact that, for Plaintiff SAW, SBA identified SAW as allegedly being ineligible for the PPP under the Prurience Regulation back on September 9, 2022, at the latest, [Excerpts of Administrative Record in SAW's first OHA appeal of its first draw PPP Loan initiated on or about November 30, 2023, at pp. 3542, 3547, 3550, and 3553-55][9]

---

[9] Citations are to the page numbers stamped on the bottom of the pages, not the PDF page number.

(**Ex. R**, excerpts of the "Affiliate Narrative Worksheet Mohney et al #127 prepared and/or reviewed/approved by Kevin Clay and Sharon K. Drake on or about September 19, 2022), states: "There are NO entities that qualify for PPP Waivers since . . . AND Google Search identify the business establishments as either gentlemen's club [sic] or a business providing Prurient Sexual Material. See Appendix B," (**Ex. R** p. 3547), with Appendix B thereto stating, "Business Address located in Google Search/Maps identifies ineligible businesses of prurient nature," and providing the following:

### Affiliate Narrative Worksheet Mohney et al #127



Ln# 4961177704 S A W Entertainment Limited. Per Google Address 1510 1st Ave Seattle WA 98101

https://www.google.com/maps/place/1510+1st+Ave,+Seattle,+WA+98101/@47.6091992,-122.3404636,3a,28.2y,93.13h,85.8t/data=!3m7!1e1!3m5!1sku3Vhu36nWxflIQ9OqHBGg!2e0!6shttps:%2F%2Fstreetviewpixels-pa.googleapis.com%2Fv1%2Fthumbnail%3Fpanoid%3Dku3Vhu36nWxflIQ9OqHBGg%26cb_client%3Dsearch.gws-prod.gps%26w%3D86%26h%3D86%26yaw%3D90.431206%26pitch%3D0%26thumbfov%3D100!7i16384!8i8192!4m5!3m4!1s0x54906ab2fda78543:0x71b0cff274dbb0b5!8m2!3d47.6092249!4d-122.3399343

**Id.** at p. 3554)], yet issued SAW its first FLRD, which does not reference this alleged ineligibility reason. [**Ex. Q**]. This was also included in the administrative record in Gold Club's appeal of SBA's denial of its first draw Loan forgiveness application. [**Ex. VV**]. It was only *after* SAW appealed that FLRD in the OHA and SBA withdrew that FLRD dis

SBA issue the second FLRD, which raised, for the first time, SAW's alleged ineligibility based on the Prurience Regulation. This scheme was designed to cause SAW to unnecessarily incur significant professional fees when SBA knew the present reason for its denial of SAW's forgiveness request all a long; and

j.      The fact that, after losing the Meacham appeal based on, among other things, a lack of evidence to support the FLRD's conclusion in the administrative record, SBA, having included the same type of evidence in the administrative record of SAW that it had included and was forced to rely upon in Meacham's OHA appeal, withdrew the FLRD that SAW was appealing because it could not support the conclusions in SAWs FLRD. This scheme, combined with the fact that multiple courts have enjoined the use of the Prurience Regulation as eligibility criteria for first draw PPP Loans, was designed to cause SAW to unnecessarily incur significant professional fees.

655.    The causal link between these Plaintiffs' protected First Amendment conduct, as described herein, is evidenced by, among other things detailed herein, the scope of the Affiliation Narrative Worksheet Mohney et al #127 appearing in nearly every administrative record the undersigned firm has reviewed, the actions of the SBA to claw back various RRF grants by applying standards it waived via a settlement agreement, and Benderson's comments in the aforementioned Zoom call directed at any of the undersigned firm's clients that present constitutionally protected live female performance dance entertainment such as these Plaintiffs.

656.    As a direct and proximate result of the retaliatory actions of Defendants based on these Plaintiffs' First Amendment protected activities, as well as Defendants', and their delegates', application and enforcement of the Prurience Regulation, the Incorporating Statute, and the Affiliation Rules against the affected Plaintiffs and their interests, all as referenced above, the

159

affected Plaintiffs, as well as their owners and employees, the entertainers who perform on their premises and the customers who frequent their establishments, have suffered, and/or will suffer, and/or will continue to suffer irreparable injuries including but not limited to financial collapse, business ruination, and/or the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment.

657.    Because of the First Amendment rights being infringed upon by Defendants retaliatory actions as discussed herein, this Court has the authority to declare the rights and legality of the actions of the various parties and should do so here. It should also permanently enjoin enforcement by the SBA of the Prurience Regulation, the Incorporating Statute, and the Affiliation Rules as they apply to the PPP, against the affected Plaintiffs.

658.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of the Prurience Regulation, the Incorporating Statute, and the Affiliation Rules, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

659.    For the reasons set forth above, Plaintiffs are entitled to judicial review in regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT VI

**THE SBA'S APPLICATION OF THE AFFILIATION EXCEPTION PROVISIONS
VIOLATES THE FIFTH AMENDMENT**

160

660. Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

661. The way that the SBA is applying and enforcing the Affiliation Exception Provisions, and in particular in regard to businesses engaged in expression protected by the First Amendment, violates, and is contrary to, the Fifth Amendment to the United States Constitution for numerous and various reasons, including but not limited to:

a. It is an arbitrary and capricious construction and application of the Affiliation Exception Provisions;

b. It is directly contrary to the plain text of the Affiliation Exception Provisions;

c. It is being applied in such a manner for vindictive, retaliatory, harassing and discriminatory purposes;

d. The SBA has no lawful authority to reject, or to change, a self-assigned NAICS code of a PPP loan applicant or recipient that otherwise lawfully applies to such entity;

e. There is no basis in law for the SBA to challenge a legally licensed bar, tavern, and/or nightclub as a NAICS code 72 business based upon an undefined and unarticulated standard of differing income streams;

f. It permits the SBA to demand—as a condition for Loan forgiveness—that an applicant produce information held by others that it has no lawful way of obtaining;

g. It violates the occupational liberty rights of the affected Plaintiffs, their employees, and the entertainers who perform on their premises;

161

h.      It violates the substantive and procedural Due Process rights of the affected Plaintiffs, their employees, and the entertainers who perform on their premises;

i.      It denies, for the reasons set forth in detail above, the affected Plaintiffs of equal protection under the laws of the United States of America, particularly with regard to other NAICS code 72 businesses that do not provide or present forms of entertainment that are disagreeable to the SBA or to its officials;

j.      Upon information and belief, the SBA is not applying or interpreting the Affiliation Exception Provisions in such a manner or fashion except for businesses that present entertainment that the SBA or its officials find to be disagreeable, or are businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs;

k.      It has been used to deny Plaintiffs forgiveness of PPP loans to which they are entitled and is thereby being used to take Plaintiff's protected property interest in loan forgiveness;

l.      It treats, has been used to treat, and could continue to treat in the future, similarly situated persons and businesses differently without justification.

662.    As a direct and proximate result of the unconstitutional aspects of the SBA's application of the Affiliation Exception Provisions, all as referenced above, the affected Plaintiffs, as well as their owners and employees, the entertainers who perform on their premises and the customers who frequent their establishments, have suffered, and/or will suffer, and/or will continue to suffer irreparable injuries including but not limited to financial collapse, business ruination, and/or the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment.

663.    Because Plaintiffs' Fifth Amendment rights have been infringed upon by Defendants' application of the Affiliation Exception Provisions, all as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

664.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin the Defendants' application of the Affiliation Exception Provisions, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

665.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT VII

### THE SBA'S INTERPRETATION(S) AND APPLICATIONS OF THE AFFILIATION EXCEPTION PROVISIONS ARE INVALID

666.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

667.    The SBA and/or the Administrator's application and enforcement of the Affiliation Exception Provisions is not a legitimate or lawful exercise of the SBA's or its Administrator's authority, and is otherwise invalid under the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* and applicable law because, among other reasons:

163

a.      Such construction is inconsistent with the plain text of the Affiliation Exception Provisions;

b.      Such construction is not a reasonable interpretation of the Affiliation Exception Provisions;

c.      Such construction is arbitrary, capricious, an abuse of discretion in light of, and is directly contrary to, the PPP and in particular the plain text of the Affiliation Exception Provisions;

d.      Such construction is inconsistent with Congress's goals under the CARES Act and the Appropriations Act; and

e.      Such construction and application to Plaintiffs runs contrary to the evidence before the SBA, namely, that Plaintiffs are NAICS 72 businesses such that they qualify for Affiliation exception Provisions.

668.    Because the SBA's and/or the Administrator's application of the Affiliation Exception Provisions is inconsistent with the SBA Act, as well as the broad form of relief provided by the CARES Act and the Appropriations Act, all as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

669.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of the SBA's application of the Affiliation Exception Provisions, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and

164

because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

670.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT VIII

### OTHER INVALIDITY OF THE WAY THE SBA IS APPLYING THE AFFILIATION EXCEPTION PROVISIONS

671.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

672.    The SBA's and the Administrator's application and enforcement of the Affiliation Exception Provisions are not legitimate or lawful exercises of the SBA's or the Administrator's authority as applied to first and second draw PPP loans, and are otherwise invalid under the Administrative Procedure, 5 U.S.C. § 551 *et seq.* and applicable law because, among other reasons:

    a.    There has been no formal ruling making whatsoever that would permit the SBA and the Administrator to create their own construct of the Affiliation Exception Provisions, especially one that runs counter to the clear text of the statute;

    b.    They fail to serve any lawful or legitimate regulatory purpose for the SBA or the Administrator as to first and second Draw PPP loans or otherwise;

    c.    The SBA and/or the Administrator failed to make a sufficient record, or to otherwise articulate a satisfactory explanation, as to why their application and enforcement of the Affiliation Exception Provisions are rational or reasonable responses to a problem that the agency was charged with solving under the CARES Act or the Appropriations Act, and in particular the first and second Draw PPP loans; and

165

d.    The SBA and/or the Administrator failed to make a sufficient record or examine relevant evidence before it at the time it made its decision to deny Plaintiffs PPP Loan forgiveness requests such that SBA's FLRDs are not the product of reasoned decision-making.

673.    Because the SBA's and the Administrator's application and enforcement of the Affiliation Exception Provisions are inconsistent with the SBA Act, as well as the broad form of relief provided by the CARES Act and the Appropriations Act, all as referenced above, because they do not, again as applied by the SBA and/or the Administrator, represent a rational and reasonable response to a problem that the agency was charged with solving, and because the SBA's decisions with regard to Plaintiffs' PPP Loan forgiveness requests failed to examine relevant evidence and otherwise fails to explain its decision, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

674.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of the SBA's application of the Affiliation Exception Provisions, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

675.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## **COUNT IX**

## IN THE ALTERNATIVE, THE AFFILIATION RULES VIOLATE
## THE FIFTH AMENDMENT

676.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

677.    In the alternative to invalidating the manner and way that the SBA is interpreting and applying the Affiliation Exception Provisions, Plaintiffs assert this Count IX and Counts X - XI immediately below.

678.    The Affiliation Rules violate, and are contrary to, the Fifth Amendment to the United States Constitution, both on their face and particularly as applied by the SBA to Plaintiffs, for numerous and various reasons, including but not limited to:

a.    They are unconstitutionally vague on their face and as applied by the SBA, particularly when applied to First Amendment protected businesses as a result of the enhanced vagueness standards that are imposed upon laws that impact upon speech and expression-related activities, because: 1) they do not provide standards that can be readily understood by persons of common intelligence; 2) as exemplified by the circumstances here and in particular light of the provisions of 13 C.F.R. § 121.103(a)(5), they do not provide clear guidance to governmental officials so that no ad hoc, arbitrary, or discriminatory enforcement decisions are made;

b.    They treat similar businesses differently for no compelling, important, or rational reason;

c.    They permit the SBA to demand—as a condition for Loan forgiveness— that an applicant produce information held by others that it has no lawful way of obtaining;

d.    They violate the occupational liberty rights of the affected Plaintiffs, their employees, and the entertainers who perform on their premises;

167

e.    They violate the substantive and procedural Due Process rights of the affected Plaintiffs, their employees, and the entertainers who perform on their premises;

f.    They treat, have been used to treat, and could continue to treat in the future, similarly situated persons and businesses differently without justification;

g.    They deny, for the reasons set forth in detail above, the affected Plaintiffs of equal protection under the laws of the United States of America; and

h.    They are being arbitrarily and capriciously applied by the Defendants.

679.    As a direct and proximate result of the unconstitutional aspects of the Affiliation Rules, as well as the Defendants', and their delegates', application of them against the affected Plaintiffs and their interests, all as referenced above, the affected Plaintiffs, as well as their owners and employees, the entertainers who perform on their premises and the customers who frequent their establishments, have suffered, and/or will suffer, and/or will continue to suffer irreparable injuries including but not limited to financial collapse, business ruination, and/or the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment.

680.    Because of the Fifth Amendment rights being infringed upon by Defendants' application of the Affiliation Rules, all as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

681.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of the Affiliation Rules, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and because the balance of harms tilts in favor

of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

682.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT X

## THE SBA'S INTERPRETATION(S) OF THE AFFILIATION RULES ARE INVALID

683.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

684.    The SBA and/or the Administrator's interpretation and/or application of the Affiliation Rules is not a legitimate or lawful exercise of the SBA's or its Administrator's authority, and is otherwise invalid under the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* and applicable law because, among other reasons:

  a.    Such interpretation and/or application is inconsistent with the SBA Act and its purposes;

  b.    Such interpretation and/or application is not a reasonable in light of the purpose and intent of the SBA Act;

  c.    Such interpretation and/or application is arbitrary, capricious, an abuse of discretion in light of, and is directly contrary to, the SBA Act; and

  d.    Such interpretation and/or application is inconsistent with Congress's goals under the CARES Act and the Appropriations Act.

685.    Because, as applied by the SBA and/or the Administrator, the Affiliation Rules are inconsistent with the SBA Act, as well as the broad form of relief provided by the CARES Act and

169

the Appropriations Act, all as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

686.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of the Affiliation Rules, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

687.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT XI

### OTHER INVALIDITY OF THE AFFILIATION RULES

688.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

689.    The Affiliation Rules are not a legitimate or lawful exercise of the SBA's or the Administrator's authority under the SBA Act because, among other reasons:

      a.     They are contrary to the very purpose and intent of the SBA Act;

      b.     They fail to serve any lawful or legitimate regulatory purpose for the SBA or the Administrator under the SBA Act;

      c.     They fail to acknowledge and give respect to corporate formalities otherwise legally enforceable;

170

d.     The SBA and/or the Administrator failed to make a sufficient record, or to otherwise articulate a satisfactory explanation, as to why the Affiliation Rules are a rational or reasonable response to a problem that the agency was charged with solving under the SBA Act; and

e.     The SBA and/or the Administrator failed to make a sufficient record or otherwise examine relevant data to establish that the Affiliation rules are a rational or reasonable response to a problem that the agency was charged with solving.

690.     Because the Affiliation Rules, as applied by the SBA and/or the Administrator, are inconsistent with the SBA Act, as well as the broad form of relief provided by the CARES Act and the Appropriations Act, all as referenced above, and because they do not, again as applied by the SBA and/or the Administrator, represent a rational and reasonable response to a problem that the agency was charged with solving, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

691.     Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of the Affiliation Rules, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

692.     For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT XII

### THE SPECIAL OHA RULES VIOLATE THE FIFTH AMENDMENT

693. Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

694. The Special OHA Rules violate, and are contrary to, the Fifth Amendment to the United States Constitution, both on their face and particularly as applied by the SBA to Plaintiffs, for numerous and various reasons, including but not limited to:

    a.    They deny both substantive and procedural due process in that, among other ways, they:

        i.    Provide for no form of hearing whatsoever;

        ii.    Preclude any form of discovery whatsoever, including discovery that may be essential to the later adjudication of the appellant's claims in court following conclusion of the administrative appeal proceedings;

        iii.    Preclude the submission by the appellant of any documents, material, or information that is not included in the formal "administrative record" created solely by the SBA, while, seemingly, permitting SBA to submit documents, material, or information that is not included in the formal "administrative record," as evidenced by SBA's responses to the OHA appeals of Meacham and Gold Club;

        iv.    Do not permit the appellant to meaningfully participate in the creation of the formal "administrative record" upon which the administrative appeal is to be solely based;

v.      Do not provide sufficient time frames as a matter of right for the appellant to respond to and filed objections concerning the formal "administrative record" created solely by the SBA;

vi.      Do not permit the appellant any ability whatsoever to confront or challenge the evidence that the SBA purports to possess against it;

vii.      Require the appellant to file its substantive "appeal brief" before it has been provided with the "administrative record" purportedly created by the SBA as the basis of rendering its adverse decision against the appellant;

viii.      Permit the SBA to produce such heavily redacted "administrative records" that it is virtually impossible for the appellant to understand the full basis for the SBA's decision or, more importantly, to either file adequate objections to such "record" or to be able to seek leave to be able to respond to the contentions as contained in the purported "administrative record";

ix.      Permit SBA to broadly assert claims of privilege without an avenue for appellant to challenge such claims and without explanation of the claim of privilege, *see* **Ex. D**, at p. 4 (SBA claiming the redactions in the administrative record "are not relevant and require no explanation or claims of privilege");

x.      Provide no right of the appellant to file a "merits" or "reply" brief once it has been provided with the "administrative record" purportedly created by the SBA as the basis of rendering its adverse decision against the appellant;

xi.      Permit SBA to, apparently, withdraw an FLRD for any reason or no reason at all, thereby needlessly increasing the costs of an OHA appeal, which is contrary to the purposes of the PPP;

173

xii.     Are not applied consistently by the OHA and the personnel who act as adjudicators; and

xiii.     As applied by the OHA, provide no substantive protections for the appellant whatsoever, including even requiring that the OHA follow its own Special OHA Rules when to do so might be to the advantage of the appellant;

b.     They violate the occupational liberty rights of the affected Plaintiffs, their employees, and the entertainers who perform on their premises;

c.     In contrast to the OHA appellate rules that apply to all other forms of appeals from SBA decisions, they treat, have been used to treat, and could continue to treat in the future, similarly situated persons and businesses differently without justification;

d.     They deny, for the reasons set forth in detail above, the affected Plaintiffs of equal protection under the laws of the United States of America;

e.     They are being arbitrarily and capriciously applied by the Defendants; and

f.     They are impermissibly vague on their face and as applied to these Plaintiffs for the reasons discussed above.

695.    As a direct and proximate result of the unconstitutional aspects of the Special OHA Rules, as well as the Defendants', and their delegates', application of them against the affected Plaintiffs and their interests, all as referenced above, the affected Plaintiffs, as well as their owners and employees, the entertainers who perform on their premises and the customers who frequent their establishments, have suffered, and/or will suffer, and/or will continue to suffer irreparable injuries including but not limited to financial collapse, business ruination, the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment, and the denial of their due process rights.

696.    Because of the Fifth Amendment rights being infringed upon by Defendants' application and enforcement of the Special OHA Rules, all as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

697.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of the Special OHA Rules, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction, and because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

698.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT XIII

### OTHER INVALIDITY OF THE SPECIAL OHA RULES

699.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

700.    The Special OHA Rules are not a legitimate or lawful exercise of the SBA's or the Administrator's authority as applied to first and second draw PPP loans, and are otherwise invalid under the Administrative Procedure, 5 U.S.C. § 551 *et seq.* and applicable law because, among other reasons:

175

a.     They fail to serve any lawful or legitimate regulatory purpose for the SBA or the Administrator as to first and second Draw PPP loans or otherwise;

b.     For the reasons set forth in the previous Count, they are contrary to constitutional rights and privileges;

c.     For the reasons set forth in the previous Count, they fail to provide adequate procedure; and

d.     The SBA and/or the Administrator failed to make a sufficient record, or to otherwise articulate a satisfactory explanation, as to why the Special OHA Rules are a rational or reasonable response to a problem that the agency was charged with solving under the CARES Act or the Appropriations Act, and in particular the first and second Draw PPP loans.

701.   Because Special OHA Rules are inconsistent with the SBA Act, as well as the broad form of relief provided by the CARES Act and the Appropriations Act, all as referenced above, and because they do not represent a rational and reasonable response to a problem that the agency was charged with solving, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

702.   Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity and because resolution of their claims in court may be constrained by the OHA proceedings undertaken pursuant to and informed by the Special OHA Rules. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein, because Plaintiffs will be suffer irreparable injury if this Court does not enjoin enforcement of Special OHA Rules, because the Defendants will not suffer any harm whatsoever by the entry of a preliminary

injunction, and because the balance of harms tilts in favor of the Plaintiffs and against the Defendants, this Court should enter a preliminary injunction in order to protect Plaintiffs' fundamental rights at issue here.

703.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

**COUNT XIV**

**ESTOPPEL**

704.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

705.    Through the PPP, the regulations promulgated thereto, other documents issued and/or distributed by the SBA, and the loan Documents, the SBA itself and through its Lending Banks created a system of representations and promises to borrowers establishing that if borrowers (including each one of these Plaintiffs), during certain critical periods of the Pandemic, retained their employees so that they would not be required to avail themselves of other governmental assistance programs such as welfare and unemployment compensation and otherwise used Loan Proceeds only for the Permitted Uses, their Loans would be forgiven (collectively the "Promises").

706.    The Promises are definite and of definite terms, which the SBA would expect the Plaintiffs to rely on.

707.    The Promises reasonably induced reliance thereon by the Plaintiffs.

708.    The Plaintiffs relied on the Promises of Loan forgiveness to their detriment, and no longer possess any of the Loan Proceeds; having used the amounts sought via Plaintiffs' PPP Loan forgiveness applications exclusively for the Permitted Uses.

177

709. For each of the Plaintiffs, the Defendants had actual, or at least constructive knowledge, of the facts relating to the eligibility or ineligibility of the Plaintiffs for their Loans at the time of the granting of such Loans and the disbursement of the Loan Proceeds, and, for those Plaintiffs that received forgiveness of their Loans, actual, or at least constructive knowledge, of the eligibility of such Plaintiffs for Loan forgiveness at the time their Loans were forgiven.

710. Regardless of the matters set forth in the paragraph immediately above, the Defendants, at no time prior to the issuance of the Loans and, for those Plaintiffs that received Loan forgiveness, prior to the forgiving of such Loans, disclosed, and in fact concealed, the material fact that the SBA would contend that the Plaintiffs were ineligible for such Loans and/or for forgiveness thereof.

711. The concealment by the Defendants of the material facts as referenced in the two paragraphs immediately above was done with the intention that the Plaintiffs would nevertheless utilize the Loan Proceeds for the Permitted Uses, retain their staffs thereby, ensure, as a result thereof, that the Plaintiffs' employees would not be required to seek other forms of governmental financial assistance as a result of Pandemic-related closures, and otherwise abide by the requirements of the PPP.

712. At no time prior to the developments leading to the filing of this action did the Plaintiffs know, or have had the means of knowing, that the Defendants would seek to deny Loan forgiveness and for those Plaintiffs that obtained forgiveness of their Loans reverse such decisions and seek repayment of such Loan Proceeds.

713. As a result of the above, Plaintiffs detrimentally relied upon the actions, inactions, representations, and concealments of the Defendants by obtaining the Loan Proceeds, using the

portions to which they seek forgiveness of exclusively for the Permitted Uses, and otherwise abiding by the terms of the PPP.

714. For the reasons set forth above, Defendants should be estopped from denying Loan eligibility and Loan forgiveness of the Plaintiffs' PPP Loans at issue.

## COUNT XV

## ATTORNEYS' FEES AND COSTS

715. Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

716. For all of the reasons set forth above, the positions of the SBA in taking the actions as detailed herein were not substantially justified.

717. There are no special circumstances that make an award of fees and other expenses in favor of the Plaintiffs and against the Defendants unjust.

718. For the reasons set forth above, Plaintiffs are entitled to an award of attorneys' fees and costs against the Defendants pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, to 5 U.S.C.§ 504, and as otherwise permitted by law.

## COUNT XVI

## 15 U.S.C. § 634(B)(1) VIOLATES THE CONSTITUTION

719. Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

720. 15 U.S.C. § 634(b)(1) states that

In the performance of, and with respect to, the functions, powers, and duties vested in him by this chapter, the Administrator may—(1) sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; *but no attachment,*

179

*injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property*[.]

(emphasis added—the italicized portion is hereafter referred to as the "Injunction Provision").

721.    The United States Court of Appeals for the Fifth Circuit has held that this Injunction Provision operates as an absolute bar to the issuance of any injunction against the SBA.

722.    As applied by the United States Court of Appeals for the Fifth Circuit and the United States District Courts therein (collectively, the "Fifth Circuit"), the Injunction Provision is violative of the First and Fifth Amendment for numerous and various reasons including but not limited to:

a.    Courts in the Fifth Circuit have not been applying this evenhandedly; indeed, the Southern District of Texas did issue an injunction against the SBA in <u>D. Houston v. SBA</u>, 579 F. Supp. 3d 959, 970-71 (S.D. Tex. 2020);

b.    As noted by District Court Judges Adelman and Leitman in <u>Camelot Banquet Rooms, Inc. v. SBA</u>, 458 F. Supp. 3d 1044, 1052 (E.D. Wis. 2020) and <u>DV Diamond Club of Flint, LLC</u>, 459 F. Supp. 3d 943, 952-54 (E.D. Mich. 2020), as interpreted by the Fifth Circuit, SBA could adopt unconstitutional policies and continue to follow them even after a court declared them unconstitutional;

c.    It permits the SBA to act unconstitutionally and renders the courts powerless to stop the SBA;

d.    It permits the SBA to continue to engage in the unconstitutional and illegal conduct described herein indefinitely; and

e.    It prevents recourse against the SBA for the SBA's infringement of Plaintiff's First and Fifth Amendment rights as outlined herein because it prevents courts

from enjoining SBA's actions and Plaintiffs are prevented under Sovereign Immunity from obtaining damages from the SBA.

723.    As a direct and proximate result of the unconstitutional nature of the Injunction Provision, as referenced herein, Plaintiffs, as well as their owners and employees, the entertainers who perform on their premises and the customers who frequent their establishments, have suffered, and/or will suffer, and/or will continue to suffer irreparable injuries including but not limited to financial collapse, business ruination, and/or the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment.

724.    Because of the fundamental rights being infringed upon by Defendants as referenced herein, this Court has the authority to declare the rights and legal actions of the various parties and should do so here.

725.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity. Because of the same, because Plaintiffs have a reasonable likelihood of success on the merits in regard to the claims asserted herein, because Plaintiffs will suffer irreparable injury if the Court does not enjoin enforcement of the regulations and statutes as noted herein, particularly the Prurience Regulation and Incorporating Statute, because Defendants will not suffer any harm whatsoever by the entry of a preliminary injunction as requested herein, particularly because Plaintiffs do not seek to attach the SBA's assets or otherwise interfere with its internal operations, and because the balance of harms tilts in favor of Plaintiffs and against Defendants, this Court should enter a preliminary injunction enjoining the use of the Injunction Provision as an absolute bar to injunctions against the SBA, in order to protect Plaintiffs' fundamental rights at issue here.

## COUNT XVII

181

**JUDICIAL REVIEW OF THE MAY 14 ORDER AND UNDERLYING FLRD**

726.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

727.    Gold Club seeks judicial review pursuant to the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*, of any and all decisions, including the May 14 Order and underlying FLRD (the second FLRD regarding Gold Club's second draw PPP Loan), issued by SBA and OHA so reviewable on issues so reviewable.

728.    For the reasons set forth herein, Gold Club is entitled to a reversal of SBA's second FLRD regarding Gold Club's second draw PPP Loan and OHA's May 14 Order affirming that FLRD, and in their place, an order granting forgiveness of Gold Club's second draw PPP Loan in the amount of $1,993,233.75.

## COUNT XVIII

## INJUNCTIVE RELIEF

729.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

730.    A PPP Loan recipient's obligation to make payments on the Loan is deferred during OHA proceedings.

731.    "Borrowers can apply for forgiveness at any time up to five years form the date that SBA issued the SBA loan number," and "[i]f [PPP] borrowers do not apply for forgiveness within 10 months after the last day of the covered period, then PPP loan payments are no longer deferred, and borrowers will begin making loan repayments to their PPP lender." https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-loan-forgiveness (last visited Jul. 15, 2024).

732.    Because Gold Club no longer has a pending OHA appeal regarding its second draw PPP Loan, it is obligated to make and has begun making payments on this Loan to its Lending Bank.

733.    Because, some Plaintiffs' case, SBA has issued FLRDs and then withdrawn them after that Plaintiff timely appealed to that FLRD to the OHA, for example, Plaintiff SAW, and because those Plaintiffs did not apply for forgiveness of those PPP Loans within 10 months after the last day of the covered period of their loans, for example, Plaintiff SAW, those Plaintiffs, SAW included, are required to make and have been making repayments on their PPP Loans to their Lending Banks.

734.    Plaintiffs in the situation described in paragraph 733 are unaware of any mechanism to recoup the monies already repaid on those Loans to their Lending Banks if they are ultimately successful in this action and thereby entitled to forgiveness of the Loans at issue.

735.    If ultimately successful in this action, Gold Club will be entitled to forgiveness of $1,993,233.75 of its second draw PPP Loan; however, Gold Club is unaware of any mechanism to recoup the monies already repaid on this Loan to its Lending Bank.

736.    Gold Club and the Plaintiffs in the situation described in paragraph 733, therefore, do not have adequate remedies at law because, among other things, they cannot, so far as they are aware, recover those monies already repaid to their Lending Banks.

737.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of sovereign immunity and because, so far as they are aware, there is no mechanism to recoup the amount of monies paid back to the Lending Banks on a PPP Loan, which a court has subsequently determined should have been forgiven. Because of the unconstitutionality of the Prurience Regulation and its application to Gold

183

Club and those Plaintiffs in the situation described in paragraph 733 by Defendants, all as outlined herein; because Gold Club and these Plaintiffs will suffer irreparable injury if this Court does not enjoin Gold Club's and these Plaintiffs' obligation(s) to make payments on the PPP Loans at issue during the pendency of this matter; because Defendants will not suffer any harm whatsoever by the entry of the preliminary injunction requested herein; this Court should enter a preliminary injunction staying Gold Club's and the Plaintiffs in the situation described in paragraph 733's obligation(s) to make payments on the PPP Loans at issue during the pendency of this matter.

738.   Alternatively, the Court should order that Defendants set aside funding in the of Gold Club's and those Plaintiffs in the situation described in paragraph 733's requested PPP Loan forgiveness amount, which, for Gold Club is $1,993,233.75, during the pendency of this litigation so that, if Plaintiffs are ultimately successful, SBA may remit the difference between the amounts forgiven and what these Plaintiffs have already paid back on their Loans to their Lending Banks thereby making the Lending Banks whole and remit the remainder, representing the amounts these Plaintiffs have already paid back on their Loans, to the individual Plaintiffs affected, thereby making these Plaintiffs whole.

## **PRAYER FOR RELIEF**

For the reasons set forth herein, this Honorable Court should enter the following relief:

A.   Declare that the Defendants are applying the Prurience Regulation (13 C.F.R. § 120.110(p)) and Incorporating Statute (15 U.S.C. § 636(37)(A)(iv)(III)(aa)) in an unconstitutional and/or unlawful manner;

B.   Declare that the Prurience Regulation and Incorporating Statute are facially unconstitutional, and/or that the SBA's application of them here under the PPP is not a legitimate or lawful exercise of the SBA's or its Administrator's authority, and are otherwise invalid under the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* and applicable law;

184

C.    Declare that 15 U.S.C. § 634(b)(1) as applied by the Fifth Circuit is unconstitutional;

D.    Enter both a preliminary and permanent injunction precluding 15 U.S.C. § 634(b)(1) from operating as a complete bar to injunctions against the SBA;

E.    Enter a preliminary injunction precluding the Defendants, as well as their employees, agents, and representatives, including the Lending Banks, from requiring Plaintiffs to make payments on the PPP Loans until such a time as this Court is able to adjudicate the merits of these claims;

F.    As an alternative to the preceding paragraph, Order Defendants to set aside guaranteed funding in the amount to be demonstrated at the preliminary injunction hearing, but which shall not be less than $1,993,233.75, during the pendency of this litigation;

G.    Enter both a preliminary and permanent injunction precluding the Defendants, as well as their employees, agents, and representatives, including the Lending Banks, from using or applying the Prurience Regulation and/or the Incorporating Statute as a means of denying eligibility and/or forgiveness of the Plaintiffs' PPP Loans at issue, or to the PPP loans of any businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs;

H.    Declare that the Defendants are applying the Affiliation Exception Provisions (15 U.S.C. § 636(a)(36)(D)(iii)(I), 15 U.S.C. § 636(a)(36)(D)(iv)(I), and 15 U.S.C. § 636(a)(37)(D) and (E)) in an unconstitutional and/or unlawful manner;

I.    Declare that all Plaintiffs are NAICS code 72 businesses for all purposes under the PPP and that, as a result thereof, Plaintiffs are therefore exempt from the Affiliation Rules under the PPP;

185

J.      Enter both a preliminary and permanent injunction precluding the Defendants, as well as their employees, agents, and representatives, including the Lending Banks, from determining that the Plaintiffs, or any other businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs that are licensed bars, taverns, and/or nightclubs, are anything other than NAICS code 72 businesses for PPP loan purposes and for application of the Affiliation Exception Provisions to the Affiliation Rules;

K.      Declare that the Defendants are applying the Affiliation Rules (13 C.F.R. § 121.101, 13 C.F.R. § 121.103; 13 C.F.R. § 121.201, 13 C.F.R. § 121.301) in an unconstitutional and/or unlawful manner;

L.      Declare that the Affiliation Rules are facially unconstitutional, and/or that the SBA's application of them here under the PPP is not a legitimate or lawful exercise of the SBA's or its Administrator's authority, and are otherwise invalid under the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* and applicable law;

M.      Enter both a preliminary and permanent injunction precluding the Defendants, as well as their employees, agents, and representatives, including the Lending Banks, from using or applying the Affiliation Rules to Plaintiffs' PPP Loans as a means of denying eligibility and/or forgiveness of the Plaintiffs' PPP Loans at issue, or to the PPP loans of any businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs;

N.      Order the Defendants, as well as their employees, agents, and representatives, including the Lending Banks, to grant Loan forgiveness to those Plaintiffs, or to those businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs, that have been denied forgiveness of any of their PPP Loans at issue, or that have been denied Loan forgiveness, that have filed appeals in the OHA, and that have then had the SBA withdraw the FLRD upon

which the administrative appeal was based for further consideration of the affected Plaintiffs' Loan forgiveness application;

O.     Declare that OHA appeals for these Plaintiffs would be futile given the text of the Special OHA Rules and the claims being asserted by these Plaintiffs;

P.     Enter both a preliminary and permanent injunction precluding the Defendants, as well as their employees, agents, and representatives, including the Lending Banks, from requiring the Plaintiffs, or any businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs, to have to undergo OHA appeals as a procedural prerequisite to being able to appear before this Honorable Court in order to have their constitutional and other legal claims set forth herein fully adjudicated;

Q.     Declare that the Special OHA Rules (13 C.F.R., Ch. I, Pt. 134, Subpart L), as applied to PPP loans, denies due process and therefore violates the First and Fifth Amendments to the United States Constitution, and/or that the SBA's application of them here under the PPP is not a legitimate or lawful exercise of the SBA's or its Administrator's authority, and/or are otherwise invalid under the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* and applicable law;

R.     Enter both a preliminary and permanent injunction precluding the Defendants, as well as their employees, agents, and representatives, from applying the Special OHA Rules against the Plaintiffs, or against any businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs, in regard to any of their legal challenges to the SBA's actions concerning their PPP Loans;

S.     Declare that the Defendants should be estopped from denying loan eligibility and forgiveness of the Plaintiffs' PPP Loans at issue, and of the PPP loans of any businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs;

187

T.    Enter both a preliminary and permanent injunction estopping the Defendants, as well as their employees, agents, and representatives, including the Lending Banks, from denying Plaintiffs eligibility and forgiveness of their PPP Loans at issue, or to the PPP loans of any businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs;

U.    Order Defendants, as well as their employees, agents, and representatives, to notify, as expeditiously as possible, all SBA lending banks to immediately discontinue using or applying the Prurience Regulation and the Incorporating Statute for any matters concerning PPP loans;

V.    Order Defendants, as well as their employees, agents, and representatives, to notify, as expeditiously as possible, the OHA to immediately discontinue using or applying the Special OHA Rules in regarding appeals concerning PPP loans;

W.    Order the Defendants, as well as their employees, agents, and representatives, including the Lending Banks, to immediately desist from conducting any, or from initiating any further, audits, "Post Payment Reviews," or other similar investigations of any of the Plaintiffs' PPP Loans at issue or any PPP Loans obtained by any businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs;

X.    Order the Defendants to immediately issue to the Lending Banks correspondence withdrawing all threats issued to such banks related to the Loans issued to the Plaintiffs, or issued to any businesses that the SBA asserts, believes, or claims to be "affiliated" with any of the Plaintiffs, including but not limited to the threat to refer such Lending Banks to the Office of Credit Management and/or to transfer the matter to the office of Inspector General;

Y.    Enter an award of attorneys' fees and costs against the Defendants and in favor of the Plaintiffs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, to 5 U.S.C.§ 504, and as otherwise permitted; and

188

Z.       Enter such other and further relief as this Court may deem to be just and proper in these circumstances.

Dated: July 15, 2024                                  Respectfully Submitted,

**SHAFER & ASSOCIATES, P.C.**


*/s/       Matthew J. Hoffer*
Matthew J. Hoffer (MI P70495)
Bradley J. Shafer (MI P36604)
Zachary M. Youngsma (MI P84148)
**SHAFER & ASSOCIATES, P.C.**
3800 Capital City Blvd., Ste. 2
Lansing, Michigan 48906
T: 517-886-6560
F: 517-886-6565
E: Matt@BradShaferLaw.com
E: Brad@BradShaferLaw.com
E: Zack@BradShaferLaw.com

*Attorneys for All Plaintiffs*

**DEMAND FOR JURY TRIAL**

Plaintiffs, by counsel and pursuant to Fed. R. Civ. P. 38, hereby demand a trial by jury of any issues so triable.

Dated: July 15, 2024                               Respectfully Submitted,

                                                   **SHAFER & ASSOCIATES, P.C.**


                                                   */s/      Matthew J. Hoffer*
                                                   Matthew J. Hoffer (MI P70495)
                                                   Bradley J. Shafer (MI P36604)
                                                   Zachary M. Youngsma (MI P84148)
                                                   **SHAFER & ASSOCIATES, P.C.**
                                                   3800 Capital City Blvd., Ste. 2
                                                   Lansing, Michigan 48906
                                                   T: 517-886-6560
                                                   F: 517-886-6565
                                                   E: Matt@BradShaferLaw.com
                                                   E: Brad@BradShaferLaw.com
                                                   E: Zack@BradShaferLaw.com

                                                   *Attorneys for All Plaintiffs*

## VERIFICATION OF COMPLAINT AS TO:
### Dallas Food and Beverage, LLC; 2345 Meacham, LLC; and 11000 Reeder, LLC

1.      I, Curtis Wise, am the Managing Member of Dallas Food and Beverage, LLC; 2345 Meacham, LLC; and 11000 Reeder, LLC.

2.      I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.      I have reviewed the foregoing *PLAINTIFFS' VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; ATTORNEY'S FEES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT; AND JUDICIAL REVIEW OF FINAL AGENCY ACTION* (the "FAC") in its entirety.

4.      The factual statements in the FAC, as they pertain to Dallas Food and Beverage, LLC; 2345 Meacham, LLC; and 11000 Reeder, LLC, are true and accurate to the best of my information, knowledge and belief.

5.      Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: 7/15/2024

DocuSigned by:

*Curtis Wise*

662203E74C13492...

By:      Curtis Wise

**VERIFICATION OF COMPLAINT AS TO:**
**Deja Vu Showgirls of Las Vegas, LLC and Stockton Enterprises, LLC**

1.    I, Donald Krontz, am the Managing Member of Deja Vu Showgirls of Las Vegas, LLC and Stockton Enterprises, LLC.

2.    I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.    I have reviewed the foregoing *PLAINTIFFS' VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; ATTORNEY'S FEES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT; AND JUDICIAL REVIEW OF FINAL AGENCY ACTION* (the "FAC") in its entirety.

4.    The factual statements in the FAC, as they pertain to Deja Vu Showgirls of Las Vegas, LLC and Stockton Enterprises, LLC, are true and accurate to the best of my information, knowledge and belief.

5.    Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: 7/15/2024

By:    Donald Krontz

**VERIFICATION OF COMPLAINT AS TO:**
**Pole Position at Tacoma, LLC**

1.    I, Eric Forbes, am the Managing Member of Pole Position at Tacoma, LLC.

2.    I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.    I have reviewed the foregoing *PLAINTIFFS' VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; ATTORNEY'S FEES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT; AND JUDICIAL REVIEW OF FINAL AGENCY ACTION* (the "FAC") in its entirety.

4.    The factual statements in the FAC, as they pertain to Pole Position at Tacoma, LLC, are true and accurate to the best of my information, knowledge and belief.

5.    Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: 7/15/2024

DocuSigned by:

*Eric Forbes*

A7F1C0B2480242F...

By:    Eric Forbes

## VERIFICATION OF COMPLAINT AS TO:
### Smithville Bistro, LLC and Cats Meow of Vegas, LLC

1.     I, Harry Mohney, am the Managing Member of Smithville Bistro, LLC and Cats Meow of Vegas, LLC.

2.     I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.     I have reviewed the foregoing *PLAINTIFFS' VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; ATTORNEY'S FEES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT; AND JUDICIAL REVIEW OF FINAL AGENCY ACTION* (the "FAC") in its entirety.

4.     The factual statements in the FAC, as they pertain to Smithville Bistro, LLC and Cats Meow of Vegas, LLC, are true and accurate to the best of my information, knowledge and belief.

5.     Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: 7/15/2024

DocuSigned by:

*Harry V. Mohney*

B192E6CD0991499...

By:     Harry Mohney

**VERIFICATION OF COMPLAINT AS TO:**
**Cats 701 Bourbon, LLC; Jamme Holdings, LLC; and Las Vegas Bistro, LLC**

1.      I, Jason Mohney, am the Managing Member of Cats 701 Bourbon, LLC; Jamme Holdings, LLC; and Las Vegas Bistro, LLC.

2.      I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.      I have reviewed the foregoing *PLAINTIFFS' VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; ATTORNEY'S FEES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT; AND JUDICIAL REVIEW OF FINAL AGENCY ACTION* (the "FAC") in its entirety.

4.      The factual statements in the FAC, as they pertain to Cats 701 Bourbon, LLC; Jamme Holdings, LLC; and Las Vegas Bistro, LLC, are true and accurate to the best of my information, knowledge and belief.

5.      Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: 7/15/2024

DocuSigned by:

*Jason Mohney*

7299EF4847BC408...

By:    Jason Mohney

Docusign Envelope ID: 813AD9A0-5D33-4F91-A9BC-8A72DE34B8CA

## VERIFICATION OF COMPLAINT AS TO:
### Gold Club – S.F., LLC and S.A.W. Entertainment Limited

1.  I, Joseph Carouba, am the Managing Member of Gold Club – S.F., LLC and President of S.A.W. Entertainment Limited.

2.  I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.  I have reviewed the foregoing *PLAINTIFFS' VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; ATTORNEY'S FEES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT; AND JUDICIAL REVIEW OF FINAL AGENCY ACTION* (the "FAC") in its entirety.

4.  The factual statements in the FAC, as they pertain to Gold Club – S.F., LLC and S.A.W. Entertainment Limited, are true and accurate to the best of my information, knowledge and belief.

5.  Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: 7/15/2024

DocuSigned by:

*Joseph H. Carouba*

27AE321940D249E...

By:     Joseph Carouba

Docusign Envelope ID: 96911530-6410-4D8C-9352-33791D8E9BFE

**VERIFICATION OF COMPLAINT AS TO:**
**Office Minneapolis, LLC and 90's Minneapolis, LLC**

1.      I, Peter Hafiz, am the Managing Member of Office Minneapolis, LLC and 90's Minneapolis, LLC.

2.      I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.      I have reviewed the foregoing *PLAINTIFFS' VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; ATTORNEY'S FEES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT; AND JUDICIAL REVIEW OF FINAL AGENCY ACTION* (the "FAC") in its entirety.

4.      The factual statements in the FAC, as they pertain to Office Minneapolis, LLC and 90's Minneapolis, LLC, are true and accurate to the best of my information, knowledge and belief.

5.      Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: 7/15/2024

By:      Peter Hafiz